**No. 2024-2296**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

EXAFER LTD, *Plaintiff-Appellant*

v.

MICROSOFT CORPORATION, *Defendant-Appellee,*

Appeal from the United States District Court for the Western District of Texas
No. 1:20-CV-131-RP, Judge Robert Pitman

# CORRECTED NON-CONFIDENTIAL OPENING BRIEF OF PLAINTIFF-APPELLANT

January 14, 2025

Ronald M. Daignault*
Scott R. Samay*
Jason S. Charkow*
Elizabeth Bernard*
DAIGNAULT IYER LLP
8229 Boone Boulevard, Ste 450
Vienna, VA 22182
rdaignault@daignaultiyer.com
ssamay@daignaultiyer.com
jcharkow@daignaultiyer.com
ebernard@daigaultiyer.com
(917) 838-9795
**Not admitted in Virginia*

*Counsel for Plaintiff-Appellant Exafer Ltd.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-2296

**Short Case Caption** Exafer Ltd. v. Microsoft Corp.

**Filing Party/Entity** Exafer Ltd.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/13/2024

Signature: /s/ Ronald M. Daignault

Name: Ronald M. Daignault

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**March 2023**

| **1. Represented Entities.**<br>Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.**<br>Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.**<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Exafer Ltd. | None | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Daignault Iyer LLP<br>Chandran B. Iyer | Daignault Iyer LLP<br>Shailendra Maheshwari | Daignault Iyer LLP<br>Oded Burger |
| Daignault Iyer LLP<br>Hoda Rifai-Bashjawish | Daignault Iyer LLP<br>Stephanie R. Mandir | Daignault Iyer LLP<br>Austin Ciuffo |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| None | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ ii

CONFIDENTIAL MATERIAL OMITTED ........ iv

TABLE OF AUTHORITIES ........ v

TABLE OF ABBREVIATIONS ........ xi

STATEMENT OF RELATED CASES ........ xii

JURISDICTIONAL STATEMENT ........ xii

INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. Background of the Patented and Accused Technology ........ 5

1. Computer Networks and Virtual Machines ........ 5

2. Litigation Overview ........ 8

3. The Patents-in-Suit ........ 9

4. Microsoft's Azure Platform ........ 10

B. At the Time of the Hypothetical Negotiation, Microsoft's Valuation of the Infringing Technology Related to Increasing VMs. ........ 12

C. Exafer's Expert Relied on How Microsoft Itself Valued the Infringing Technology at the Time of the Hypothetical Negotiation ........ 19

D. The District Court Granted Microsoft's *Daubert* Motion Regarding Mr. Blok's Testimony and Denied Exafer's Request for Supplemental Discovery ........ 23

E. The District Court Granted Microsoft's Motion for Summary Judgment Based on Absence of Remedy. ........ 25

SUMMARY OF THE ARGUMENT ....................................................................29

STANDARD OF REVIEW ..........................................................................31

ARGUMENT ..........................................................................................33

A. The District Court Erred in Excluding Mr. Blok's Expert Opinions on Damages. ..........................................................................33

1. The District Court Erred in Excluding Mr. Blok's Reasonable Royalty Analysis. ..........................................................34

a. Mr. Blok Properly Applied the Hypothetical Negotiation Methodology. ..........................................................34

b. Mr. Blok's Use of VMs in the Reasonable Royalty Analysis was Appropriate. ..........................................37

*2.* The District Court Abused Its Discretion in Excluding Mr. Blok's Opinions Entirely. ..........................................................44

B. The District Court Abused its Discretion in Refusing to Allow Exafer to Supplement with a Cost-Savings Theory. ..........................................46

C. The District Court Erred in Granting Summary Judgment Based on Absence of Remedy..........................................................................50

1. Section 284 Does Not Permit Summary Judgment Based on an Alleged Lack of Evidence of a Reasonable Royalty. ...............50

2. The District Court Erroneously Dismissed This Case Based on an Alleged Lack of Evidence of a Reasonable Royalty. ..........56

CONCLUSION ......................................................................................63

**CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rule 25.1(e) and the stipulated Protective Order (AppxI-XXXVI), two versions of this brief are being filed with the Court: a confidential version that notes the material marked confidential by Microsoft in the district court proceedings, and a non-confidential version containing appropriate redactions. In the non-confidential version of this brief, pages 17, 18, 20, 21, 22, 27, 59, and 62 omit material describing Microsoft's Internal Confidential Business Information.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................................................55

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
738 F.3d 1350 (Fed. Cir. 2013) ....................................................32

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ....................................................*passim*

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014) ....................................................36, 41

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*,
28 F.4th 1247 (Fed. Cir. 2022) ....................................................32

*Blue Spike, LLC v. Huawei Techs. Co.*,
2016 U.S. Dist. LEXIS 199913 (E.D. Tex. Oct. 14, 2016) ....................................................46

*Brumfield v. IBG LLC*,
97 F.4th 854 (Fed. Cir. 2024) ....................................................40, 41, 43

*In re C.F. Bean L.L.C.*,
841 F.3d 365 (5th Cir. 2016) ....................................................49

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015) ....................................................35

*Certain Underwriters at Lloyd's v. Axon Pressure Prods.*,
951 F.3d 248 (5th Cir. 2020) ....................................................45

*Collins v. Wayne Corp*,
621 F.2d 777 (5th Cir. 1980) ....................................................57, 58

*Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys.*,
809 F.3d 1295 (Fed. Cir. 2015) ....................................................35

*Curtis v. M&S Petroleum, Inc.*,
174 F.3d 661 (5th Cir. 1999) ....................61

*DMF Inc. v. AMP Plus, Inc.*,
2024 U.S. Dist. LEXIS 134652 (C.D. Cal. July 29, 2024)....................54

*Dow Chem. Co. v. Mee Indus., Inc.*,
341 F.3d 1370 (Fed. Cir. 2003) ....................50, 51, 52, 56

*EEOC v. Gen. Dynamics Corp.*,
999 F.2d 113 (5th Cir. 1993) ....................48, 49

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
2017 U.S. Dist. LEXIS 94495 (E.D. Tex. Jun. 20, 2017) ....................54, 58

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
909 F.3d 398 (Fed. Cir. 2018) ....................*passim*

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012) ....................47

*Ergo Sci., Inc. v. Martin*,
73 F.3d 595 (5th Cir. 1996) ....................63

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ....................38

*Fox v. Taylor Diving & Salvage Co.*,
694 F.2d 1349 (5th Cir. 1983) ....................58

*Fractus, S.A. v. AT&T Mobility LLC*,
2019 U.S. Dist. LEXIS 169610 (E.D. Tex. Sept. 30, 2019)....................58

*GoDaddy.com LLC v. RPost Commc'ns Ltd.*,
2016 U.S. Dist. LEXIS 61670 (D. Ariz. May 10, 2016) ....................46

*Graco Children's Prods. Inc. v. Kids II, Inc.*,
2018 U.S. Dist. LEXIS 49865 (N.D. Ga. Mar. 22, 2018) ....................54

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ....................36, 37, 42

*Hollister Inc. v. Zassi Holdings, Inc.*,
752 F. App'x 888 (11th Cir. 2018) ....................54

*Holmberg v. Stealth Cam, LLC*,
2015 U.S. Dist. LEXIS 120527 (D. Minn. Sept. 10, 2015)....................54

*Huss v. Gayden*,
571 F.3d 442 (5th Cir. 2009) ....................32

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ....................41, 43

*Info-Hold, Inc. v. Muzak LLC*,
783 F.3d 1365 (Fed. Cir. 2015) ....................51, 54, 61, 62

*Insight Equity v. Transitions Optical, Inc.*,
2016 U.S. Dist. LEXIS 164742 (D. Del. Nov. 30, 2016)....................49

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) ....................35

*IPA Techs., Inc. v. Microsoft Corp.*,
2024 U.S. Dist. LEXIS 80212 (D. Del. May 2, 2024) ....................40

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ....................34

*Lee v. Offshore Logistical and Transp., L.L.C.*,
859 F.3d 353 (5th Cir. 2017) ....................59, 60

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
895 F.2d 1403 (Fed. Cir. 1990) ....................51, 55

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................34, 35, 44

*Maurer v. Indep. Town*,
870 F.3d 380 (5th Cir. 2017) ....................33

*Maxell, Ltd. v. Apple Inc.*,
2021 U.S. Dist. LEXIS 136283 (E.D. Tex. Feb. 26, 2021)....................55

*Micro Chem., Inc. v. Lextron, Inc.*,
317 F.3d 1387 (Fed. Cir. 2003) ....................35

*MicroSource, LLC v. Eco World Grp.*,
587 F. Supp. 3d 770 (N.D. Iowa 2022) ....................54

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
2019 U.S. Dist. LEXIS 180948 (N.D. Cal. Oct. 17, 2019) ....................54

*Molins PLC v. Quigg*,
837 F.2d 1064 (Fed. Cir. 1988) ....................32

*Mondis Tech. Ltd. v. LG Elecs., Inc.*,
2020 U.S. Dist. LEXIS 70561 (D.N.J. Apr. 22, 2020)....................54

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
55 F.4th 1354 (Fed. Cir. 2022) ....................33

*Nat'l Prods., Inc. v. Arkon Res., Inc.*,
2019 U.S. Dist. LEXIS 238979 (C.D. Cal. Mar. 25, 2019)....................46

*New Hampshire v. Maine*,
532 U.S. 742 (2001)....................63

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ....................32, 45

*Pierce v. Dep't of U.S. Air Force*,
512 F.3d 184 (5th Cir. 2007) ....................33

*Prism Techs. LLC v. Sprint Spectrum L.P*
849 F.3d 1360 (Fed. Cir. 2017) ....................42

*Promega Corp. v. Life Techs. Corp*,
875 F.3d 651 (Fed. Cir. 2017) ....................53

*Redhawk Holdings Corp. v. Schreiber*,
836 F. App'x 232 (5th Cir. 2020) ....................57

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
561 F. App'x. 909 (Fed. Cir. 2014) ....................47, 48, 55

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
2023 U.S. Dist. LEXIS 167166 (D. Del. Sept. 20, 2023)....................................54

*Rite-Hite Corp. v. Kelly Co. Inc.*,
56 F.3d 1538 (Fed. Cir. 1998) ..........................................................................41

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*,
330 F. Supp. 3d 574 (D. Mass. 2018)...................................................................54

*Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*,
912 F.3d 805 (5th Cir. 2019) ..............................................................................48

*Squyres v. Heico Cos., LLC*,
782 F.3d 224 (5th Cir. 2015) .........................................................................32, 43

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) .....................................................................53, 54

*Thorne Rsch., Inc. v. Xymogen*,
2018 U.S. Dist. LEXIS 33272 (D. Utah Feb. 28, 2018).......................................54

*Triple Tee Golf, Inc. v. Nike, Inc.*,
485 F.3d 253 (5th Cir. 2007) ..............................................................................33

*Trs. in Bankr. of N. Am. Rubber Thread Co. v. U.S.*,
593 F.3d 1346 (Fed. Cir. 2010) ..........................................................................63

*TWM Mfg. Co., Inc. v. Dura Corp.*,
789 F. 2d 895 (Fed. Cir. 1986) ...........................................................................34

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .....................................................................36, 49

*United States v. Nelson*,
242 F. App'x 164 (5th Cir. 2007) .......................................................................57

*Versata Software, Inc. v. SAP Am., Inc.*,
717 F.3d 1255 (Fed. Cir. 2013) .....................................................................56, 57

*Via Vadis, LLC v. Amazon.Com, Inc.*,
2022 U.S. Dist. LEXIS 93577 (W.D. Tex. May 24, 2022) .................................46

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ........................................................................33

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006) ........................................................................32

**Statutes**

35 U.S.C. §284 ........................................................................*passim*

**Other Authorities**

FED. R. CIV. P. 32(a)(1) ........................................................................57

FED. R. CIV. P. 56(c) ........................................................................59, 60

FED. R. CIV. P. 56(c)(2) ........................................................................60

FED. R. EVID. 702 ........................................................................*passim*

FED. R. EVID. 801(d)(2)(A) ........................................................................60, 62

FED. R. EVID. 801(d)(2)(B) ........................................................................58, 59

FED. R. EVID. 802(d)(2)(C) ........................................................................57

FED. R. EVID. 804(b)(1) ........................................................................57

FED. R. EVID. 804(b)(6) ........................................................................57

## TABLE OF ABBREVIATIONS

| Term | Description |
|---|---|
| ’733 patent | U.S. Patent No. 8,325,733 |
| ’335 patent | U.S. Patent No. 8,971,335 |
| CPU | Central Processing Unit |
| COGS | Costs of Goods Sold |
| Exafer | Plaintiff-Appellant Exafer Ltd. |
| Microsoft | Defendant-Appellee Microsoft Corporation |
| NIC | Network Interface Card |
| SOTC | Statement of the Case |
| VFP | Virtual Filtering Platform |
| VM | Virtual Machine |

## STATEMENT OF RELATED CASES

Exafer's counsel is not aware of any other case(s) pending in this or any other court that will directly affect or be affected by the Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. §1331 and §1338(a) because this action arose under the Patent Act of 35 U.S.C. §101 et seq. *See* Appx0106-0147, Appx0453-0505. The district court entered final judgment in favor of Microsoft on August 30, 2024. Appx0036. Plaintiff-Appellant Exafer timely filed a notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A) on September 3, 2024. Appx4430-4431. This Court has jurisdiction under 28 U.S.C. §1295(a).

## INTRODUCTION

Exafer is a small start-up company founded more than fifteen years ago to commercialize the innovative networking inventions claimed in the patents-in-suit. At the time of the claimed inventions, there were various drawbacks with network architecture and virtualization with respect to the way data traffic was processed and transmitted through networks. The patents-in-suit relate to improving how data is transmitted through a network. Only later would this type of technology become known as "Software Defined Networking." And the technology proved to be very beneficial to the modern cloud-computing industry. But as a start-up in a market with large players, Exafer could not remain competitive. Exafer filed this case to enforce its patent rights against one of those players, Microsoft, and its infringing use of Exafer's inventions in Microsoft's Azure cloud network.

The district court, however, never addressed Exafer's infringement claims before it dismissed this case with prejudice. Instead, this is an appeal from a series of district court rulings related to reasonable royalty damages, starting with the erroneous grant of Microsoft's *Daubert* motion excluding Exafer's expert damages testimony in its *entirety* and culminating in the legally baseless summary judgment in favor of Microsoft. The district court's summary judgment decision was not based upon a finding of non-infringement or invalidity, but rather on a finding that Exafer allegedly *lacked evidence* of a reasonable royalty after the district court

excluded its expert. The district court's erroneous orders, each flawed and more prejudicial than the last, led to an extreme and unjust result that is not conceivable in light of 35 U.S.C. §284's mandate that a district court *shall* award "damages adequate to compensate for the infringement, but in *no event less* than a reasonable royalty for the use made of the invention."

*The District Court's Erroneous Daubert Order*. Exafer's damages theory was based on how Microsoft (*pre-litigation*) valued its infringing use of the accused VFP Fastpath and SmartNIC technology *at the time of the hypothetical negotiation*. Microsoft does not charge separately for this infringing technology, but its internal business prognostications repeatedly valued the technology by the increase in revenue-generating virtual machines ("VMs") in Azure resulting from its use of the infringing technology. Exafer's expert relied upon this contemporaneous business analysis when calculating damages. The district court rejected Exafer's damages theory because it believed that theory was improper as a matter of law. In doing so, the district court set a categorical bar on the consideration of *any* non-accused activities in a reasonable royalty analysis, including the infringer's *own business valuation* of the technology at the time of the hypothetical negotiation. The district court precluded *all* of Exafer's damages expert testimony, without any explanation for such a wholesale exclusion.

*The District Court's Denial of Supplemental Damages Discovery*. After

inexplicably leaving Exafer without *any* damages expert opinions, the district court denied Exafer's request for supplemental damages discovery to address the district court's (flawed) view of the law. The district court refused to provide Exafer a second chance to present a damages theory in a supplemental expert report. In doing so, the district court failed to consider the importance of this evidence under §284 and the impact on Exafer's case of denying any additional damages discovery.

*The District Court's Erroneous Grant of Summary Judgment*. Indeed, Microsoft sought to capitalize on the total exclusion of Exafer's damages expert and filed for summary judgment based on an alleged absence of remedy. Microsoft did not argue or provide any evidence showing that Exafer's patented inventions and its use of those inventions had zero value, or that a hypothetical negotiation would result in a zero royalty (as required by *Apple v. Motorola*). Microsoft instead argued that Exafer lacked non-speculative evidence on the amount of a reasonable royalty for its infringement. Though severely limited in its opposition due to the wholesale exclusion of its damages expert, Exafer presented evidence of a non-zero royalty, including evidence from Microsoft's own internal documents, witnesses, and experts. The district court rejected this evidence (which raised disputed issues of fact), and granted summary judgment, even though there was *no* evidence supporting a *zero royalty* and the record evidence could be used to

determine a non-zero royalty.

A single *Daubert* motion excluding a damages expert should not leave a patentee with *no* damages and *no* opportunity to prove liability (i.e., zero royalty), while an infringer like Microsoft skates free. Sustaining such a rule would cut-off a patentee's ability to defend its constitutionally granted exclusive patent rights and undermine §284 clear mandate, which entitles a patentee to *at least* a reasonable royalty for use of its inventions. The district court's erroneous orders should be reversed, and this case remanded for trial.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in a) determining that the reasonable royalty opinions of Exafer's damages expert (Mr. Justin Blok), which were predicated on uncontested record evidence of how Microsoft valued its own use of the infringing technology at the time of the hypothetical negotiation, were unreliable and inadmissible; and b) precluding Mr. Blok's reasonable royalty opinions in their *entirety* without identifying any basis for doing so.

2. Whether the district court abused its discretion a) in denying Exafer's motion for supplemental expert reports (and related damages discovery) to present an alternative damages theory to the jury following exclusion of its damages expert opinions in their entirety; and b) by failing to consider the importance of this evidence under 35 U.S.C. §284 and to Exafer's case.

3. Whether the district court erred in granting summary judgment a) based on an alleged lack of evidence that a jury could use to arrive at a non-speculative reasonable royalty; and b) giving no consideration to the record evidence demonstrating the benefits Microsoft receives from its use of the patented inventions and admissible evidence of a reasonable royalty from Microsoft's own documents, fact witnesses, and expert.

## STATEMENT OF THE CASE

### A. Background of the Patented and Accused Technology

#### 1. Computer Networks and Virtual Machines

Computers (desktops, laptops) can be connected together by a network using physical devices called switches and routers. Appx0866-0869(¶¶34-42).




Switching involves moving data between devices in the same local area network ("LAN"), while routing involves moving data between different networks. Appx0874-0876(¶¶59-61). Computers and servers often use a physical device called a network interface card ("NIC") to connect to a network. Appx0885-0886(¶86).




Data that is transmitted in a network is broken up and transported in units called "frames." Appx0869-0871(¶¶43-50). A frame includes a header and a payload. Appx0870(¶47).[1] The payload includes the actual data being transmitted, and the header includes the source and destination addresses for the data. *Id*. The diagram below provides additional details about a basic frame structure:




Appx0870(¶46). Data communications work similar to the postal system. A frame is like an envelope; it has a source address and a destination address. One can think of the data inside the frame as a letter in an envelope. Just like the post office determines how to route an envelope based on addresses, a switch determines how a frame should be handled based on, e.g., address(es) in the frame.

[1] The terms "packet" and "frame" are used interchangeably. Appx0869(¶43).

Appx0874(¶59).

Similar to how physical computers can be connected through physical devices, there are also "virtual" computers/machines ("VMs") that can be connected together by a virtual network using virtual switches. Appx0867(¶35). A VM acts just like a physical computer but exists only in code on servers. Appx0884-0886(¶¶82-89). Prior to virtualization, each individual operating system required its own physical server, but today, multiple operating systems now can be run on a single physical server (known as a host). Appx0884-0885(¶¶82-83).

**Traditional and Virtual Architecture**




Using a virtualization layer of software, a single physical server can also host multiple VMs. *Id*. Similar to a physical computer, each VM has its own set of virtualized hardware (HW), operating system (OS) and application (App). *Id*. Virtual networks also include virtual switches and virtual NICs, which enable VMs to communicate with each other and establish connections between networks.

Appx0885-0886(¶¶85-89).




The allegedly infringing technology in this case relates to virtual switches and associated network elements.

**2. Litigation Overview**

In December 2019, Exafer filed this litigation against Microsoft and asserted claims for patent infringement of the ’733 patent and ’335 patent (the “patents-in-suit”). Appx0106-0147. Exafer subsequently filed an Amended Complaint. Appx0453-0505. Exafer accused Microsoft’s “Azure Platform” of infringement, defined to include “(1) the Microsoft Azure cloud computing platform, (2) the hardware and software systems and components of the Microsoft Azure cloud computing platform, and (3) the numerous cloud-based features, products, services, and systems that are dependent upon or that leverage the Microsoft Azure cloud computing platform.” Appx0455(¶10), Appx0484(¶137), Appx0495(¶160).

### 3. The Patents-in-Suit

The patents-in-suit are generally directed to improvements in network efficiency by optimizing the forwarding and processing of network data flows. Appx0897(¶117).

The ’733 patent is directed to a “Layer 2 Manipulator and Forwarder” (a type of switch) and describes a system and method for forwarding frames of a flow while improving network utilization and reducing latency. Appx0060(Abstract), Appx0901-0905(¶¶190-200).[2] Prior to the ’733 patent, network switches were not making intelligent decisions on how to best forward frames on a per flow basis. Appx0895(¶109). The ’733 patent provides for a flow forwarding plan (referred to as “rules”) for transmitting frames through a network. *See* Appx0902(¶193). That plan can be determined, e.g., at the arrival of the first few frames of a flow. *Id*. Once the plan is determined, all subsequent frames in the flow can be handled the same way as the first frame of the flow. *Id*. The benefits of the ’733 patent include maximizing use of server and network resources and more efficient functioning of networks, resulting in reduced infrastructure costs for the network operator. Appx0895(¶110).

The ’335 patent is directed to a system and method for creating an

[2] A flow is a sequence of related frames. Appx0069(1:39-41).

"optimized flow path" and describes optimizing the path of data traffic from a source to a destination in virtual networks. Appx0077(Abstract), Appx0093(1:16-19), Appx0905-0908(¶¶203-208). This optimization is accomplished by using a new type of network component, which the patent refers to as a "flow path optimizer and creator" (FPOC). Appx0905(¶203). The benefits of the '335 patent include bypassing and freeing up equipment, as well as reducing latency and achieving more transactions. Appx0896(¶112). This offers the benefit of infrastructure cost savings to the network operators. *Id*.

#### 4. Microsoft's Azure Platform

This case relates to technology used in Microsoft Azure—a cloud computing service. Appx0828, Appx1836-1840, Appx0913-0946(¶¶228-258). Microsoft offers its cloud services as software as a service (SaaS), platform as a service (PaaS), and infrastructure as a service (IaaS). Appx0829, Appx1881-1884. IaaS customers are provided with a menu of "Compute," "Storage," and "Networking" products/services from which they build custom virtual networks. Appx0829, Appx1881-1884, Appx1851-1852, Appx1854-1855, Appx1857-1858.




The "Networking" and "Compute" services do not exist in isolation from each other but, according to Microsoft, "are collaborative and interrelated."

Appx0829.

Microsoft customers can purchase VMs (a "Compute" service), priced by the hour, with different capabilities, memory, and storage to build a virtual network hosted on the Azure cloud. *See* Appx1851-1852, Appx0829. An Azure virtual network ("VNet") is a network or environment that can be used to connect and run VMs and applications in the cloud. Appx1854-1855, Appx1476(279:14-280:5). In Azure, virtual networking is free of charge. Appx1842-1849, Appx1889-1891.[3]

The VMs (shown below in blue) reside on Microsoft Azure servers. Appx0916-0919(¶¶231-233).




As shown above, Microsoft servers also have virtual switches (vSwitch, or

[3] VNet Peering, a service that links two virtual networks, and enables a customer to route traffic between them, carries a charge. Appx1842-1849. Network appliances such as VPN Gateway and Application Gateway that are run inside a virtual network are also charged. *Id*.

as referred to within Microsoft, VM switch) (yellow). *Id*. The virtual switches enable VMs to communicate with each other or to devices in other networks. Appx0919-0922(¶234). Within an Azure virtual switch is a software component called the virtual filtering platform or VFP that is used to optimize the flow of data traffic, including network traffic to/from the VMs. Appx0922-0932(¶¶235-244). The server can also have a hardware NIC called a SmartNIC (orange), which connects the virtual switch to a network. Appx0932-0938(¶¶245-249).



SmartNIC

All data traffic going to and coming from a VM must use the VFP and/or SmartNIC. Appx2296(23:5-24). The infringing technology resides within Microsoft's Azure Platform and includes, among other things, VFP and SmartNIC.

### B. At the Time of the Hypothetical Negotiation, Microsoft's Valuation of the Infringing Technology Related to Increasing VMs.

Servers in Azure are hosts to VMs that consume the computing power of central processing units ("CPUs") on the server. Appx0832. Microsoft strives to

efficiently use each server's CPUs, specifically, CPU cores/cycles. *See* Appx1456(187:14-188:13), Appx2251-2287(at Appx2251). A CPU core is the part of a CPU that performs computing operations and is the "single most expensive resource in [] Azure." *Id*. A CPU cycle is a measurement unit for the time a CPU core requires to perform an operation, and a CPU only has a certain number of cycles available for processing at a given time. Appx1421(46:4-10), Appx2789(15:11-16:6).

There is significant value to reducing CPU cycles needed to perform an operation; reducing the amount of CPU cycles needed for one operation frees up CPU cycles for other operations in Azure. Appx1472(137:19-138:1), Appx1492(70:3-71:6), Appx1416(19:3-14), Appx2789(13:19-14:4, 15:11-16:6), Appx4090-4091(100:23-101:15). That is, by using CPUs more efficiently, Microsoft can get more out of each CPU core and, thus, more out of a server. In other words, a server in Azure that has freed up CPU cycles/cores can perform more operations.

This, in turn, can reduce the cost of goods sold ("COGS"). Microsoft defines COGS as how much it costs to build the Azure infrastructure. Appx1494(77:16-20). At the time of the hypothetical negotiation, a strategy for cloud vendors to reduce COGS was to "increas[e] VM density—getting more CPUs and thus VMs onto a single node [server] and so reducing the COGS per VM." Appx2257; *see*

*also* Appx1988-2005(at Appx1998) ("Compute COGS are driven by VM Density"), Appx2017-2065(at Appx2057), Appx2237-2250(at Appx2243). Each server in Azure has a networking infrastructure with dedicated CPUs to process network traffic, including VM traffic, which takes away CPU cycles from being used for other things such as VMs. *See* Appx0832, Appx1989, Appx2258. Microsoft incorporated the infringing VFP Fastpath and SmartNIC technology to free up these networking CPUs in each Azure server. Appx0832, Appx1416(19:5-14), Appx2066-2111(at Appx2110), Appx1420(43:20-24).

In particular, from 2011-2013 in Azure, the VFP separately analyzed and processed each frame passing through a virtual switch. Appx0922-0926(¶¶235-239), Appx1474(175:3-14). The VFP then determined how each frame should be transmitted to/from a VM or network. Appx0922-0926(¶¶235-239). This was inefficient, and Microsoft later referred to this processing as "Slowpath." Appx0926(¶239), Appx0931(¶241), Appx1474(175:3-14). In 2014, Microsoft changed its VFP and incorporated a "VFP Fastpath." Appx0830, Appx0927-0932(¶¶240-244). The newly modified VFP analyzed the first frame in a series of related frames, determined how to handle/modify the frame, and defined a master rule (known as a composition transposition) based on how the first frame was handled/modified. Appx0927-0932(¶¶240-244), Appx1471(136:12-23).

The virtual switch/VFP could then use this rule to process all subsequent

related frames that it received. Appx0927-0932(¶¶240-244), Appx1474(173:14-174:5). This is the "Fastpath," and using this, the VFP can avoid inefficiently processing each frame. Appx0931-0932(¶244). The process is shown in the VFP diagram below (Appx1636-1691(at Appx1671)):




The "Expensive" (red) (Slowpath) and "Cheap" (green) (Fastpath) refers to the number of CPU cycles it takes to process a packet—VFP Fastpath (with its multiple lookups) was less expensive in terms of CPU cycles than VFP "Slowpath." Appx0928-0931(¶¶242-243), Appx1439(133:3-19), Appx1456(186:4-11), Appx1481(26:2-18), Appx1420-1421(43:20-44:5, 45:12-46:10), Appx1425-1426(92:19-93:2), Appx2305(124:10-16). VFP Fastpath increased the number of packets that could be processed in the same amount of CPU for the VMs. Appx1443(170:5-8). This efficiency enabled Microsoft to free up networking CPU cycles/cores for other operations. Appx0896(¶115), Appx0898-0899(¶¶122-124),

Appx0927(¶240), Appx1471-1472(136:12-138:1).

In 2016, Microsoft introduced SmartNIC (essentially, a hardware implementation of VFP Fastpath) to offload processing of subsequent frames to free up even more CPU cycles/cores. Appx0897(¶¶116-17), Appx0898-0900(¶¶122-126), Appx0932-0938(¶¶245-249), Appx1416(19:5-14).

Microsoft's use of VFP Fastpath and SmartNICs infringe the patents-in-suit. All data traffic to/from VMs uses VFP or SmartNIC. Appx2296(23:5-24). But Microsoft does not directly charge its customers for using VFP Fastpath or SmartNICs. Appx0831. That is, VFP Fastpath and SmartNICs are not sold as standalone products or instrumentalities that generate their own revenue base. Thus, to support the business investment in developing the infringing technology, at the time of the hypothetical negotiation in 2014, Microsoft's engineers used VMs (i.e., increasing "VM density") to quantify the benefit and value of VFP Fastpath and SmartNIC to Microsoft. *E.g.*, Appx1958-1973. As Microsoft acknowledges, Microsoft's Networking team engineers aspired to use the performance gains from VFP Fastpath and SmartNIC to free up some of the CPU reserved for infrastructure to give back to the host computer for VMs. *See* Appx0832, Appx1933-1987(at Appx1973).

Microsoft's internal analysis of the economic benefits of freeing up CPU cycles/cores using the infringing technology *repeatedly* focused on VMs.

Microsoft's engineers determined that eliminating host CPUs would save on Microsoft's COGS by enabling Microsoft to increase the VM density:

[redacted]

Appx2006-2016(at Appx2009). Microsoft's engineers focused on how reducing networking CPU cycles/cores (by using VFP FastPath and/or SmartNIC) affected the number of VMs on a server (i.e., VM density). Appx1973, Appx2000, Appx2009, Appx2054, Appx2057, Appx2110, Appx2112-2154(at Appx2152), Appx2155-2175(at Appx2164), Appx2176-2199(at Appx2192), Appx2200-2236(at Appx2222), Appx2243.

As shown in Microsoft's internal documents, Microsoft was focused on the "COGS of Increasing VM Density." Appx1973. Specifically, Microsoft believed that by using the infringing technology, Microsoft could eliminate CPU cycles used for networking and avoid missing out on, e.g., [redacted] "lost VMs" per server and [redacted] in revenue per VM per server (Appx1973):

Msft Internal CBI

[redacted]

As shown above, Microsoft *quantified the benefit* of the infringing technology as increased VM density (i.e., more VMs per servers) and reduced COGS.

The connection between VMs and the value of the infringing technology was confirmed by Microsoft's testimony. Dr. David Maltz, Corporate Vice President for Azure Core Networking and Rule 30(b)(6) deponent, testified:

> It would perhaps be best to say that the value of VFP is in relation to how much network traffic the VM is sending.

Appx1483(167:8-19). Dr. Maltz confirmed that "[t]he rate of traffic that a customer can send is a function of the size of their VM" and Microsoft charges for VMs based on VM size/hours. Appx1483(165:25-166:20). Dr. Maltz further testified:

> The way we would evaluate the financial value to Microsoft of VFP would be the revenue we receive for the set of services that we offer, using VFP.

Appx1482(163:9-12). Microsoft's expert admitted that VMs use VFP. Appx2296(23:5-24). Dr. Maltz admitted that another service is VNET services, which Microsoft makes money on by selling VMs. Appx1483(165:13-166:20). A key Microsoft engineer, Mr. Daniel Firestone (who developed VFP Fastpath), further confirmed that "[t]he reasons for [Microsoft] to build a SmartNIC were that we wanted . . . to reduce CPU cycles on the host, which allows [Microsoft] to, essentially, give those CPU cycles to the VMs . . . ." Appx1416(19:5-14).

### C. Exafer's Expert Relied on How Microsoft Itself Valued the Infringing Technology at the Time of the Hypothetical Negotiation.

Exafer sought damages under 35 U.S.C. §284. Appx0504. Exafer's technical expert, Dr. Paul Congdon, developed the technical model for how Mr. Justin Blok, Exafer's damages expert, could value the infringing technology. Appx0896-0900(¶¶113-126), Appx1347-1363.

Consistent with Microsoft's *own* documents and testimony (*supra* Section B), Dr. Congdon considered and analyzed the potential for Microsoft to increase VM density as a metric for valuing Microsoft's use of the infringing technology. The technological improvements from VFP Fastpath and SmartNIC allowed Microsoft to increase the throughput of data packets (frames) on a host without increasing CPU cycles. Appx0896-0900(¶¶113-126). Dr. Congdon opined that the quantity of CPU cores required to process a given volume of frames was reduced,

contributing to a potential increase in the quantity of VMs that an individual server could host (i.e., increasing VM density). *Id*. Microsoft was able to save on CPUs per server/host and could use freed-up CPU cycles to offer more VMs/VM hours per host. Appx1356-1360(¶¶26-29), Appx2941-2943, Appx0896-0900(¶¶115-125). As a result, Microsoft could sell more VMs without the need for additional network infrastructure; this would reduce COGS and lead to an increase in Microsoft's profit. *Id*.

To quantify this benefit, Dr. Congdon pointed to Microsoft's internal development and testing (below) that showed the infringing VFP Fastpath in Azure provided a [redacted] improvement in VFP CPUs:

Msft Internal CBI

[redacted]

Appx0898-0900(¶¶123-125), Appx2148, Appx1969, Appx1352-1353(¶¶16-18), Appx2790(97:17-23), Appx2941-2943. Dr. Congdon also used Microsoft's

internal estimates (below) showing [redacted] CPU improvement (i.e., freed-up cores) by using SmartNICs:

[redacted]

Appx0899(¶124), Appx2768-2769, Appx1587-1590. Dr. Congdon also relied on the testimony of Microsoft's corporate representative, Dr. Maltz, regarding the benefits/advantages of using VFP Fastpath and SmartNIC including savings in CPU cycles. Appx1349-1354(¶¶13-19). Based on Microsoft's internal measurements, and his extensive investigation and experience, Dr. Congdon opined that the improvements Microsoft envisioned can be directly correlated to VM hours that Microsoft would be able to provide—i.e., the quantity of VM hours are tied to improvements in VFP CPU usage. Appx0899(¶124), Appx1360(¶29), Appx2941-2943(¶7). In other words, the more Microsoft reduces CPU usage the more VM hours Microsoft could get out of a server. Appx0899(¶124).

Accordingly, based on Dr. Congdon's opinions and Microsoft's own view on how to assign value to VFP Fastpath and SmartNIC, Mr. Blok determined that the parties would value the use of the infringing technology in terms of additional VMs that result from this use at the time of the hypothetical negotiation. Appx1208-1309(¶¶92-119), Appx1365-1377(¶¶10-13). Mr. Blok analyzed the portion of realizable profit attributable to the claimed inventions by examining the

incremental benefit to Microsoft of freed-up CPUs and an anticipated increase in VM density. Appx1253-1260(¶¶106-119), Appx1263-1268(¶¶123-137); *see also* Appx1245-1246(¶93), Appx1372-1374(¶¶16-19).

In doing so, Mr. Blok's reasonable royalty *did not* depend on the overall revenue of VMs nor did his analysis vary with VM sales. Appx1263(¶124). Mr. Blok's royalty was not a traditional running royalty with a royalty base of revenue or sales and royalty rate. Instead, based on Dr. Congdon's analysis of the technical benefits of the infringing technology, which was consistent with Microsoft's own internal analysis of the benefits of the accused technology, Mr. Blok's royalty was a fixed royalty per VM hour of use of the infringing technology, which simply allocated the value Microsoft would realize from the infringing technology across its overall use of the technology. Appx1254(¶¶107-108). Mr. Blok's royalty valued the CPU-savings benefit by looking at additional VM hours that Microsoft's internal analysis indicated it could add by using the infringing technology. Appx1263(¶124). Based on this determination and his overall analysis of the *Georgia-Pacific* factors, Mr. Blok calculated a reasonable royalty per [redacted] per VM hour or alternatively [redacted] per VM hour. Appx1263-1268(¶¶123-37), Appx1372-1374(¶¶16-19).[4]

[4] Mr. Blok only opined on damages from January 2014 to December 2020, as Microsoft never updated any of its financial information during the course of the

### D. The District Court Granted Microsoft's *Daubert* Motion Regarding Mr. Blok's Testimony and Denied Exafer's Request for Supplemental Discovery.

On October 27, 2023, Microsoft filed a *Daubert* motion to exclude the damages testimony of Dr. Congdon and Mr. Blok. Appx0820-0847. Microsoft claimed that, despite its own internal business prognostications, it was wrong for Exafer to seek a royalty related to VMs because Dr. Congdon did not opine that VMs infringe. Appx0836-0837. Microsoft claimed instead that the smaller revenues for "Networking Services" that "use VFP" would be proper, even though Microsoft never measured the value of its infringing use by these services nor did any expert testimony connect that revenue to the inventions. Appx0827, Appx0831. Microsoft also moved to exclude Mr. Blok's opinions under Rule 702 for other alleged issues, including challenging the evidence regarding VMs as "forward-looking," challenging Mr. Blok's profit split analysis and arguing that Mr. Blok applied the entire market value rule. Appx0826-0827. Based only on these discrete issues, Microsoft moved to exclude Mr. Blok's testimony *entirely*. Appx0826.

Exafer opposed (Appx1908-1932), and without hearing oral argument, Magistrate Judge Lane granted Microsoft's motion to exclude Mr. Blok's opinions

---

litigation. Appx1268(¶136), Appx1372-1374(¶¶16-19).

*entirely*. Appx0001-0006. Judge Lane did so based only on Microsoft's mistaken argument that Mr. Blok included non-accused products in a royalty base. *Id.* In a six-page opinion, with one paragraph of analysis, Judge Lane relied on *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398 (Fed. Cir. 2018) to find that Exafer improperly used sales of VMs as a royalty base to determine damages. Appx0005-0006. Judge Lane did not address Microsoft's other Rule 702 arguments but still excluded *all* of Mr. Blok's damages testimony. Appx0006. Judge Lane, on the other hand, denied Microsoft's motion to exclude Dr. Congdon's testimony, because "he does not opine that VMs should serve as the royalty base." *Id.*

Exafer timely filed Rule 72 objections (Appx3250-3268), but the district court affirmed Judge Lane's partial grant of Microsoft's *Daubert* motion in a four-page order on April 11, 2024, again without oral argument. Appx0007-0010. The district court found *Enplas* "directly applicable to this case" because "Mr. Blok attempted to use VM hours—which are not accused of infringement—as the royalty base for Exafer's damages." Appx0009.

Left without a damages expert, Exafer moved to supplement its report and re-open discovery to develop an alternative way to value Microsoft's cost savings that did not refer to VMs to account for the district court's (erroneous) view of the law and to assist the jury in its reasonable royalty determination under §284.

Appx3307-3320. Microsoft opposed Exafer's request, and the district court denied Exafer's motion in full. Appx0011-0017.

### E. The District Court Granted Microsoft's Motion for Summary Judgment Based on Absence of Remedy.

Microsoft moved for summary judgment based on absence of remedy. Appx3413-3433. Microsoft capitalized on the district court's contested exclusion of Mr. Blok's damages report in its entirety and argued that Exafer was left with "***no*** admissible damages evidence" and that the *Daubert* order was "case-dispositive." Appx3418 (emphasis in original). Microsoft claimed that because Exafer did not have any expert evidence, the record supports "a zero royalty award" on summary judgment. *Id*. But Microsoft's opening brief set forth no evidence from any witnesses, experts or documents supporting a zero royalty or zero value for the infringing technology or its infringement. *See* Appx3413-3461.

Exafer opposed Microsoft's motion. Appx3533-4372. Exafer asserted that Microsoft's argument was based on an erroneous assumption—that exclusion of a damages expert or a single damages theory absolves a defendant of any liability or damages for infringement. Appx3538. Exafer pointed to clear Federal Circuit precedent that summary judgment of absence of remedy must be denied where there is *any* evidence of a non-zero royalty (Appx3538-3540) and evidence in the record of the technical benefits and value Microsoft received from its infringing use. Appx3540-3549. Given these arguments and record evidence, Exafer

explained that there was a genuine dispute regarding the non-zero value of Microsoft's use of the patented invention, and Microsoft failed to meet its burden. Appx3549-3557.

Because of the exclusion of Mr. Blok's testimony in its entirety, the extent of admissible evidence for Exafer's opposition and reasonable royalty was severely limited. But even so, Exafer identified several categories of admissible record evidence to support damages based on Microsoft's infrastructure/server cost savings from its use of the patented inventions, from which a jury could determine a non-zero reasonable royalty award (*see* Appx3540-3549, Appx3560-Appx3562):

- <u>Dr. Congdon's Opinions</u>: Dr. Congdon's opinions were not excluded, and Dr. Congdon opined that without the infringing technology, Microsoft would have "had to procure and operate more infrastructure (e.g., servers, switches, and storage), procure additional network bandwidth and associated hardware equipment from network service providers, and reduce margins on existing installations in order to remain competitive." Appx3617(¶119). Dr. Congdon quantified the benefit in terms of CPU core savings and the percentage of freed up CPU cores/cycles for additional use, consistent with Microsoft's internal analysis. Appx3618-3620(¶¶122-25), Appx4021-4037(¶¶12-24, 33), Appx4039-4081(at Appx4075).
- <u>Microsoft's Rule 30(b)(6) Testimony</u>: Dr. Maltz testified repeatedly that the

main value driver of VFP Fastpath and SmartNIC was CPU cores/CPU cycles cost savings. Appx4085(13:19-25, 15:11-24), Appx4087(69:12-25). Dr. Maltz testified that "using SmartNICs is cheaper than adding additional hardware, such as servers or cores, to achieve the same performance" and confirmed a [redacted] improvement in CPU usage. Appx4088-4089(80:23-81:2), Appx4090(98:2-23). Dr. Maltz's testimony confirmed that VFP Fastpath and SmartNIC benefited Microsoft by having more CPU cycles available to, e.g., collect telemetry or run storage clients. Appx4090-4091(100:23-101:3, 101:9-15), Appx4086(66:8-68:10).

- Microsoft's Expert Testimony: Microsoft's damages expert Mr. Christopher Martinez's initial report provided financial information related to the cost-savings benefit, including Microsoft's average server costs per year based on discussions with Dr. Maltz. Appx4148(¶102). Mr. Martinez's supplemental report analyzed an alternative damages theory related to "Networking Services," and presented revenue information and evidence from Microsoft's financial documents and Rule 30(b)(6) depositions that [redacted] of the services use VFP. Appx4172-4174(¶¶18-24). Mr. Martinez relied on Dr. Maltz's testimony that Microsoft "would take the revenue associated with ExpressRoute and Brooklyn and prorate it by the fraction of the scenario that involves VFP," calling this evidence "more direct measures of value."

Appx4172(¶¶18-19). Mr. Martinez's deposition testimony further confirmed the cost-savings nature of the claimed inventions. *See* Appx4175(¶26), Appx4095(96:25-97:12), Appx4096(128:8-13), Appx4097(206:20-207:2), Appx4101(358:8-13, 359:20-24), Appx4102 (361:13-16), Appx4103-4104(419:22-420:1). Dr. James Olivier, Microsoft's technical expert, testified that Microsoft's evidence showed a reduction of CPU cores/cycles by implementation of VFP Fastpath and SmartNIC, thereby reducing Microsoft's need for servers. Appx4207-4208 (104:25-105:2, 106:11-16), Appx4209(118:5-11), Appx4298-4301(¶¶27-34).

Based on *all* of this evidence, Exafer argued that the question is not *whether* VFP Fastpath and SmartNIC provided value to Microsoft (i.e., zero royalty), but *how much* value the technologies provided, a question for the jury. Appx3549-3554.

In its reply brief, Microsoft presented five new evidentiary exhibits, including competing testimony of Dr. Maltz and another Microsoft engineer. Appx4373-4426. Further, for the first time, Microsoft indicated that it would not bring Mr. Martinez to trial, making him unavailable, and objected to his opinions as hearsay. Appx4381. Microsoft further claimed that Mr. Martinez did not present any alternative theory, even though it argued to the district court in its *Daubert* motion that "Networking Services" revenue was the right measure of damages in

this case (consistent with Mr. Martinez's supplemental report). Appx4382-4384; *see also* Appx3011-3012.

The district court denied the parties' request for oral argument and granted summary judgment based on absence of remedy. Appx4427-4429, Appx0057, Appx0018-0035. The district court acknowledged the extensive evidence of the technical benefit to Microsoft for its use of the patented inventions but ruled that Exafer did not have admissible evidence to quantify the damages for the jury in the absence of a damages expert. Appx0027-0034. The district court discounted all the record testimony Exafer presented as evidence only of the *technical* benefits to Microsoft, and not the financial benefit or how much costs were saved. Appx0027-0033. The district court refused to consider Mr. Martinez's evidence and theory, declaring his deposition and report "inadmissible hearsay." Appx0031-0032. The district court did not consider whether any of the underlying Microsoft evidence that Mr. Martinez cited for this theory, and Exafer identified, was admissible.

Accordingly, the district court rendered final judgment on August 30, 2024, based on its summary-judgment finding that there was no evidence of damages, with infringement issues still remaining in the case. Appx0036.

## SUMMARY OF THE ARGUMENT

A.1. The district court's exclusion of Mr. Blok's reasonable royalty opinions under Rule 702 should be reversed. Mr. Blok's opinions were sufficiently tied to

the facts of this case and were based on reliable methodology. The uncontested evidence demonstrated that at the time of the hypothetical negotiation, Microsoft expected that use of the infringing technology would benefit it by reducing the computing resources (CPU cycles/cores) required to process data in its systems. Microsoft valued that benefit by looking at its ability to increase VM density on Azure servers and add revenue-generating VM hours. Mr. Blok properly based his damages analysis on this evidence. Relying on *Enplas*, the district court erred as a matter of law in applying a categorical bar to considering non-infringing activities in a reasonable royalty analysis.

A.2. The district court abused its discretion in excluding Mr. Blok's testimony in its entirety. Though the district court ruled that Mr. Blok's royalty base opinion did not meet the standards of Rule 702, it did *not* provide a basis for excluding Mr. Blok's entire testimony, including his *Georgia-Pacific* analysis. Mr. Blok's *Georgia-Pacific* opinions are admissible under Rule 702 and would assist the fact finder in determining the damages Exafer is entitled to under 35 U.S.C. §284.

B. The district court abused its discretion in denying Exafer's request for supplemental damages discovery to present an alternative damages theory. 35 U.S.C. §284 states that a patentee is entitled to no less than a reasonable royalty for an infringer's use of the invention, and the evidence in this case demonstrated

additional cost-savings benefits to Microsoft for its use of the patented inventions. The district court should have considered the importance of this evidence under §284, and to Exafer's case, and granted supplemental damages discovery to assist the jury in determining the reasonable royalty Exafer is entitled to by statute.

C.1. The district court's grant of summary judgment based on an alleged lack of evidence of a non-speculative reasonable royalty in the absence of expert testimony should be reversed. Under 35 U.S.C. §284, the district court is obligated to award a reasonable royalty upon a finding of infringement, however nominal. This statutory obligation does not permit summary judgment based on alleged lack of evidence of a reasonable royalty. Instead, this Court has held that summary judgment can only be granted in a patent case if the evidence is uncontroverted that zero is the only reasonable royalty. The district court erred in its grant of summary judgment because there was no evidence of record supporting a zero royalty.

C.2. The district court's summary judgment decision also cannot stand as there is admissible record evidence upon which a jury could determine a non-zero royalty. The district court erred in its consideration and assessment of the admissibility of this evidence. The evidence that Exafer cited establishes there is a genuine issue of material fact regarding a non-zero reasonable royalty.

## STANDARD OF REVIEW

In patent appeals, the Federal Circuit applies the law of the regional circuit

"to which district court appeals normally lie, unless the issue pertains to or is unique to patent law." *Molins PLC v. Quigg*, 837 F.2d 1064, 1066 (Fed. Cir. 1988); *see also Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1354 (Fed. Cir. 2013).

The Federal Circuit reviews evidentiary rulings under the law of the regional circuit. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1368 (Fed. Cir. 2021). The Fifth Circuit reviews a district court's evidentiary rulings, including the decision to exclude expert testimony, for an abuse of discretion. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). However, "'where a district court rules, as a matter of patent law, that a party is precluded from introducing evidence,' this court applies its own law and reviews de novo." *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, 28 F.4th 1247, 1275 (Fed. Cir. 2022) (quoting *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004)).

The Federal Circuit reviews district court decisions on procedural matters in patent cases for an abuse of discretion. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1325-26 (Fed. Cir. 2006); *Squyres v. Heico Cos., LLC*, 782 F.3d 224, 237 (5th Cir. 2015) (reviewing a ruling on a motion to modify a scheduling order for an abuse of discretion).

The Federal Circuit reviews a grant of summary judgment under the law of the regional circuit, while applying its own law to issues unique to patent law. *See*

*Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1362 (Fed. Cir. 2022). The Fifth Circuit reviews grants of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007); *Pierce v. Dep't of U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007). The Fifth Circuit reviews a district court's evidentiary rulings that determine the summary judgment record for abuse of discretion. *Maurer v. Indep. Town*, 870 F.3d 380, 383 (5th Cir. 2017). Although that standard is deferential, an "erroneous view of the law" satisfies it. *Id.* at 383-84 (citation omitted).

## ARGUMENT

### A. The District Court Erred in Excluding Mr. Blok's Expert Opinions on Damages.

Under Federal Rule of Evidence 702 and *Daubert*, a district court may exclude expert testimony "if it is based on unreliable principles or methods, or legally insufficient facts and data." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). Though consistent with Microsoft's own internal business judgment and documents, the district court precluded Mr. Blok from testifying *at all* because Mr. Blok's methodology used VM hours in his reasonable royalty analysis. The district court erred as a matter of law.

### 1. The District Court Erred in Excluding Mr. Blok's Reasonable Royalty Analysis.

The district court's exclusion of Mr. Blok's reasonable royalty testimony was legally erroneous because it was based on a misunderstanding of this Court's jurisprudence.

Section 284 does not dictate how the fact finder must compute the reasonable royalty, but instead requires only that it must compensate the patentee for "the use made of the invention by the infringer." 35 U.S.C. §284; *see also* *TWM Mfg. Co., Inc. v. Dura Corp*., 789 F. 2d 895, 899 (Fed. Cir. 1986). This Court has made clear that there is "more than one reliable method for estimating reasonable royalty," *Apple,* 757 F.3d at 1315, and experts routinely apply a variety of approaches in leveraging evidence to calculate a reasonable royalty. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

#### a. Mr. Blok Properly Applied the Hypothetical Negotiation Methodology.

The "hypothetical negotiation" is a well-established framework for calculating a reasonable royalty in patent cases. *See Lucent*, 580 F.3d at 1324-25. That framework is designed "to discern the value of the patented technology" when infringement first began by attempting to estimate the royalty that the parties would have agreed to had they negotiated a license agreement at that time. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012).

The hypothetical negotiation assumes that the asserted patent claims are valid and infringed. *Lucent*, 580 F.3d at 1325.[5]

Because the focus is the value to the parties when infringement begins, the analysis begins with "what the parties to the hypothetical negotiation would have considered" at the time of first infringement. *Id.* at 1334. "A key inquiry in the analysis is what it would have been *worth to the defendant*, as it saw things at the time, to obtain the authority to use the patented technology, considering the *benefits it would expect* to receive from using the technology and the alternatives it might have pursued." *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd*., 807 F.3d 1283, 1304 (Fed. Cir. 2015) (emphasis added).

Federal Circuit law dictates a flexible and fact-specific consideration of what the parties would have considered when determining a reasonable royalty. *See Lucent,* 580 F.3d at 1334 (rejecting any "strict requirement [that] could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations"); *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys*., 809 F.3d 1295, 1301-02 (Fed. Cir. 2015) ("This adaptability is necessary because different cases present different facts."). Various kinds of evidence from

---

[5] This Court has consistently upheld experts' use of a hypothetical negotiation and the *Georgia-Pacific* factors for estimating a reasonable royalty. *See, e.g., Micro Chem., Inc. v. Lextron, Inc*., 317 F.3d 1387, 1393 (Fed. Cir. 2003); *Interactive Pictures Corp. v. Infinite Pictures, Inc*., 274 F.3d 1371, 1384 (Fed. Cir. 2001).

the parties may inform the calculation of a reasonable royalty, including "licenses, business prognostications, and information about cost savings or value enhancements compared to alternatives." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771-72 (Fed. Cir. 2014).

Consistent with this Court's clear precedent, Mr. Blok's expert opinion relied on evidence "tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1318 (Fed. Cir. 2011); *see also Hanson v. Alpine Valley Ski Area, Inc*., 718 F.2d 1075, 1081 (Fed. Cir. 1983) (determining a reasonable royalty should not be based on "a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of negotiations.").

*First*, Mr. Blok looked at the extensive evidence regarding the benefit that Microsoft expected to receive by implementing the infringing technology. *See supra* SOTC Sections B-C. This evidence included Microsoft's own documentary analysis at or around the time of first infringement and testimony from Microsoft's corporate witness. *See id*. That evidence established that the claimed invention allowed Microsoft to implement a "Fastpath" system in each Azure server, which increased the number of packets that could be processed by a given amount of

CPUs in the accused system. That efficiency enabled Microsoft to free up CPU cycles/cores normally dedicated to networking in Azure servers for other activities.

*Second*, Mr. Blok looked to how Microsoft valued this benefit it received from use of the infringing technology—again using Microsoft's own contemporaneous documents. Mr. Blok considered evidence showing that, at the time of the hypothetical negotiation, Microsoft's internal business prognostications valued its use of the infringing technology as enabling an increase in VM density per server and an increase in VM hours and revenue. *See supra* SOTC Sections B-C. Mr. Blok relied upon Microsoft's witnesses that admitted that Microsoft's use of the invention reduced networking CPUs in Azure servers and would allow more CPU cycles for additional VMs. *See id*.

Based on this evidence, Mr. Blok opined that the parties at the hypothetical negotiation would consider the impact the infringing technology has on VM density and would quantify the incremental benefit as a royalty per-VM hour for use of the patented inventions. Appx1245-1255(¶¶92-109). Mr. Blok's analysis consistently relied upon relevant evidence regarding Microsoft's own view of the infringing technology at the relevant time—which is exactly what a proper hypothetical negotiation analysis should do pursuant to this Court's precedent.

**b. Mr. Blok's Use of VMs in the Reasonable Royalty Analysis was Appropriate.**

The district court's exclusion of Mr. Blok's damages theory—premised

solely on the fact that the VMs Microsoft's own internal analysis used to value the benefit of the invention were not "accused products"—was improper. The accused system was generally the Azure Platform in which the infringing VFP Fastpath and SmartNIC technology reside. There is no dispute that those infringing technologies are used to provide the data that goes into, or comes out of, the VMs. Appx2296(23:5-24).

Mr. Blok's damages theory was a reasonable and reliable way of measuring the value of infringing technology without its own revenue stream (the infringing VFP FastPath and SmartNIC are not sold as standalone products and, therefore, do not generate their own revenue). Mr. Blok did ***not*** seek a royalty for ***any*** non-infringing activities. Instead, Mr. Blok charged a per-hour royalty for the use of the patented inventions that accounted only for the value that the claimed inventions contributed the accused Azure Platform. Mr. Blok's analysis thus satisfied the "essential requirement" of a proper damages analysis by ensuring that "the ultimate reasonable royalty award" was based on "the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

The cases that Microsoft and the district court relied on present factual and legal issues that were entirely different from those confronted by Mr. Blok. In *Enplas,* the Federal Circuit rejected a "freedom to operate" damages theory that

expressly included revenue for unidentified *potentially infringing* lenses. 909 F.3d at 409. *Enplas* held the patentee could not seek damages based on revenue of unrelated and unaccused products. *Id*. at 411. In *AstraZeneca AB v. Apotex Corp.*, the district court awarded damages that included a royalty on sales made *after the asserted patents had expired* but during a "pediatric exclusivity period." 782 F.3d 1324, 1341 (Fed. Cir. 2015).

The district court found *Enplas* applicable here, but neither the facts of *Enplas* nor its reasoning supports the district court's opinion. In *Enplas* (and *AstraZeneca*), the damages theory *expressly* included a royalty that reached ***beyond the alleged infringement***. But here, Mr. Blok's opinion was limited to assessing damages for the alleged infringement and only the value of the *use of the invention* by Microsoft. The *only* way to get data to/from the VMs is by using the infringing technology. *See* Appx2296(23:5-24). Microsoft's infringing use is efficiently moving data through the networks and VMs, which benefits the operation and revenue-generating capabilities of Microsoft Azure. Analyzing this infringing use, and the value of that infringing use to VMs—which Microsoft did using its own business judgment—was a proper part of Mr. Blok's damages theory.

Importantly, *Enplas* and *AstraZeneca* do not support the district court's overbroad ruling that consideration of *any* non-infringing product or activities is prohibited in a reasonable royalty analysis. In fact, this Court recently addressed

this issue in *Brumfield v. IBG LLC,* 97 F.4th 854 (Fed. Cir. 2024). *Brumfield* supports the *opposite* conclusion:

> [The] principles [from *AstraZeneca* and other cases] point to a minimum requirement for a patentee seeking reasonable-royalty damages based on foreign conduct that is not independently infringing. Under the foregoing principles, the hypothetical negotiation must turn on the amount the hypothetical infringer would agree to pay to be permitted to engage in the domestic acts constituting "the infringement." 35 U.S.C. § 284. If the patentee seeks to increase that amount by pointing to foreign conduct that is not itself infringing, the patentee must, at the least, show why that foreign conduct increases the value of the domestic infringement itself–because, *e.g.*, the domestic infringement enables and is needed to enable otherwise-unavailable profits from conduct abroad–while respecting the apportionment limit that excludes values beyond that of practicing the patent.

97 F.4th at 876-77. *Brumfield* (though ruling on foreign conduct) makes clear that no categorical bar exists prohibiting the consideration of non-infringing activities.[6] This Court's opinion in *Brumfield* instead suggests that non-infringing conduct can be part of patent damages if there is a sufficient causal relationship to the infringement and the damages based on the non-infringing conduct are a result of the infringing activity. This Court provided an example of one sufficient relationship that permits consideration of non-infringing activities that is highly

[6] One district court has applied this holding to reject the same arguments Microsoft made in this case to Judge Lane (prior to *Brumfield*). *See IPA Techs., Inc. v. Microsoft Corp.*, 2024 U.S. Dist. LEXIS 80212, at *3-4 (D. Del. May 2, 2024) ("None of the cited cases support [the] overbroad interpretation that this principle prohibits a damages theory from including consideration of any non-infringing product.").

applicable here: when the infringing activity "enables and is needed to enable otherwise-unavailable profits" from the non-infringing activity. *Id.*

Other Federal Circuit cases support consideration of non-infringing products and activities in the reasonable royalty analysis. In *Apple*, for example, the patent at issue disclosed the use of finger contacts to control a touch screen computer. 757 F.3d at 1294-95. Apple's damages expert looked to the non-accused Magic Trackpad, which is a touchpad used with Apple computers in place of a traditional computer mouse, as a benchmark to value the patented invention. *Id.* at 1316. The Federal Circuit found that the expert had applied sound methodology and his testimony was admissible. *Id*. at 1318; *see also i4i Ltd. P'ship v. Microsoft Corp*., 598 F.3d 831, 854 (Fed. Cir. 2010) (rejecting Microsoft's challenge to expert's use of a benchmark for the damages analysis).[7]

Similarly, a price for a hypothetical license may appropriately be based on consideration of the "costs and availability of non-infringing alternatives" and the potential infringer's "cost savings." *Aqua Shield*, 774 F.3d at 771–72; *see also*

---

[7] The concept that non-infringing products can be relevant, and part of a royalty base when they are functionally related to an infringing product, has long been present in patent damages law. *See Rite-Hite Corp. v. Kelly Co. Inc.,* 56 F.3d 1538, 1550 (Fed. Cir. 1998) (finding a patentee may recover lost profits on unpatented components sold with a patented item if both the patented and unpatented products "together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit").

*Hanson*, 718 F.2d at 1080-81 ("Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty."). In *Prism Techs. LLC v. Sprint Spectrum L.P.*, for example, the patents were directed to methods and systems for managing access to a network. 849 F.3d 1360, 1364 (Fed. Cir. 2017). The patentee's expert testified that, in the absence of a license, Sprint would have attempted to design around the patented invention by building its own private backhaul network. *Id*. at 1376. This Court rejected Sprint's challenge that this was improper because the patentee did not "invent" backhaul networks and found "the uncontroverted evidence showed that Sprint would have chosen to build its own backhaul network in the absence of a license." *Id*. at 1375-76; *see also Hanson*, 718 F.2d at 1080-82 (approving a reasonable royalty not based on "actual use of the snowmaking machinery" but on what a party would have paid to have the machine available to use).[8]

In all the above cases, this Court allowed non-infringing activities to be considered in order to ***value infringing activities***. This Court's precedent thus does not categorically prohibit a patentee from seeking reasonable royalty damages

[8] Mr. Blok's opinion complies with these principles as well. By using Exafer's inventions, Microsoft saves on the "costs" associated with greater CPU usage. Microsoft envisioned—and documented—its planned use of the reduced CPUs to add more VMs. *See supra* SOTC Section B. The alternative to forgoing use of the patented inventions would be more CPUs, less VMs, and less VM hours.

based on a non-infringing product or activity but instead calls for a fact-specific hypothetical negotiation analysis focused on valuing the use of the infringing technology. Mr. Blok's theory did not capture more than the "'value of what was taken'—the value of the use of the patented technology." *AstraZeneca,* 782 F.3d at 1344 (quoting *Aqua Shield,* 774 F.3d at 770). Here, the relationship between VMs and the infringing technology presents the exact type of situation this Court contemplated in *Brumfield* (and contrasted with *Enplas* and *AstraZeneca*), as well as the benchmark-product royalty approaches in, for example, *Apple* and *i4i.*[9]

Microsoft convinced the district court to rely on a technical distinction that ignores the reality of the accused VFP Fastpath and SmartNICs in cloud-based technologies—and Microsoft's own business. Microsoft's accused Azure servers and virtual networks that use the infringing technology are fully integrated with, and connected to, VMs. Microsoft does not separately sell or charge for the

[9] Microsoft itself suggested that it would be appropriate to use other revenue streams to value its use of the invention. Microsoft claimed that "Networking Services" revenue was an appropriate measure of damages, e.g., Appx0827, Appx0831, Appx3011-3012, but no expert opined that any "Networking Service" infringed. Microsoft pointed to the litigation testimony of Dr. Maltz that the value of the infringing technology is related to the services that "use VFP" (Appx0831)—but Microsoft's expert admitted that VMs use VFP. Appx2296(23:5-24). There is no evidence that Microsoft valued the infringement by use of any Networking Services the way it did with VMs. Under Microsoft's own logic, it would be appropriate to use the VM revenues that Mr. Blok used in his report to value the CPU-saving benefit enjoyed by the accused products.

infringing technology in its systems. Microsoft admittedly received efficiency benefits from the accused products that it valued—for its own business purposes—by looking at how the infringing technology could enable it to increase VM density in its system and boost the sales of VM hours.

Fundamentally, this Court's reasonable royalty precedent embraces using real-life facts that would actually be considered by the parties at the time of first infringement to value patented technology. It does not impose any "strict requirement [that] could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." *Lucent*, 580 F.3d at 1334. Because the entire point of the hypothetical negotiation is to capture how the parties would have valued the patented technology at the time of infringement, this Court should reverse the district court's exclusion of Mr. Blok's opinion, which properly applied that methodology and is firmly tethered to the facts of this case.

#### *2.* The District Court Abused Its Discretion in Excluding Mr. Blok's Opinions Entirely.

The district court did not just preclude Mr. Blok from testifying about a portion of his report perceived to be impermissible, it precluded Mr. Blok from testifying *at all*. Appx0006, Appx0010. The district court provided no basis for excluding all of Mr. Blok's opinions. Microsoft's *Daubert* motion did not challenge his qualifications to testify regarding damages in this case or critique Mr. Blok's *Georgia-Pacific* analysis. *See* Appx0820-0847. The issues Microsoft raised

did not span all of Mr. Blok's damages opinions or his report. *Id*. And the district court only found that Mr. Blok's royalty base must be excluded under Rule 702 (under its misplaced reliance on *Enplas*), and did not reach any of the other issues Microsoft raised. Appx0004-0006, Appx008-0010.

Mr. Blok performed a full *Georgia-Pacific* analysis, providing qualified economic opinions regarding, e.g., profitability, which would be helpful to the jury in its application of the *Georgia-Pacific* factors and determining the reasonable royalty for Microsoft's infringement. Appx1226-1267(¶¶43-122, 128-134). These other opinions by Mr. Blok were never addressed (or challenged) on the merits, but Exafer nonetheless was prevented from presenting this admissible evidence to defeat summary judgment. *See infra* Section C. The district court had no basis to bar Mr. Blok from testifying *in toto* and preclude a fulsome discussion of the damages evidence at summary judgment and trial.

The district court abused its discretion in excluding Mr. Blok's opinions in their entirety, and judgment should be vacated and the case should be remanded for this reason alone. *Omega Patents,* 13 F.4th at 1375-76 (finding abuse of discretion and ordering new trial where district court provided no basis for its ruling to preclude an expert's testimony entirely); *see also Certain Underwriters at Lloyd's v. Axon Pressure Prods*., 951 F.3d 248, 268-269 (5th Cir. 2020) (vacating the district court's order excluding an expert's entire testimony because it failed to

explain its decision).

### B. The District Court Abused its Discretion in Refusing to Allow Exafer to Supplement with a Cost-Savings Theory.

In addition to its error in excluding Mr. Blok's entire damages analysis, the district court abused its discretion when it prevented Mr. Blok from submitting any revised or supplemental report and denied any supplemental damages discovery.

District courts regularly grant patentees the opportunity to submit a revised damages expert report if the initial opinion is excluded under Rule 702, consistent with §284's mandate that the court "shall award the claimant damages adequate to compensate" upon a finding of infringement.[10] Though a district court has discretion to prohibit a patentee from providing a revised expert report or re-opening discovery, this discretion is not absolute. As this Court recognized, there are inherent difficulties in estimating damages in a patent infringement case:

> Those requirements—specifically, the requirements to focus on reliable evidence of value apportioned to the invention itself and to avoid potentially misleading forms of presentation of evidence—support "certain general rule[s]." But given the nature of the inquiries involved, *the rules are not so precise in their application or scope as to make a single opportunity for compliance clearly or always enough*—though,

[10] *See, e.g.*, *Via Vadis, LLC v. Amazon.Com, Inc*., 2022 U.S. Dist. LEXIS 93577, at *9 (W.D. Tex. May 24, 2022); *Nat'l Prods., Inc. v. Arkon Res., Inc.,* 2019 U.S. Dist. LEXIS 238979, at *22 (C.D. Cal. Mar. 25, 2019); *Blue Spike, LLC v. Huawei Techs. Co.*, 2016 U.S. Dist. LEXIS 199913, at *9-13 (E.D. Tex. Oct. 14, 2016); *GoDaddy.com LLC v. RPost Commc'ns Ltd.,* 2016 U.S. Dist. LEXIS 61670, at *33-34 (D. Ariz. May 10, 2016).

in the right circumstances, a district court may well decide that it is. *Rembrandt Soc. Media, LP v. Facebook, Inc.,* 561 F. App'x. 909, 912-913 (Fed. Cir. 2014) (emphasis added) (citation omitted).

It was an abuse of discretion for the district court to reject Exafer's request for supplemental damages discovery to add more information that could be used to value the cost savings resulting from Microsoft's use of the infringing technology. A second opportunity made sense given that Mr. Blok's original opinion was a reasonable, good-faith attempt to apply the facts of the case to the rules in estimating patent damages. Mr. Blok's opinion was based on *Microsoft's* own internal evidence and business valuation of the infringing technology at the relevant time. And the parties were more than four months from trial.[11] Microsoft would have had ample time to consider the additional analysis, which would be based on much of the same evidence as Mr. Blok's original theory, i.e., the CPU savings from use of the infringing technology. *See* Appx3307-3320. Allowing Exafer to at least submit a revised expert opinion would have served the interest of justice and the mandate of §284, while not prejudicing Microsoft. Thus, contrary to the district court's opinion, Exafer satisfied Rule 16's good cause standard. *See id.*;

[11] In cases in which the Federal Circuit has affirmed a district court's decision not to allow for supplementation it has been because the parties were on the eve of trial. *E.g., ePlus, Inc. v. Lawson Software, Inc.,* 700 F.3d 509, 523 (Fed. Cir. 2012).

Appx0011-0017.

Contrary to this Court's guidance in *Rembrandt*, however, the district court refused to allow any revision or supplemental discovery. *Id*. In doing so, the district court did not consider the critical importance of such evidence in patent cases and imposed a harsh and extreme sanction that was tantamount to dismissal of Exafer's claims. *See EEOC v. Gen. Dynamics Corp*., 999 F.2d 113, 116-17 (5th Cir. 1993) (finding abuse of discretion in district court's exclusion of expert because the total exclusion of such testimony "was tantamount to a dismissal of [plaintiff's] … claim").

The Fifth Circuit has found that a district court's discretion is not unlimited and that a continuance, as opposed to exclusion, is the "preferred means" of dealing with a party's attempt to offer new evidence after the time for discovery has closed. *See Gen. Dynamics,* 999 F.2d at 116.[12] The most important factor in the district court's analysis should have been the critical nature of the evidence, and the nature of the consequences if supplementation were denied. Section 284 mandates that Exafer is entitled to no less than a reasonable royalty for Microsoft's infringement. And the evidence of the substantial technical benefit and cost

---

[12] The factors the Fifth Circuit considers in reviewing a district court's decision regarding exclusion of expert testimony and Rule 16 are the same. *Compare Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 819 (5th Cir. 2019) *with Gen. Dynamics*, 999 F.2d at 115.

savings that Microsoft obtained from its infringement is abundant. *See supra* SOTC Section E. The district court did not consider how denying Exafer supplemental discovery deprived Exafer the full extent of the statutory damages it was entitled to under the law.

Nor did the district court consider that Mr. Blok's expert testimony was absolutely indispensable to the quantification of damages in this case and the prosecution of Exafer's claims—indeed, its exclusion led to dismissal of the case. *See infra* Section C. The Fifth Circuit has found, absent *bad faith,* such a sanction imposed by a district court is unduly harsh. *Gen. Dynamics*, 999 F.2d at 117; *see also In re C.F. Bean L.L.C.*, 841 F.3d 365, 373-74 (5th Cir. 2016) (finding abuse of discretion in district court's exclusion of expert testimony that led to summary judgment). In these circumstances, a continuance would have sufficed to cure any prejudice to Microsoft of allowing supplementation. *See id.*[13]

---

[13] *Microsoft* (not Exafer) had twice asked for a continuance of the trial date prior to Exafer's request. *See* Appx0016-0017 (district court incorrectly stating that the first trial date reset was due to "Exafer's technical expert" conducting final exams). To the extent Microsoft asserted that allowing a continuance is itself prejudice, the Fifth Circuit nonetheless views a continuance as the "preferred" option. *See Gen. Dynamics,* 999 F.2d at 116. Other courts agree despite specifically acknowledging that all litigation entails expense. *See Insight Equity v. Transitions Optical, Inc.*, 2016 U.S. Dist. LEXIS 164742, at *4 (D. Del. Nov. 30, 2016) ("Litigation entails expense but cost is not a reason [] to issue a dispositive evidentiary ruling . . . the need for a revised damages model is not surprising in fact. Defendant has long known it was challenging Plaintiff's damages theory.").

The district court abused its discretion in denying Exafer a reasonable opportunity to address the district court's perceived shortcomings in Mr. Blok's opinions by supplementing its damages report. To the extent this Court affirms any exclusion of Mr. Blok's testimony, it should nonetheless vacate the judgment and remand the case to allow Exafer the opportunity to revise its damages case.

### C. The District Court Erred in Granting Summary Judgment Based on Absence of Remedy.

The district court compounded the errors discussed above when it refused to allow Exafer to present its case to the jury absent the stricken damages testimony. The district court's grant of summary judgment contravened 35 U.S.C. §284, and this Court's guidance that "a fact finder may award no damages only when the record supports a zero royalty award," *Apple*, 757 F.3d at 1328, and damages can be proven without an expert. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003).

#### 1. Section 284 Does Not Permit Summary Judgment Based on an Alleged Lack of Evidence of a Reasonable Royalty.

The district court granted summary judgment based an alleged lack of evidence that a jury could use to arrive at a non-speculative reasonable royalty. Appx0034. As provided by 35 U.S.C. §284 and acknowledged by this Court's precedent, there is an obligation on the district court to award at least a reasonable royalty to Exafer upon a finding that its patents are infringed. This statutory

obligation *precludes* dismissing a case on summary judgment based on an alleged lack of evidence to assess a reasonable royalty. The district court's summary judgment order, which did just that, must be reversed.

Section 284 is "unequivocal" and requires the district court to award damages "in no event less than a reasonable royalty." *Apple,* 757 F.3d at 1327-28. Section 284 guarantees a reasonable royalty for infringement "even if [the patentee] has no evidence to proffer." *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015); *see also Dow,* 341 F.3d at 1382 ("The district court's conclusion that no damages could be awarded, in light of the presumption of damages when infringement is proven, was in error."); *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co*., 895 F.2d 1403, 1406 (Fed. Cir. 1990) ("In patent law, the fact of infringement establishes the fact of damage because the patentee's right to exclude has been violated.").

Accordingly, at "summary judgment … a judge may only award a zero royalty for infringement if there is no genuine issue of material fact that zero is the only reasonable royalty." *Apple,* 757 F.3d at 1328. If there exists a factual issue regarding whether the patentee is due *any* non-zero royalty, the district court *must* deny summary judgment. *Id.*; *Info-Hold,* 783 F.3d at 1372. A lack of expert evidence in the record does not alone support a finding that zero is a reasonable royalty. *Apple,* 757 F.3d at 1330. Even where the patentee's proof is weak, the

district court must determine what royalty is supported by the record and may award nominal damages at trial. *See id.* at 1327-28 ("If a patentee's evidence fails to support its specific royalty estimate, the fact finder is still required to determine what royalty is supported by the record."); *Dow*, 341 F.3d at 1382 (finding the court must "award such reasonable royalties as the record evidence may support").

Microsoft's motion for summary judgment of absence of remedy was based solely on the argument that because Mr. Blok's testimony was excluded, Exafer lacked non-speculative evidence to prove the amount of damages. Appx3413-3433, Appx4373-4388. Microsoft did not present any evidence that Exafer's patented inventions had no value, or that the parties would agree a zero royalty is proper at the hypothetical negotiation. Microsoft's motion fails for this reason alone, as it failed to meet its burden as the movant and provide evidence and argument to support a zero royalty award. *Apple,* 757 F.3d at 1329 (reversing grant of summary judgment where defendant failed to meet its burden of demonstrating that the "record is uncontroverted that zero is the only reasonable royalty").

Merely arguing that Exafer allegedly lacked evidence to prove the non-zero *amount* of damages is not a basis for summary judgment under Federal Circuit precedent. *Id.* at 1328 ("[A] fact finder may award no damages only when the record supports a zero royalty award."). Exafer presented evidence—even if allegedly imperfect—that established a reasonable royalty had value in this case,

and Exafer would have recovered at least *some* damages in the hypothetical negotiation. *See supra* SOTC Section E. The district court acknowledged the extensive evidence of the technical benefit to Microsoft from its use of the infringing technology (Appx0026-0033), and there was ***no evidence*** that this benefit had zero value. To the contrary, Exafer presented record evidence from several witnesses that this benefit had value to Microsoft and saved on infrastructure costs. *See, e.g.*, Appx3617-3620(¶¶119, 122-25), Appx4088-4089(80:23-81:2), Appx4207-4208 (104:25-105:2, 106:11-16). Exafer raised a factual issue on whether it is due a non-zero royalty, and summary judgment should have been denied. *Apple*, 757 F.3d at 1328 ("[I]f a patentee raises a factual issue regarding whether it is due any non-zero royalty, summary judgment must be denied.").

The cases the district court relied on involved litigants that had proceeded to *trial* on the merits and extreme circumstances not present here. In *Promega Corp. v. Life Techs. Corp*, this Court explained that *at trial*, "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory." 875 F.3d 651, 666 (Fed. Cir. 2017); *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) (affirming district court's award of zero damages where patentee presented no evidence of damages at trial). These cases merely stand for the

proposition that if a patentee deliberately takes a risk *at trial*, and *waives* the right to damages, a ruling of zero damages may be proper. As the Federal Circuit acknowledged in *Promega*, these cases are "unusual," because "[p]atent owners who prove infringement are typically awarded at least some amount of damages." *Promega*, 875 F.3d at 666 (citing *Lindemann*, 895 F.3d at 1406).

This Court has *not* applied the principles of *Promega* and *TecSec* to summary judgment, as the district court did here. Indeed, neither Microsoft nor the district court cited a single Federal Circuit case affirming summary judgment of absence of remedy in a patent case. In fact, this Court, and other courts, routinely decline to grant such motions or a zero royalty based on *Apple* and the mandate of §284.[14] This is because a zero royalty is *highly unlikely* to be the answer. *See TecSec*, 978 F.3d at 1291. Exafer never abandoned any theory or waived its claim

[14] *See, e.g.*, *Info-Hold*, 783 F.3d at 1372; *Hollister Inc. v. Zassi Holdings, Inc.*, 752 F. App'x 888, 895 (11th Cir. 2018); *DMF Inc. v. AMP Plus, Inc.*, 2024 U.S. Dist. LEXIS 134652, at *98-99 (C.D. Cal. July 29, 2024); *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 2023 U.S. Dist. LEXIS 167166, at *27 (D. Del. Sept. 20, 2023); *MicroSource, LLC v. Eco World Grp.*, 587 F. Supp. 3d 770, 829 (N.D. Iowa 2022); *Mondis Tech. Ltd. v. LG Elecs., Inc.*, 2020 U.S. Dist. LEXIS 70561, at *9-12 (D.N.J. Apr. 22, 2020); *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 2019 U.S. Dist. LEXIS 180948, at *9-13 (N.D. Cal. Oct. 17, 2019); *Graco Children's Prods. Inc. v. Kids II, Inc.*, 2018 U.S. Dist. LEXIS 49865, at *29-30 (N.D. Ga. Mar. 22, 2018); *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F. Supp. 3d 574, 598 (D. Mass. 2018); *Thorne Rsch., Inc. v. Xymogen*, 2018 U.S. Dist. LEXIS 33272, at *5-9 (D. Utah Feb. 28, 2018); *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 2017 U.S. Dist. LEXIS 94495, at *12-13 (E.D. Tex. Jun. 20, 2017); *Holmberg v. Stealth Cam, LLC*, 2015 U.S. Dist. LEXIS 120527, at *31-32 (D. Minn. Sept. 10, 2015).

to a reasonable royalty upon a finding of infringement. Liability can (and should) still be tried and established even if the district court's *Daubert* ruling left Exafer with little proof of damages. *See Rembrandt*, 561 F. App'x at 910-911. Damages are not an essential element of patent infringement: The "fact of damage"—including the right to exclude—is presumed with infringement and different from the quantity of damages. *Lindemann,* 895 F.2d at 1406; *see also Maxell, Ltd. v. Apple Inc.,* 2021 U.S. Dist. LEXIS 136283, at *27 (E.D. Tex. Feb. 26, 2021) ("Maxell is correct in noting that damages are not an essential element of infringement."). If Exafer is lacking evidence to support an amount of the royalty at trial, Exafer would still be entitled to a damages award for any infringement, however nominal.[15] *Lindemann*, 895 F.2d at 1407 (affirming award of nominal damages where plaintiff's evidence was inadequate).

At summary judgment, however, the *amount* of the royalty—an issue for the jury to decide upon a finding of infringement—cannot be resolved in accordance with this Court's precedent unless the evidence demonstrates that *zero is the only*

---

[15] A nominal royalty is not an empty victory for a patentee. A liability finding would confirm Exafer's defense of its patents against an infringer, and Exafer could seek an ongoing royalty (based on additional evidence) or file a new case for Microsoft's ongoing infringement, as the patents-in-suit have several years before expiration. *E.g., ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012). Exafer also would not face costs and attorneys' fees, as Microsoft now seeks based on the exclusion of its damages expert report under Rule 702. Appx0058-0059.

*answer*, as there is an *obligation* for the court to award some amount of damages. Even if Exafer's evidence does not support a non-speculative *amount* of damages (which it does, *see infra*), Microsoft did not present any evidence that a zero royalty is the answer. In fact, Exafer presented enough evidence that it is not. Because the specific reasonable royalty that the record evidence supports is a question for the jury, this case should proceed to trial. *See Apple*, 757 F.3d at 1327-30.

### 2. The District Court Erroneously Dismissed This Case Based on an Alleged Lack of Evidence of a Reasonable Royalty.

The district court granted summary judgment because Exafer could not prove the amount of reasonable royalty damages without Mr. Blok's testimony. Appx0026-0035. The law is clear that Exafer does not need Mr. Blok to testify and may establish a reasonable royalty through Microsoft's witnesses and documentation. *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1267-68 (Fed. Cir. 2013) (upholding damages based on defendant's expert after patentee's was excluded); *Dow*, 341 F.3d at 1381-82 (finding reasonable royalty can be awarded without expert testimony). There was ample record evidence which the jury could use to assess a reasonable royalty, Appx3533-4372, but the district court made multiple errors in refusing to fully consider this evidence.

*First*, the district court was wrong to declare the opinions of Mr. Martinez (Microsoft's expert) "inadmissible hearsay" for several reasons. Appx0032. The

district court correctly found that Microsoft designated Mr. Martinez as a testifying damages expert to rebut Mr. Blok's opinions. Appx0030. But Microsoft sought to declare Mr. Martinez an unavailable witness ***in its reply brief*** to remove evidence from the record. Appx4381. Fundamentally, the fact that Microsoft's chicanery is responsible for making Mr. Martinez unavailable is sufficient for Mr. Martinez's opinions to be admissible under Rule 804.[16] FED. R. EVID. 804(b)(1), 804(b)(6); FED. R. CIV. P. 32(a)(1). The district court never considered that it was Microsoft who pulled Mr. Martinez as a witness and called him unavailable, and that Exafer was not given an opportunity to be heard on this issue following Microsoft's introduction of this momentous change in its reply, as required by Fifth Circuit law. *See Redhawk Holdings Corp. v. Schreiber*, 836 F. App'x 232, 237 (5th Cir. 2020); *see also* Appx0057 (text order denying Exafer's request for oral argument).

The district court also wrongly found that *Collins v. Wayne Corp,* 621 F.2d 777 (5th Cir. 1980) and Rule 802(d)(2)(C) does not apply to "litigation experts," choosing the interpretation of *Collins* in one court in the Eastern District of Texas

[16] Courts routinely find that a patentee can rely on the opposing expert to support a reasonable royalty when faced with a *Daubert* exclusion. *See Versata,* 717 F.3d at 1267-68. Microsoft withdrew Mr. Martinez to avoid Exafer relying on his testimony to defeat summary judgment. *See United States v. Nelson*, 242 F. App'x 164, 170-71 (5th Cir. 2007) (holding preponderance of the evidence is the standard under Rule 804(b)(6)); Rule 804(b)(6) Advisory Committee Notes ("The wrongdoing need not consist of a criminal act.").

over another. Appx0031-0032 (analyzing conflicting *Fractus, S.A. v. AT&T Mobility LLC*, 2019 U.S. Dist. LEXIS 169610 (E.D. Tex. Sept. 30, 2019) and *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 2017 U.S. Dist. LEXIS 94495 (E.D. Tex. June 20, 2017) adopted by 2017 U.S. Dist. LEXIS 178887 (E.D. Tex. July 31, 2017)). This is an overly narrow and unsupported interpretation of Fifth Circuit law. The Fifth Circuit has allowed expert testimony to serve as a party admission where the expert's statements or reports were prepared for the very case in which admission was sought. *See Fox v. Taylor Diving & Salvage Co*., 694 F.2d 1349, 1354-55 (5th Cir. 1983) ("The expert testified at a very early stage in the plaintiff's case.").

The district court failed to consider whether Mr. Martinez's statements were admissible as adopted admissions under Rule 801(d)(2)(B). Under Fifth Circuit law, the district court must consider "whether the particular circumstances warrant the conclusion that adoption in fact occurred." *Fox,* 694 F.2d at 1355 (citing *McCormick on Evidence* § 269, at 650 (2d ed. 1972)). In this case, like in *Fox*, the totality of the circumstances surrounding the expert's testimony is sufficient to preclude Microsoft from claiming Mr. Martinez's opinions are hearsay. *See Fox,* 694 F.2d at 1354-57; *see also Fractus*, 2019 U.S. Dist. LEXIS 169610, at *15 (finding a defendant may adopt its expert witness's statements by reliance "upon the statements in pre-trial motion practice").

Exafer sought to rely on Mr. Martinez's statements and analysis in his report, which demonstrated the value of Microsoft's infringing use (and a reasonable royalty) based on "Networking Services" revenue. Appx3544-3548. Mr. Martinez, relying on Microsoft's financial records and Rule 30(b)(6) testimony, opined that the value of Microsoft's infringing use could be determined by attributing [redacted] of "Networking Services" revenue to use of VFP. Appx4171-4174. Mr. Martinez stated that this is the "more relevant measure of the value to Microsoft for using" the infringing technology. *Id.* This was *Microsoft's* theory—Microsoft also claimed that "Networking Services" was the relevant measure of a reasonable royalty to convince the district court Mr. Blok's damages theory was unreliable. Appx0827, Appx0831, Appx3011-3012. Microsoft's pre-trial *Daubert* motion thus *expressly adopted* Mr. Martinez's opinion. Mr. Martinez's statements are admissible as adopted admissions under Rule 801(d)(2)(B).

*Second*, the district court misapplied Fifth Circuit precedent regarding the presentation of evidence pursuant to Rule 56. *See* FED. R. CIV. P. 56(c). The district court cited *Lee v. Offshore Logistical and Transp., L.L.C.*, 859 F.3d 353 (5th Cir. 2017) for the proposition that "substance or content of the evidence submitted to support or dispute a fact on summary judgment must be … admissible at trial." Appx0032. But the district court omitted a key portion of what *Lee* says: The full quote of *Lee* states, "[a]lthough the substance or content of the evidence submitted

to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." 859 F.3d at 355. The Fifth Circuit has found that pursuant to Rule 56(c), a district court must consider whether the *contents* of the evidence *may be* presented in admissible form at trial. *Id*.

Exafer cited specific portions of Mr. Martinez's report, showing Microsoft's costs for servers based on statements made by Microsoft's executive Dr. Maltz, and Microsoft financial documents and Rule 30(b)(6) testimony relied upon by Mr. Martinez in opining that "Networking Services" revenue would be a proper measure of damages. Appx3544-3548, Appx4148(¶102), Appx4171-4174; *see also* Appx3011-3012. The district court never considered whether the statements, financial documents, and Rule 30(b)(6) testimony underlying the opinions of Mr. Martinez that Exafer identified were independently admissible at trial.[17] These Microsoft statements, documents and testimony are party-admissions and thus not hearsay, *see* FED. R. EVID. 801(d)(2)(A), and in all events, the evidence underlying Mr. Martinez's opinions is capable of being presented in a form that is admissible to prove damages.

[17] While Microsoft's reply argued that Mr. Martinez's report is hearsay, Microsoft never objected that the portions of Mr. Martinez's report cited by Exafer could not be produced in admissible form. *See* Appx4381-4382; FED. R. CIV. P. 56(c)(2).

*Finally*, after determining the district court mistakenly excluded this evidence from summary judgment, this Court should find that Microsoft was not entitled to summary judgment. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 667-68 (5th Cir. 1999) (after reviewing evidentiary rulings, "[t]hen, with the record defined, we must review *de novo* the order granting judgment as a matter of law"). Reviewing the evidence in the light most favorable to Exafer, as this Court must, the evidence of record pertaining to Microsoft's damages expert, Mr. Martinez, and the content of his report, in conjunction with Dr. Congdon's, Dr. Olivier's and Dr. Maltz's testimony, should have been outcome determinative in Exafer's favor. *See Info-Hold*, 873 F.3d at 1372 (allowing the district court to consider the defendant's expert testimony in determining a reasonable royalty).

Microsoft's admissible "Networking Services" revenue (and Dr. Maltz's Rule 30(b)(6) testimony) alone constitute sufficient evidence to permit an assessment of a reasonable royalty for Microsoft's use of the infringing technology. Mr. Martinez, relying on Dr. Maltz's admissible Rule 30(b)(6) testimony, stated:

> The more relevant measure of the value to Microsoft from using VFP Fastpath and SmartNICs, if any, is the revenue from certain services offered by the Azure Networking business line. According to Dr. Maltz, Microsoft would evaluate the value of VFP by analyzing "the revenue [it] receives for the services that [it] offer[s] using VFP." Specifically, for applications that may use VFP in some capacity, Microsoft "would take the revenue associated with ExpressRoute and Brooklyn and prorate it by the fraction of the scenario that involves VFP."

Appx4172-4173(¶¶18, 21). Mr. Martinez then presented the relevant revenue for "Networking Services" based on independently admissible financial documents. Appx4173(¶22). Mr. Martinez found that the accused technology contributed [redacted] of this overall revenue based on Microsoft's business documentation. Appx4173-4174(¶23). All the information Mr. Martinez relied on is admissible as party admissions, *see* FED. R. EVID. 801(d)(2)(A), and even if Mr. Martinez's report were not admissible, this information is admissible and evidence upon which a jury could determine a reasonable royalty.

Mr. Martinez also provided Microsoft's yearly server costs, which can be applied to the admissible information Dr. Congdon and Dr. Maltz provided regarding the percentage of CPUs saved per server by use of the infringing technology, and Microsoft's admissible documents showing the number of cores saved. *E.g.*, Appx4148(¶102). All of this is sufficient evidence to defeat Microsoft's motion for summary judgment based on absence of remedy and should not be ignored. *See Info-Hold*, 783 F.3d at 1372 (reversing district court's grant of summary judgment based on absence of damages after determining there was "record evidence to demonstrate the existence of a genuine issue of material fact" as to the reasonable royalty).

Moreover, Microsoft is judicially estopped from challenging that Mr. Martinez's analysis is a relevant measure of the value of Microsoft's infringing use

or a reasonable royalty in this case. Judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996). The doctrine precludes litigants from "playing fast and loose" with the courts and "prohibits parties from deliberately changing positions based upon the exigencies of the moment." *Id.* Microsoft's statements declaring "Networking Services" the relevant measure of a reasonable royalty in its *Daubert* motion (Appx0827, Appx0831, Appx3011-3012) meet all of the elements of judicial estoppel. *See New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (enumerating three factors for judicial estoppel). Microsoft's bait-and-switch is the exact behavior judicial estoppel seeks to prevent. *See Ergo*, 73 F.3d at 598-600; *see also Trs. in Bankr. of N. Am. Rubber Thread Co. v. U.S.*, 593 F.3d 1346, 1357 (Fed. Cir. 2010) ("Once a party takes a position in litigation, it cannot lightly about-face."). Microsoft cannot challenge that Mr. Martinez's analysis, "Networking Services" revenue, and Dr. Maltz's Rule 30(b)(6) testimony is sufficient evidence to support a reasonable royalty for Microsoft's use of the infringing technology.

Summary judgment should be reversed.

## CONCLUSION

For the reasons set forth above, Exafer respectfully requests this Court to (1)

reverse the exclusion of Exafer's original damages theory as a matter of law; (2) reverse the district court's refusal to allow a revised damages report and supplemental discovery; and (3) reverse the grant of summary judgment as a matter of law. This Court should vacate final judgment and remand the case for trial, and instruct the district court to allow the parties, if necessary, to submit revised expert reports consistent with this Court's opinion.

Dated: January 14, 2025

Respectfully submitted,

*/s/ Ronald M. Daignault*
Ronald M. Daignault*
Scott R. Samay*
Jason S. Charkow*
Elizabeth Bernard*
DAIGNAULT IYER LLP
8229 Boone Boulevard, Ste 450
Vienna, VA 22182
rdaignault@daignaultiyer.com
ssamay@daignaultiyer.com
jcharkow@daignaultiyer.com
ebernard@daigaultiyer.com
(917) 838-9795
**Not admitted in Virginia*

*Counsel for Plaintiff-Appellant Exafer Ltd.*

# ADDENDUM

# TABLE OF CONTENTS
## ADDENDUM


| Date Filed | Docket No. | Description | Page |
|---|---|---|---|
| 3/7/2024 | 165 | Order granting Microsoft's motion to exclude the expert opinions of Justin Blok | Appx1 - 6 |
| 4/11/2024 | 180 | Order denying the appeal of Judge Lane's Order excluding the opinion of Justin Blok | Appx7 - 10 |
| 6/11/2024 | 212 | Order denying Exafer's motion to re-open fact and expert discovery | Appx11 - 17 |
| 8/15/2024 | 247 | REDACTED Order granting Microsoft's motion for summary judgment based on absence of remedy | Appx18 - 35 |
| 8/30/2024 | 249 | Final Judgment granting Microsoft's motion for Summary Judgment and dismissing Exafer's claims against Microsoft | Appx36 |
| 12/4/2019 | 1-1 | U.S. Patent No. 8,325,733 | Appx60 - 76 |
| 12/4/2019 | 1-2 | U.S. Patent No. 8,971,335 | Appx77 - 105 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **EXAFER LTD.,** | § | |
| **Plaintiff,** | § | |
| **V.** | § | **1:20-CV-131-RP** |
| | § | |
| **MICROSOFT CORPORATION,** | § | |
| **Defendant.** | § | |

**ORDER**

Microsoft Corporation's Motion to Exclude Expert Opinions of Mr. Justin R. Blok and Dr. Paul Congdon Regarding Damages (Dkt. 152), Exafer Ltd.'s Response (Dkt. 155), and Microsoft's Reply (Dkt. 160) are before the court.[1] Having considered the parties' briefs, the applicable law, the entire docket, the undersigned enters the following order.

**I. BACKGROUND**[2]

Exafer accuses Microsoft of infringing its U.S. Patent Nos. 8,325,733 (the '733 patent) and 8,971,335 (the '335 patent). The '733 patent "describes method and system for forwarding frames of a flow via a layer 2 forward and manipulator (L2FM) for improving network utilization and improving users experience by reducing the latency associated with the flow." '733 patent Abstract. The '335 patent is directed to optimizing, controlling, manipulating, and creating the best traffic paths for data flow in a network. Thus, both patents describe ways to optimize data transmission efficiency within a network.

Microsoft moves to exclude the testimony of Exafer's damages expert, Mr. Blok, and

[1] United States District Judge Robert Pitman referred this matter to the undersigned for resolution as to the merits pursuant to 28 U.S.C. § 636(b)(1)(A), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. *See* Text Order dated November 27, 2023.
[2] Any technical descriptions are given for contextual purposes only and are not intended construe or limit the claims in any way.

Exafer's technical expert, Dr. Congdon, to the extent that Mr. Blok relies on Dr. Congdon's analysis to support Exafer's damages theory. Microsoft argues that Exafer cannot meet its burden to show by a preponderance of the evidence that the testimony of its experts is relevant, reliable, or admissible under Rule 702.

## II. RULE 702 STANDARD

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 was amended effective December 1, 2023 to clarify that the proponent bears the burden of showing the expert testimony more likely than not complies with the rule and to emphasize that an expert opinion must reflect a reliable application of the expert's methodology. *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab. Litig.*, 93 F.4th 339, n.4 (6th Cir. 2024).

For expert testimony, the trial judge plays a "gatekeeping role," which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (citing *Daubert*, 509 U.S. at 597, 592-93). The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id*. (quoting *Daubert*, 509 U.S. at 595). "[A] reasonable or scientifically valid methodology is nonetheless unreliable where the data used is not sufficiently tied to the facts of the case." *Id*. (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)). Likewise, "ideal input

data cannot save a methodology that is plagued by logical deficiencies or is otherwise unreasonable." *Id*. (quoting *Summit* 6, 802 F.3d at 1296). But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied. *Id*.

## III. Patent Damages

Upon a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). A reasonable royalty may be a lump-sum payment not calculated on a per unit basis, but it may also be, and often is, a running payment that varies with the number of infringing units. *Id*. In that event, it generally has two prongs: a royalty base and a royalty rate. *Id*.

No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features. *Id*. Indeed, the Supreme Court long ago observed that a patentee

> must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.

*Id*. (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). Courts are cognizant of the difficulty that patentees may face in assigning value to a feature that may not have ever been individually sold and absolute precision is not required. *Id*. at 1328. However, a patentee's obligation remains to

apportion damages only to the patented features. *Id.* at 1329.

## IV. ANALYSIS

Exafer accuses Microsoft's Azure network's "VFP Fastpath" and "SmartNIC Accelerated Networking" (collectively, the Accused Features) of infringement. Azure is Microsoft's cloud computing platform that offers products and services to build, deploy, and manage applications on any device. The Accused Features impact the efficiency at which data is transmitted on the Azure network. One service Azure offers is "virtual machines" (VM), which are software representations of physical computers that run on Azure servers hosted in the Azure cloud. Exafer does not accuse VMs—which Microsoft offered before it implemented the Accused Features—of infringing either patent. However, Exafer's technical expert, Dr. Congdon, contends that the Accused Features create efficiencies that enable Microsoft's servers to host more VMs.

Both sides agree that Microsoft does not directly charge for the Accused Features. Accordingly, relying on the premise that the Accused Features allow Microsoft to achieve more VMs on a server, Exafer's damages expert, Mr. Blok, values the Accused Features based on the amount of VMs on the network. Specifically, Blok opines:

> My analyses relating to a reasonable royalty rate for a license to the Patents-in-Suit in this matter is based on a hypothetical negotiation between Exafer and Microsoft that would have occurred on or about the time of first infringement (i.e., January 2014). . . . [I]t is my opinion that the parties would have agreed upon a reasonable royalty for rights to the Patents-in-Suit of no less than $0.0247 per virtual machine hour Microsoft sold in connection with the Accused Platform. As a result of applying a per-hour royalty rate of $0.0247 to the total number of virtual machine hours Microsoft sold as of December 2020 . . . , I have calculated reasonable royalty damages owed to Exafer for Microsoft's alleged infringement of the Patents-in-Suit to be approximately $211.1 million.

Dkt. 152-2 (Blok Report) ¶ 7 (footnotes omitted). Microsoft objects to this valuation theory, arguing that it is impermissible to base damages on VMs, which are unaccused technology. Even if Exafer is allowed to base its damages theory on VMs, Microsoft asserts a myriad of reasons for why Exafer's

damages theory is so flawed it should be struck.

Microsoft first argues Exafer's damages model is fundamentally flawed because it uses unaccused VMs as the royalty base. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 411 (Fed. Cir. 2018) ("[A] reasonable royalty "cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'") (quoting *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015) (quoting § 284)). Exafer argues that its damages theory follows Microsoft's perspective at the time infringement. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) ("the [hypothetical] negotiation must be hypothesized as of the time infringement began"). Thus, both parties rely on basic principles of patent-damages law to sustain their position.

Exafer contends that at the time infringement began Microsoft valued the Accused Features by the extent to which they could increase the amount of VMs offered on a server. Exafer cites to various presentations on the technology positing this benefit. *See* Dkt. 155 at 10 n.1 (citing exhibits). Thus, Exafer argues that at the hypothetical negotiation, Microsoft would have negotiated with this in mind. Exafer does not directly respond to the cases cited by Microsoft holding that it is improper for unaccused technology to form the royalty base. Exafer cited no case holding that the royalty base could entirely consist of unaccused technology.

Most closely on point is the *Enplas* case relied on by Microsoft. *Enplas*, 909 F.3d at 398. In *Enplas*, the jury's damage award was based on a "freedom-to-operate" payment, meaning the damages award included payment for infringing products and *potentially* infringing products so that defendant would be insulated from any infringement claims for any other products. *Id.* at 409-11. Over defendant's objection, plaintiff's damages expert testified that at the hypothetical negotiation the parties would not have limited the license to just the accused products if there were a risk of infringement by manufacturing other similar products. *Id.* at 409. Relying on a prior opinion, the

Federal Circuit vacated the damages award because "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" *Id.* at 411 (quoting *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284). Similarly, Exafer uses sales of VMs—which are not accused of infringement—as the royalty base to determine damages. Exafer does not distinguish *Enplas* or any of the many cases that Microsoft cited on this point. Exafer has failed to meet its burden to show that Mr. Blok's damages theory is based on a sufficiently reliable methodology such that it should go before a jury.

As this issue is dispositive of Microsoft's motion, the court does not reach Microsoft's remaining arguments. For the reasons above, the court excludes the expert testimony of Mr. Blok on damages. The court declines to strike paragraphs 108-126 of Dr. Congdon's report because he does not opine that VMs should serve as the royalty base.

## V. CONCLUSION

Accordingly, for the reasons given above, the court **GRANTS** Microsoft Corporation's Motion (Dkt. 152) to the extent it seeks to exclude the expert Opinions of Mr. Justin R. Blok and **DENIES** the Motion as to Dr. Paul Congdon's opinion.

SIGNED March 7, 2024.

MARK LANE
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EXAFER LTD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:20-CV-131-RP |
| | § | |
| | § | |
| MICROSOFT CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court is Plaintiff Exafer Ltd.'s ("Exafer") appeal of Magistrate Judge Lane's order excluding the opinion of Exafer's damages expert, Mr. Blok, (Order, Dkt. 165). (Exafer Appeal, Dkt. 170). Defendant Microsoft Corporation ("Microsoft") also filed an appeal of the magistrate judge's order to the extent that it did not exclude certain sections of the reports of Exafer's technical expert's, Dr. Congdon, opinions. (Microsoft Appeal, Dkt. 171). Both parties filed responses to the other party's objections. (Dkts. 173, 178). Having considered the parties' submissions, the law, and the record in this case, the Court will deny both parties' appeals of the magistrate judge's order.

**I. LEGAL STANDARD**

A district judge may reconsider any pretrial matter determined by a magistrate judge where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A). District courts apply a "clearly erroneous" standard when reviewing a magistrate judge's ruling under the referral authority of that statute. *Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995). The clearly erroneous or contrary to law standard of review is "highly deferential" and requires the court to affirm the decision of the magistrate judge unless, based on the entire evidence, the court reaches "a definite and firm conviction that a mistake has been committed." *Gomez v. Ford Motor Co.*, No. 5:15-CV-866-DAE, 2017 WL 5201797, at *2 (W.D. Tex. Apr. 27, 2017) (quoting *U.S.*

*v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The clearly erroneous standard "does not entitle the court to reverse or reconsider the order simply because it would or could decide the matter differently." *Id.* (citing *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015)).

## II. DISCUSSION

### A. Exafer's Appeal

Exafer argues that this Court should reconsider the magistrate judge's order striking Exafer's damages expert for three reasons: (1) the magistrate judge ignored the fact that Microsoft's use of the allegedly infringing technology directly benefits Microsoft's Virtual Machines ("VMs"); (2) Mr. Blok's use of VM hours as a royalty base is supported by longstanding principles of damages law; and (3) the magistrate judge mistakenly relied on the *Enplas* case in his analysis. (Exafer Appeal, Dkt. 170). The Court finds that none of these grounds of appeal establish that the magistrate judge's order was clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A).

First, the magistrate judge did not ignore the fact that Microsoft's use of the allegedly infringing technology may be directly benefitting Microsoft's VMs. In his order, the magistrate judge specifically acknowledges that "Exafer's technical expert, Dr. Congdon, contends that the Accused Features create efficiencies that enable Microsoft's servers to host more VMs." (Order, Dkt. 165, at 4). Rather, the magistrate judge took issue with the fact that Mr. Blok uses VM hours as his royalty base for calculating damages, which is impermissible because Microsoft's VMs are not, and do not contain any, accused technology. (*Id.* at 6 (citing *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 411 (Fed. Cir. 2018) ("The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement . . . .")).

This leads into Exafer's second argument: that Mr. Blok's use of VM hours is supported by longstanding principles of damages law. However, as the magistrate judge pointed out in his order,

Exafer has "cited no case holding that the royalty base could entirely consist of unaccused technology." (Order, Dkt. 165, at 5). Exafer fails to note the distinction between a royalty base and a royalty rate. *See Summit 6 LLC v. Rsch. in Motion Corp.,* No. 3:11-CV-367-O, 2013 WL 12124321, at *8, *8n.11 (N.D. Tex. June 26, 2013) ("There is no requirement that a component that an expert relies on in calculating the royalty *rate* must be a patent-practicing unit of the accused device. This is separate from the requirement that any royalty *base* must be the smallest salable patent-practicing unit.") (internal citations omitted) (emphasis in original).

Finally, Exafer contends that the magistrate judge misrelied on *Enplas* in finding that Mr. Blok's damages theory is not based on a sufficiently reliable methodology. *Enplas*, 909 F.3d 398. However, *Enplas* is directly applicable to this case as it involved the Federal Circuit vacating a damages award that was based on activities that did not constitute patent infringement. *Id.* at 411. Here, as the magistrate judge correctly stated, Mr. Blok attempted to use VM hours—which are not accused of infringement—as the royalty base for Exafer's damages. Thus, the Court finds that the magistrate judge's decision to strike Exafer's damages expert, Mr. Blok, is neither clearly erroneous nor contrary to law.

**B. Microsoft's Appeal**

In its appeal, Microsoft contends that the magistrate judge erred in denying exclusion of the parts of Dr. Congdon's opinions that speak to damages. (Microsoft Appeal, Dkt. 171, at 2). In its motion to exclude, Microsoft asked the Court to exclude not only Mr. Blok's opinions but also Dr. Congdon's damages opinions at paragraphs 108–126 of his original report and paragraphs 10–33 of his supplemental report. (*Id.* at 2). The magistrate judge declined to exclude paragraphs 108–126 of Dr. Congdon's report[1] because "he does not opine that VMs should serve as the royalty base."

---

[1] The Magistrate Judge's order does not address Microsoft's request to exclude paragraphs 10–33 of Dr. Congdon's supplemental report.

(Order, Dkt. 165, at 6). However, Microsoft argues that Dr. Congdon's damages support opinions are "independently inadmissible" because they are "unreliable, untethered to the facts, and contrary to the law." (Microsoft Appeal, Dkt. 171, at 5). The Court finds that Microsoft's arguments as to why Dr. Congdon's original and supplemental opinions are "independently inadmissible" go to the weight of the evidence, not the admissibility. The Court clarifies that it will not exclude Dr. Congdon's damages opinions from either his original report or his supplemental report.

## III. CONCLUSION

Upon its own review, this Court finds that Magistrate Judge Lane's order was not clearly erroneous or contrary to law. The Court therefore **AFFIRMS** the order excluding the opinion of Mr. Blok, (Dkt. 165), and **DENIES** both parties' appeals, (Dkts. 170, 171).

**SIGNED** on April 11, 2024.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EXAFER LTD, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:20-CV-131-RP |
| | § | |
| MICROSOFT CORPORATION, | § | |
| Defendant. | § | |

**ORDER**

Before the Court is Plaintiff Exafer Ltd's ("Exafer") Opposed Motion to Re-Open Fact and Expert Discovery and Reset the Trial Date. (Dkt. 192). Defendant Microsoft Corporation ("Microsoft") filed a response in opposition, (Dkt. 199), and Exafer filed a reply, (Dkt. 200). Microsoft then filed an unopposed motion for leave to file a sur-reply, (Dkt. 201). Having considered the parties' briefing, the record, and the relevant law, the Court will deny Exafer's motion to re-open fact and expert discovery.

## I. BACKGROUND

Exafer filed its original complaint in this action on December 4, 2019. (Dkt. 1). United States District Judge Alan Albright held a *Markman* hearing on November 6, 2020 and issued a claim construction order on January 13, 2021. (Dkts. 53, 63). The case was then transferred to the undersigned on December 13, 2021. (Dkt. 99). The Court entered a scheduling order on February 23, 2023, which set the deadline for discovery as June 6, 2023 and for dispositive motions as August 7, 2023 and set the trial date for December 4, 2023. (Dkt. 116). Microsoft then moved for a continuance, which the Court granted, moving the trial date to February 5, 2024. (*See* Dkt. 121; Text Order, April 20, 2023). The trial date was moved once again after Exafer filed two "untimely and unauthorized" supplemental expert reports, and United States Magistrate Judge Mark Lane granted

Microsoft leave to also serve supplemental expert reports to cure the prejudice. (Order, Dkt. 142). The Court then set the trial for September 20, 2024. (Order, Dkt. 157).

On March 7, 2024, Judge Lane granted Microsoft's motion to exclude the expert opinions of Exafer's damages expert, Mr. Blok, and denied Microsoft's motion to exclude portions of the expert opinions of Exafer's technical expert, Dr. Congdon. (Order, Dkt. 165). Currently, the parties are briefing their dispositive motions and remaining *Daubert* motions which include: Exafer's motion to exclude certain expert testimony of Dr. James Olivier and Mr. Christopher Martinez, (Dkt. 193); Exafer's motion for partial summary judgment, (Dkt. 194); Microsoft's motion for summary judgment based on absence of remedy, (Dkt. 195); Microsoft's motion to exclude expert opinions of Dr. Congdon, (Dkt. 196); and Microsoft's motion for summary judgment based on absence of liability, (Dkt. 197).

Exafer has also filed the instant motion, asking the court to re-open fact and expert discovery and to reset the trial date. (Dkt. 192). Specifically, Exafer requests that the Court authorize Exafer to serve ten additional requests for production and five interrogatories, take two 30(b)(6) fact depositions (one technical and the other financial), and grant the parties leave to file their respective expert reports and conduct expert depositions limited to the supplemental reports. (Mot., Dkt. 192, at 10). Exafer attached a proposed scheduling order to this motion, which would re-open fact discovery for 60 days, before giving Exafer 30 days to serve a supplemental expert report and then Microsoft 30 days to serve a rebuttal expert report. (Proposed Scheduling Order, Dkt. 192-2). The proposed scheduling order then suggests opening expert discovery seven days after Microsoft has filed its rebuttal report. Expert discovery would be open for 21 days, and the parties would then have 56 days to file *Daubert* motions and responsive briefing. (*Id.*). Exafer states that it wishes to fully develop an alternative damages theory since Judge Lane excluded the testimony of Exafer's damages

expert, Dr. Blok. (Mot., Dkt. 192, at 5). Exafer also states that the basis for this alternative damages theory already exists in the record, specifically in Exafer's technical expert's opinions and in Microsoft's experts' opinions, and that any discovery would be for the purpose of supplementing this alternative damages theory. (*Id.* at 6–8).

## II. LEGAL STANDARD

A scheduling order may "be modified only for good cause." Fed. R. Civ. P. 16(b)(4). There are four relevant factors to consider when determining whether there is good cause under Rule 16(b)(4): "(1) the explanation for the failure to timely [comply with the scheduling order]; (2) the importance of the [modification]; (3) potential prejudice in allowing the [modification]; and (4) the availability of a continuance to cure such prejudice." *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 819 (5th Cir. 2019), *as revised* (Jan. 29, 2019), *as revised* (Feb. 14, 2019). A party is required "to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008).

## III. DISCUSSION

Exafer argues that "good cause exists to re-open fact and expert discovery to supplement the record to accommodate an alternative damages theory to value the benefit that Microsoft obtained by using Exafer's invention." (Mot., Dkt. 192, at 5). Exafer states that its need for additional discovery arose after Judge Lane excluded the expert opinions of Exafer's damages expert, Mr. Justin R. Block. (*Id.*; *see also* Order, Dkt. 165). Specifically, Exafer argues that "the parties, the Court, and the jury stand to benefit from additional narrowly-tailored fact and expert discovery relating to" Exafer's under-developed alternate damages theory based on Microsoft's cost-savings. (Mot., Dkt. 192, at 8). Exafer further argues that Microsoft will not be prejudiced by an amended schedule as it

"will be given full opportunity to cross-examine, test, and respond" regarding any new discovery, (*id.* at 9), and that trial, which is set for September 20, 2024, is still months away, (*id.*).[1]

Microsoft, in opposition to Exafer's request, argues that (1) Exafer fails to give any explanation for its failure to timely comply with the scheduling order; (2) Exafer fails to show that its vague request to allow narrowly-tailored fact and expert discovery is important; (3) reopening fact and expert discovery would be highly prejudicial; and (4) a continuance would not cure the prejudice to Microsoft. (Resp., Dkt. 199).

The Court finds that Exafer fails to show that there is good cause to modify the scheduling order and re-open fact and expert discovery. First, Exafer does not provide any explanation for why it failed to timely comply with the scheduling order. *See Fahim,* 551 F.3d at 348 (movant must show that it was unable to meet the deadlines despite its own diligence). Rather, Exafer opines at length about its entitlement to damages upon a hypothetical finding of liability. (*See* Mot., Dkt. 192, at 5–8). Exafer's only attempt at explaining why it did not develop an alternate damages theory before the relevant scheduling order deadlines is that it did not know that the Court would later exclude its only damages theory. (*Id.* at 11). The Court is not persuaded by Exafer's explanation as it in no way explains why Exafer was unable to complete its fact and expert discovery within the scheduling order deadlines. Parties regularly fully develop alternative damages theories within the Court's discovery deadlines. Further, Exafer argues that the basis for this alternative damages theory already exists on the record, (Mot., Dkt. 192, at 6, 8), but fails to explain why it did not fully develop this theory within the Court-ordered discovery deadlines. In its reply, Exafer contends that the question is not whether it was diligent during original fact discovery but whether it can "diligently re-open fact discovery." (Reply, Dkt. 200, at 5). This is patently wrong. The factors for good cause clearly

[1] Despite emphasizing that trail is still months away, Exafer does request a continuance of trial in its motion. (Mot., Dkt. 192, at 13).

require the Court to consider whether Exafer was diligent during the Court-ordered discovery period. *Fahim*, 551 F.3d at 348. The Court finds that Exafer has failed to show that it was diligent during discovery or unable to comply with the Court's deadlines.

Second, Exafer fails to highlight why this additional discovery is important. Exafer states that "[i]nstead of proceeding to trial on an incomplete record, the parties, the Court, and the jury stand to benefit from additional narrowly-tailored fact and expert discovery relating to the cost saving benefits of the accused [technology]. This additional discovery and supplementation is important to the effective administration of this case." (Mot., Dkt. 192, at 8–9). However, Exafer does not specify what it seeks to recover from Microsoft that has not already been handed over during the original discovery period. Exafer requests that the Court authorize it to serve ten additional requests for production and five interrogatories and to take two 30(b)(6) depositions in order to fully develop the record "with respect to the technical benefits of the patented technology in terms of cost savings and the specific financial figures underlying Microsoft's cost savings." (*Id.* at 8, 10). Microsoft asserts that it has "already produced all the evidence in its possession on these topics that it located after a diligent search" during the original discovery period (Resp., Dkt. 199, at 7). Rather than clarifying in its reply what it seeks to discover, Exafer once again argues that it will be entitled to damages upon a finding of Microsoft's liability and states that it "may proceed to trial and present its revised cost-savings damages theory based, in large part, on evidence Microsoft admits exists in the record." (Reply, Dkt. 200, at 3). Exafer itself concedes that most of what it needs is already in the record, which only weakens Exafer's argument that there is good cause to allow for a continuance of around 200 days to complete additional fact and expert discovery. (*See* Proposed Scheduling Order, Dkt. 192-2). Exafer fails to show that this factor weighs in favor of good cause.

Third, there would be prejudice against Microsoft if the Court were to re-open fact and expert discovery and reset the trial. Exafer argues that Microsoft will not be prejudiced because "Microsoft will be given full opportunity to cross-examine, test, and respond." (Mot., Dkt. 192, at 9). Microsoft argues that it would be prejudiced because "Exafer's expansive request to broadly reopen both fact and expert discovery would massively increase litigation expenses and impose significant burdens on Microsoft." (Resp., Dkt. 199, at 12). The Court agrees with Microsoft. Even if Microsoft is able to fully test Exafer's new damages theory, it would still be forced to invest time and resources into a new round of discovery and motions practice. *See Connell W. Trucking Co. v. Estes Express Lines*, No. EP-20-CV-312-KC, 2022 WL 21712355, at *5 (W.D. Tex. Nov. 30, 2022) ("Courts have recognized increased litigation costs as a form of prejudice." (citing *Rios v. City of Conroe*, 674 F. App'x 366, 372 (5th Cir. 2016))). Thus, this factor weighs against a showing of good cause to amend the scheduling order.

Fourth, and finally, a continuance will not cure any prejudice to Microsoft. Indeed, a continuance would *cause* prejudice to Microsoft, a defendant in a case that was filed over four years ago. "When prejudice takes the form of increased litigation costs, it often follows that a continuance would not cure the prejudice but instead would exacerbate the alleged harm." *Connell W. Trucking Co.*, 2022 WL 21712355, at *5 (internal citations omitted). Exafer states that Microsoft has twice obtained later trial dates over Exafer's objections, contending that Microsoft cannot therefore be opposed to or prejudiced by a continuance. (Reply, Dkt. 200, at 5). This argument is particularly unconvincing. The first time the Court reset the trial date at Microsoft's behest, it found that good cause existed to do so because Exafer's technical expert would be conducting final exams during trial. (*See* Mot., Dkt. 121; *see also* Text Order, April 20, 2023). The Court found Microsoft's support for the continuance to be "timely and detailed" and that Exafer would not be prejudiced. (*Id.*). The

second time the Court reset the trial date at Microsoft's behest was after Exafer served two supplemental reports "after the close of expert discovery, without leave of the court, and just one week before the deadline for dispositive and Rule 702 motions in prejudice to [Microsoft]." (Order, Dkt. 142, at 2). Judge Lane gave Exafer the option of either (1) striking its untimely supplemental reports, or (2) keeping its supplemental reports and allowing Microsoft to serve rebuttal reports, which would result in the need for the undersigned to reset the trial date. (*Id.* at 3). Exafer then *chose* to allow Microsoft to serve rebuttal reports and move the trial date[2] rather than strike its own supplemental reports. (*Id.*). This can hardly be used as an example of Microsoft asking for an unjustified continuance. Thus, the Court finds that a continuance would not cure the prejudice to Microsoft and that this factor weighs against a showing of good cause.

**IV. CONCLUSION**

In conclusion, all four factors weigh against a showing of good cause to re-open discovery and reset the trial date. Thus, Exafer's Opposed Motion to Re-Open Fact and Expert Discovery and Reset the Trial Date, (Dkt. 192), is **DENIED**.

As the Court did not require a sur-reply to reach its decision, Microsoft's Unopposed Motion for Leave to File Sur-reply, (Dkt. 201), is **MOOT**.

**SIGNED** on June 11, 2024.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

[2] Giving Exafer the benefit of the doubt, the Court does note that Exafer filed objections to Judge Lane's order, contending that it was unaware that it was agreeing to a new trial date when it made the decision to keep its supplemental reports on the record. (*See* Objs., Dkt. 144). The Court overruled Exafer's objections to Judge Lane's order on the basis that the order was not clearly erroneous or contrary to law. (Order, Dkt. 146).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EXAFER LTD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:20-CV-131-RP |
| | § | |
| MICROSOFT CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court is Defendant Microsoft Corporation's ("Microsoft") Motion for Summary Judgment Based on Absence of Remedy. (Dkt. 195). Plaintiff Exafer Ltd ("Exafer") filed a response in opposition, (Dkt. 207), and Microsoft filed a reply, (Dkt. 220). Having considered the parties' submissions, the record, and the applicable law, the Court will grant Microsoft's motion for summary judgment.

## I. BACKGROUND

Exafer filed its original complaint in this action on December 4, 2019. (Dkt. 1). It then filed an amended complaint on September 8, 2020, which is the live complaint in this action. (Dkt. 38). In its amended complaint, Exafer brings claims against Microsoft for direct and indirect infringement of United States Patents Nos. 8,325,733 and 8,971,335 (the "Patents-in-Suit"). (*Id.*). Exafer requests damages under 35 U.S.C. § 284, or otherwise permitted by law. (*Id.* at 52).

Exafer alleges that the Patents-in-Suit relate to Software Defined Networking, "which is an approach to computer network management that enables dynamic programmatically efficient network configuration to improve network performance and monitoring." (*Id.* ¶ 64). The United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,325,733 ("the '733 patent"), entitled "Method and System For Layer 2 Manipulator and

Forwarder," on December 4, 2012. (*Id.* ¶ 66). Exafer states that the '733 patent is presumed valid under 35 U.S.C. § 282; Exafer owns all rights, title, and interest in the '733 patent; and Exafer has not granted a license to Microsoft relating to the '733 patent. (*Id.* ¶¶ 67–69). The abstract of the '733 patent describes a "method and system for forwarding frames of a flow via a layer 2 forwarder and manipulator (L2FM) for improving network utilization and improving users experience by reducing the latency associated with the flow. When a new flow is identified, forward control information for frames of the new flow is obtained. The forward control information can include re-writing of at least one field in an original header of the frames of the new flow. At least one field in an original header of the frames of the new flow is manipulated according to the obtained forward control information, and the manipulated frames of the new flow are forwarded accordingly." (*Id.* ¶ 70 (citing '733 Patent, Dkt. 38-1)). Exafer alleges that Microsoft's Azure Platform—specifically its Azure Smart Network Interface Cards ("Azure SmartNICs") and its Virtual Filtering Platform ("VFP") Packet Processor software component (the "Accused Features")—infringes at least Claim 26 of the '733 patent. (*Id.* ¶¶ 140, 142). Claim 26 of the '733 patent provides as follows:

> 26. A method for forwarding frames of a flow via a layer 2 forwarder and manipulator (L2FM), the method comprising:
>
> > a. identifying, at the L2FM, one or more first frames of a new flow;
> >
> > b. obtaining forward control information for frames of the new flow, wherein the forward control information includes re-writing of at least one field in an original header of the frames of the new flow, wherein obtaining forward control information is done out of band;
> >
> > c. changing the at least one field in an original header of the frames of the new flow according to the obtained forward control information; and
> >
> > d. forwarding the frames of the new flow according to the forward control information;

> wherein at least portion of the control information is obtained from a remote-admission-and-information controller (RAIC).

('733 Patent, Dkt. 38-1).

Exafer claims that the VFP Packet Processor software component and the SmartNIC "identify one or more first frames of a new flow when a new network traffic flow arrives at or is generated by the Azure Platform." (Am. Compl., Dkt. 38, at 35). Components of the Azure Platform including "servers and Azure SmartNICs" then "obtain forward control information for frames of new flows from components of the Azure Platform" before changing "at least one field in an original header of the frames of the new flow according to the obtained forward control information." (*Id.* ¶¶ 143, 148). The Azure Platform then "forward[s] the frames of the new flow according to forward control information." (*Id.* ¶ 149).

The USPTO duly and legally issued United States Patent No. 8,971,335 ("the '335 patent"), entitled "System and Method for Creating a Transitive Optimized Flow Path," on March 3, 2015. ('335 Patent, Dkt. 38-2). In regard to the '335 patent, Exafer alleges that Microsoft's Azure Platform infringes at least Claim 26. (*Id.* ¶ 160). Claim 26 of the '335 patent provides as follows:

> 26. A method to optimize information delivery between a first node on a first network and a second node on the same or different network, the delivery being made through a net worked system in which one or more paths between the first node and the second node are known and, through a Transmitting Device Set with Promiscuous and Re-writing Capabilities (TDSPRC) that receives and retransmits all frames of the first network and the same or different network, and the method comprising:
>
> > collecting topology information related to three or more different Open System Interconnection (OSI) model layers from a plurality of network devices working in networks that belong to different OSI layers;
> >
> > identifying alternate paths, based at least in part on the collected topology information related to three or more different OSI layers, between the first node and the second node;

> creating a collective virtual network (CVN) including the known paths and the alternate paths, for a particular flow, identify an optimal path in the CVN instead of a known path between the first node and the second node; and
>
> modifying the data frames of the particular flow to be compatible with a network technology employed by the identified optimal path, wherein the modification is implemented by the TDSPRC and the TDSPRC is not a member in at least one of the networks.

('335 Patent, Dkt. 38-2).

Exafer claims that Microsoft's Azure Platform "practices a method to optimize information delivery between a first node on a first network and a second node on the same or different network." (Am. Compl., Dkt. 38, ¶ 162). Exafer further claims that the Azure Platform includes a TDSPRC, (*id.* ¶ 165), and that the Azure Platform "receives and retransmits all frames of a network and the same or different network through a TDSPRC," (*id.* ¶ 166). One or more the Azure Platform's components "identify alternate paths" based on "the collected topology information related to three or more different OSI layers, between the first node and the second node"; "create a collective virtual network (CVN) including the known paths and the alternate paths, for a particular flow, and identify an optimal path in the CVN"; and "modify data frames of a flow to be compatible with a network technology employed by the identified optimal path." (*Id.* ¶¶ 168–69, 171).

Exafer alleges that Microsoft has been on notice of the Patents-in-Suit at least as early as the filing and service of the original complaint in this action. (*Id.* ¶¶ 151, 173). Exafer asserts that Microsoft "knowingly encourages, and continues to encourage, customers to directly infringe" the Patents-in-Suit, "including by Microsoft's actions that include, without limitation, instructing and encouraging customers to use the Azure Platform through user guides/manuals, advertisements, promotional materials, and instructions." (*Id.* ¶¶ 153, 174). Further, "Microsoft's domestic Azure Platform customers, including but not limited to the 173 Microsoft's Azure Platform customers who

are listed on their website, directly infringe [the Patents-in-Suit] through their use of the Azure Platform." (*Id.* ¶¶ 152, 177). Finally, Exafer asserts that "Microsoft is in violation of 35 U.S.C. § 271(b) and has been indirectly infringing" the Patents-in-Suit by "knowingly and specifically intending to induce infringement by others . . . and possessing specific intent to encourage infringement by Microsoft's customers." (*Id.* ¶¶ 157, 178).

United States District Court Judge Alan D. Albright held a *Markman* Hearing in this case on November 6, 2020. (Minute Entry, Dkt. 53). Subsequently, Judge Albright issued a claim construction order, (Dkt. 63), and a supplemental claim construction order, (Dkt. 84). This case was then transferred to United States District Court Judge Lee Yeakel on November 12, 2021, (Dkt. 97), and then to the undersigned on December 13, 2021, (Dkt. 99). On February 23, 2023, the Court entered a scheduling order, setting the jury trial for December 4, 2023. (Dkt. 116). On April 20, 2023, the Court granted Microsoft's opposed motion for a continuance and reset the trial for February 5, 2024. (Text Order, Apr. 20, 2023). The trial date was moved once again after Exafer filed two "untimely and unauthorized" supplemental expert reports, and United States Magistrate Judge Mark Lane granted Microsoft leave to also serve supplemental expert reports to cure the prejudice. (Order, Dkt. 142). The Court reset the jury trial for September 20, 2024. (Dkt. 157). The Court finally reset the jury trial for September 23, 2024. (Dkt. 234).

On March 7, 2024, Judge Lane granted Microsoft's motion to exclude the expert opinions of Exafer's damages expert, Mr. Blok, (Order, Dkt. 165), and this Court affirmed that order, (Dkt. 180). Exafer then moved to re-open fact and expert discovery and reset the trial date. (Dkt. 192). The Court denied Exafer's motion after finding that Exafer failed to show good cause for re-opening discovery. (Dkt. 212). The following motions are now pending before the Court: (1) Exafer's motion to exclude certain expert testimony of Dr. James Olivier and Mr. Christopher Martinez, (Dkt. 193); (2) Exafer's motion for partial summary judgment, (Dkt. 194); (3) Microsoft's motion for summary

judgment based on absence of remedy, (Dkt. 195); (4) Microsoft's motion to exclude expert opinions of Dr. Congdon, (Dkt. 196); and (5) Microsoft's motion for summary judgment based on absence of liability, (Dkt. 197). Because the Court will grant Microsoft's motion for summary judgment based on absence of remedy, the Court does not reach the other motions.

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers*

*Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

## III. DISCUSSION

### A. Patent Damages

Under 35 U.S.C. § 284, the Court must award a successful claimant "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." However, "[t]he statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020). Although the Federal Circuit stated that it is "unlikely" for zero to be the reasonable royalty, "in a case completely lacking evidence on which to base a damages award, the record may well support a zero royalty award." *Id.* (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1328 n.7 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). Further, "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory." *Id.* (citing *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017)).

### B. Exafer's Damages Theory

In its amended complaint, Exafer seeks damages "under 35 U.S.C. § 284, or otherwise permitted by law." (Am. Compl., Dkt. 38, at 52). Exafer does not request any injunctive relief. In its initial disclosures to Microsoft pursuant to Federal Rule of Civil Procedure 26,[1] Exafer stated that it

---

[1] Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires a party to provide to the other parties, without awaiting a discovery request: "a computation of each category of damages claimed by the disclosing party—

"seeks damages resulting for the sales of the Accused Product." It further stated that "Microsoft is in possession . . . of all financial data related to the accused products, so [Exafer] is currently unable to provide a computation of damages. Exafer will amend its response once provided with the appropriate data." (Exafer's Rule 26 Disclosures, Dkt. 195-2, at 8). Under Rule 26(e)(1)(A), Exafer was required to supplement its damages disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is . . . incomplete." Microsoft claims that Exafer never supplemented its initial disclosures to provide the required computation of damages or identification of supporting documents. (Mot., Dkt. 195, at 7–8).

Microsoft further alleges that Microsoft "specifically requested Exafer's damages theories and evidence" during fact discovery. (*Id.* at 8). In an interrogatory, Microsoft asked Exafer to describe in detail its contentions regarding any claim for damages and to identify relevant documents, evidence, and potential witnesses. (Exafer's Resp. to Microsoft's Interrogatories, Dkt. 195-2, at 3). Exafer objected to the interrogatory as "vague, ambiguous, and overlybroad" [sic] and also asserted attorney-client privilege. (*Id.* at 4). Exafer stated that it would "detail its damages theory in the liability and damages expert reports it intends to serve in this case." (*Id.*). Microsoft also sought corporate deposition testimony on the facts "concerning any contention that Exafer is entitled to a reasonable royalty in this case, including the factual bases applicable to each of the *Georgia Pacific* factors" and "any valuation of the Patents-in-Suit." (Mot., Dkt. 195, at 8; Exafer's Resp. to Microsoft's Am. Notice of Depo., Dkt. 195-2, at 12). In the same notice of deposition, Microsoft sought testimony on Exafer's valuation of the Patents-in-Suit. (*Id.* at 14). During his deposition on September 3, 2021, Exafer's designated witness, Amir Harel, stated that he could not

---

who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."

talk about Exafer's damages theory because it was privileged communication. (Harel Depo., Dkt. 195-2, at 21–22). He did state that there were "many, many ways to model" damages and that he believed Microsoft was "profiting from this technology big, big time." (*Id.* at 22). Finally, Harel confirmed that Exafer had not performed a valuation of the Patents-in-Suit. (*Id.* at 25). According to Microsoft, Exafer never supplemented its response to Microsoft's interrogatory concerning damages nor did it designate another corporate witness to testify on Exafer's alleged damages.

During expert discovery, Exafer served reports by its technical expert, Dr. Paul Congdon, and its damages expert, Mr. Justin Blok. (Mot., Dkt. 195, at 9). In his report, Mr. Blok calculated an ongoing per-hour running royalty totaling [redacted] through the end of 2020, which he estimated based on virtual machine ("VM") revenues. (Order, Dkt. 165, at 4). Exafer also served two supplemental reports from Dr. Congdon and Mr. Blok. (*See* Order, Dkt. 142). On March 7, 2024, a United States Magistrate Judge granted Microsoft's motion to exclude the expert opinions of Mr. Blok because he impermissibly based his royalty base on a feature that Exafer had not accused of infringement. (Order, Dkt. 165). This Court affirmed the magistrate judge and overruled Exafer's objections. (Order, Dkt. 180). After the Court excluded Mr. Blok's opinions, Exafer moved to re-open fact and expert discovery so that it could "supplement the record to accommodate an alternative damages theory to value the benefit that Microsoft obtained by using Exafer's invention." (Dkt. 192, at 5). The Court denied Exafer's motion on the basis that Exafer failed to show that there was good cause for re-opening discovery. (Order, Dkt. 212).

**C. Analysis**

Given that this is a motion for summary judgment, the Court must first determine whether Microsoft, the moving party, has made an initial showing that there is no evidence to support Exafer's damages claim. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Based on Exafer's damages expert being struck and its failure to disclose any other damages evidence or theories to Microsoft

during discovery, the Court finds that Microsoft has made the initial showing that there is no evidence to support that Exafer's reasonable royalty, upon a finding of infringement, should be more than zero. Thus, the issue before the Court is whether Exafer has raised a genuine issue of fact as to whether its reasonable royalty under 35 U.S.C. § 284—assuming that Exafer prevailed on its infringement claims—is greater than zero. *See Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021) ("If the moving party makes this initial showing, the nonmovant must come forward with specific facts showing a genuine factual issue for trial.") (internal citations omitted); *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1371–72 (Fed. Cir. 2015) ("[I]f there exists a factual issue regarding whether the patentee is due any non-zero royalty, the district court must deny summary judgment.").

In its response to Microsoft's motion for summary judgment based on absence of remedy, Exafer claims that there is evidence in the record that supports a non-zero royalty based on Microsoft's alleged cost savings. (Resp., Dkt. 207, at 8). Exafer contends that this evidence comes from: (1) Dr. Congdon's expert reports and testimony; (2) Dr. Maltz's record testimony; (3) Mr. Martinez's expert reports and testimony; and (4) Dr. Olivier's expert reports and testimony.

**1. Dr. Congdon's expert reports and testimony**

Dr. Congdon is Exafer's designated technical expert. Exafer asserts that "Dr. Congdon's expert opinions regarding a cost-savings-based damages award" have not been excluded by the Court. Indeed, a United States Magistrate Judge denied Microsoft's motion to exclude Dr. Congdon's damages opinions in paragraphs 108–26 of his original report and paragraphs 10–33 of his supplemental report because "he does not opine that [virtual machines] should serve as the royalty base" like Mr. Blok did. (Dkt. 165, at 6). Exafer points specifically to a number of times in the record where Dr. Congdon has opined that "the benefits from VFP FastPath and SmartNIC result in CPU cycle savings." (Resp., Dkt. 207, at 9). Exafer states that Dr. Congdon's opinions

about the CPU cycle savings are "rooted in Microsoft's own internal documents that indicate VFP provided a '[redacted]' improvement in VFP cycles" and that indicate SmartNIC provided "an improvement in CPU core performance of '[redacted].'" (*Id.* at 9 (citing VFP v2, Dkt. 207-2, at 513)). However, this is not evidence of a non-zero reasonable royalty; rather, it is evidence of a technical benefit as described by Exafer's technical expert. Exafer also points out that Dr. Congdon's supplemental report "discusses the many statements Dr. Maltz made about cost-savings associated with Microsoft's use of VFP FastPath and SmartNIC." (*Id.* at 9–10). However, these statements, too, focus only on a technical benefit from VFP FastPath and SmartNIC without making any connection to a financial benefit such as cost savings. (*See, e.g.*, Congdon Supp. Report, Dkt. 207-2, at 462 ("Microsoft used VFP FastPath in order to handle [redacted] more efficiently. This, in turn, allowed Microsoft to free up CPU cycles (and cores), which is a significant benefit."); *id.* at 473 ("[T]here are also operational savings associated with the deployment of a SmartNIC to offload network operations . . . Network functions implemented by the Azure SmartNIC, such as NATv4, were shown to improve the energy efficiency on the server by [redacted].")).

The only instance that Exafer identifies where Dr. Congdon opines on cost savings, not technical benefits, is a paragraph from his initial expert report which states:

> Without the benefits of the inventions claimed in the Patents-in-Suit, as implemented in Azure, through the VFP and SmartNIC, Microsoft would have had to procure and operate more [redacted], procure additional [redacted], and reduce margins on [redacted] in order to remain competitive.

(Resp., Dkt. 207, at 9 (citing Congdon Report, Dkt. 207-2, at 55)).

Without more, Dr. Congdon's opinion that Microsoft saved costs by not procuring and operating [redacted] is insufficient to raise a fact issue as to a zero reasonable royalty rate. Exafer does not point to anything in Dr. Congdon's reports or testimony that a court or a jury

could use to determine how much money Microsoft saved by implementing Azure or if Microsoft even did cut down on costs by implementing Azure. Further, Dr. Congdon specifically stated that "it's not [his] responsibility to come up with the specific damages number" and that he was "providing the background information to Mr. Block [sic] so that he could create a model for . . . demonstrating the benefits." (Congdon Depo., Dkt. 220-2, at 4). He also stated that his job "was to show infringement, not to do the financial or damages team's job . . . . That's not [his] area of expertise." (Congdon Depo., Dkt. 220-2, at 11). Dr. Congdon has admitted that he is not qualified to opine on a proper damages theory in this case nor was that his intent in his expert reports and testimony. Therefore, the Court finds that Dr. Congdon's testimony and expert reports do not raise a genuine issue of material fact as to a reasonable royalty of zero. *See TecSec, Inc. v. Adobe Inc.*, No. 1:10-CV-115, 2019 WL 13119397, at *4 (E.D. Va. June 18, 2019), *aff'd in part, rev'd in part and remanded*, 978 F.3d 1278 (Fed. Cir. 2020) (disregarding an expert witness's opinion on a reasonable damages award after the expert stated that he "would have to defer to the damages experts" and that he "does not know how damages are calculated.").

**2. Dr. Maltz's testimony**

Dr. Maltz is Microsoft's Technical Fellow and Corporate Vice President for Azure Core. Exafer claims that his "testimony, along with contemporaneous documents Microsoft produced in this case, provide ample factual bases for both Exafer's and Microsoft's own expert opinions that VFP FastPath and SmartNIC *are indeed* valuable to Microsoft." (Resp., Dkt. 207, at 11 (emphasis in original)). Exafer points to Dr. Maltz's testimony that "[t]he advantage of using SmartNIC is that it takes fewer cycles per byte to process [redacted]" and that "it takes fewer CPU cycles per byte [redacted]." (*Id.* at 11–12 (citing Maltz Depo., Dkt. 207-2, at 523)). However, as with Dr. Congdon's reports and testimony, the evidence that Exafer points to is not evidence of cost savings but rather evidence of the technical

benefit of the Accused Features. Exafer itself concedes that "Dr. Maltz explained how expensive it is—*in terms of CPU cycles*—[redacted]." (*Id.* at 12 (citing Maltz Depo., Dkt. 207-2, at 524) (emphasis added)).

The only statement Exafer points to in Dr. Maltz's testimony that touches on financial benefit rather than technical benefit is when Dr. Maltz testified that "using [redacted] is cheaper than [redacted], to achieve the same performance." (*Id.* at 12 (citing Maltz Depo., Dkt. 207-2, at 526–27)). However, as with Dr. Congdon's testimony, without more, Exafer fails to raise a fact issue as to whether it is entitled to a zero reasonable royalty. The Federal Circuit has held that "[i]n patent cases, the burden of proving damages falls on the patentee, and the patentee must show his damages by evidence. Damages must not be left to conjecture by the jury. They must be proved, and not guessed at." *Promega*, 875 F.3d at 660 (internal citations omitted) (cleaned up). Certainly, Exafer has not identified anything in Dr. Maltz's testimony that would save a jury from pure speculation as to what Microsoft's alleged cost savings are. As Exafer has not pointed to any evidence that would help a jury quantify the technical benefits of the Accused Features as a dollar amount in cost savings, a damages award of more than zero based on Dr. Maltz's testimony would be "ultimately speculative and insufficiently grounded in evidence." *TecSec, Inc.*, 978 F.3d at 1292 (upholding district court's conclusion that the reasonable royalty after a finding of patent infringement was zero); *see also Trutek Corp. v. BlueWillow Biologics, Inc.*, No. 21-10312, 2023 WL 6130532, at *17 (E.D. Mich. Sept. 19, 2023), *reconsideration denied*, No. 21-10312, 2024 WL 180851 (E.D. Mich. Jan. 17, 2024) (granting summary judgment of no damages when the damages evidence did not "support a nonspeculative damages award").

**3. Mr. Martinez's expert reports and testimony**

Microsoft designated Mr. Martinez as a damages expert to rebut the expert opinions of Mr. Blok, Exafer's excluded damages expert. Exafer argues that Mr. Martinez "explained in his

depositions that *one way* to determine the value of the benefit Microsoft received from VFP FastPath and SmartNIC would be to consider an appropriate reasonable royalty based on cost savings." (Resp., Dkt. 207, at 12). However, because the Court has excluded Mr. Blok's opinions, Microsoft does not plan to call Mr. Martinez. (Reply, Dkt. 220, at 9). Therefore, Mr. Martinez's reports and testimony are impermissible hearsay under Federal Rule of Evidence 801. "There are circumstances where the testimony of an expert witness can serve as an adverse admission against the presenting party." *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1355 (5th Cir. 1983). However, "[s]uch circumstances must be narrowly construed." *Id.* "[A]n expert retained solely to be an independent expert witness at trial does not fall within this exclusion to the hearsay definition." *Fractus, S.A. v. AT&T Mobility LLC*, No. 2:18-CV-00135-JRG, 2019 WL 4805910, *3 (E.D. Tex. Sept. 30, 2019).

Exafer contends that the Federal Circuit allowed a district court to consider a defendant's expert deposition although the defendant did not call that witness in *Info-Hold*, 783 F.3d at 1371. But in *Info-Hold*, the Federal Circuit merely noted that the defendant had "not specifically objected to the admissibility of [its expert's] deposition testimony" and "le[ft] to the district court to decide whether the deposition may be considered." *Id.* at 1372. Further, Exafer argued that the district court in *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, held that a defendant's damages expert report is part of the record because Fifth Circuit law holds an opponent's expert's statements admissible under Fed. R. Evid. 801(d)(2)(C) as a party admission. No. 215CV00037RWSRSP, 2017 WL 2651618, at *4 (E.D. Tex. June 20, 2017), *report and recommendation adopted*, No. 2:15-CV-00037-RWS, 2017 WL 4693971 (E.D. Tex. July 31, 2017); (Resp., Dkt. 207, at 13). However, the district court in *Elbit* did not reach the hearsay issue. 2017 WL 2651618, at *5. Although there is *dicta* in *Elbit* citing "Fifth Circuit law finding an opponent's expert's statement admissible under Rule 801(d)(2)(c)," *id.* at *4, the cited caselaw does not apply to witnesses like Mr. Martinez who are retained to offer expert opinions under Rule 26(a)(2). *Elbit* cites the Fifth Circuit's decision in *Collins v. Wayne Corp.*,

which involved an investigative expert hired "two days after the accident" to "report his conclusions" directly to the party who hired him. 621 F.2d 777, 780–82 (5th Cir. 1980). Because the investigator was an agent of the defendant, his investigative report was not hearsay but a party admission. *See id.* However, *Collins* does not apply to litigation experts, who are presumed to testify "impartially in the sphere of their expertise" and "cannot be deemed an agent" of the party that hired them. *Fractus,* 2019 WL 4805910, at *3 (quotations omitted). *Collins* is "limited to circumstances in which the expert was retained or employed for some purpose other than solely offering an expert opinion in the context of litigation"—e.g., for "internal investigations." *Id.* at *2. In contrast, "an expert retained solely to be an independent expert witness at trial does not fall within this exclusion to the hearsay definition." *Id.* at *3; *accord, e.g.*, *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995). Thus, Mr. Martinez's reports and testimony are inadmissible hearsay that Exafer cannot use to raise a fact issue as to the reasonable royalty. *See Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), *as revised* (July 5, 2017) ("substance or content of the evidence submitted to support or dispute a fact on summary judgment must be . . . admissible at trial") (internal citations omitted).

**4. Dr. Olivier's expert reports and testimony**

Dr. Olivier is Microsoft's designated infringement expert. Exafer asserts that Dr. Olivier "acknowledged Microsoft's own evidence indicating that core cycles are reduced by implementation of VFP FastPath and SmartNIC, [redacted]." (Resp., Dkt. 207, at 11). Exafer points to several of Dr. Olivier's statements in the record. (*Id.* (citing Olivier Depo, Dkt. 207-2, 645–46 ("Q. And using SmartNIC freed up CPU cores on the host [redacted], correct? A. That's what this document says."); *id.* at 646 ("And these graphs show that by using SmartNIC, Microsoft was able to [redacted], correct? A. Yeah, based on these samples that they talked about up here, that's what this document says."); *id.* at 647

("Q. Okay. And Microsoft looks for ways to get more CPUs freed up so that it can [redacted], correct? A. I would imagine they would like to, yes."))). Once again, Exafer identifies evidence that supports the existence of a technical benefit to Microsoft from use of the Accused Features but fails to identify any evidence that links the technical benefit to a monetary amount of cost savings. Damages based on Dr. Olivier's statements would be purely speculative given that there is no evidence of Microsoft's alleged cost savings. Therefore, Dr. Olivier's statements do not raise a fact issue on a zero reasonable royalty.

**5. Microsoft's documents**

Throughout its brief, Exafer refers to "Microsoft's internal documents," "technical and financial documents," "contemporaneous documents," "Microsoft's documents," and "documents that Microsoft produced." (Resp., Dkt. 207, at 4, 6, 12, 19). However, the only document that Exafer identified and attached to its response was a slide presentation that projects a "[redacted] improvement in VFP CPU." (*Id.* at 4 n.5 (citing VFP v2, Dkt. 207-2, at 513)). As Exafer has failed to identify any of Microsoft's documents that may support a non-speculative, non-zero reasonable royalty, the Court does not find that these unspecified documents raise a fact issue as to Exafer's damages award. *See Adams*, 465 F.3d at 164 (5th Cir. 2006) (Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment).

**IV. CONCLUSION**

In its response to Microsoft's motion for summary judgment, Exafer emphasizes that the Federal Circuit has held that a "patentee's failure to show that its royalty estimate is correct is insufficient grounds for awarding a royalty of zero. By extension, the exclusion of the patentee's damages evidence is not sufficient to justify granting summary judgment." (Resp., Dkt. 207, at 6–7 (citing *Info-Hold*, 783 F.3d at 1371–72)). However, the Court is not granting summary judgment

based on Exafer's failure to provide a *correct* royalty estimate or on the exclusion of Mr. Blok. Rather the Court is granting summary judgment based on the lack of evidence in the record that a jury could use to arrive at a non-speculative reasonable royalty based on Microsoft's alleged cost savings.

Where, as here, "a plaintiff fails to establish any basis for an award of relief, the defendant is entitled to a judgment dismissing the case with prejudice[.]" *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 923 (N.D. Ill. 2012), *aff'd in part, rev'd in part on other grounds and remanded*, 757 F.3d 1286 (Fed. Cir. 2014); *see also Info-Hold*, 783 F.3d at 1372 (reversing district court's grant of summary judgment based on absence of damages in a patent case after determining that there was "record evidence to demonstrate the existence of a genuine issue of material fact" as to a reasonable royalty). Accordingly, the Court will grant Microsoft's motion for summary judgment based on absence of damages and dismiss Exafer's infringement claims with prejudice.

Microsoft has represented that it plans to move to dismiss its counterclaims for declaratory judgments against Exafer in the case that the Court grants summary judgment based on absence of damages. (Reply, Dkt. 220, at 14). Therefore, in the interest of judicial efficiency, the Court will not address any of the other pending summary judgment or Daubert motions at this time.

For the reasons stated above, **IT IS ORDERED** that Microsoft's Motion for Summary Judgment Based on Absence of Remedy, (Dkt. 195), is **GRANTED**. Exafer's claims against Microsoft are **DISMISSED WITH PREJUDICE**.

The Court files this order under seal because it contains references to material that may be subject to the parties' protective order in this case. The Court intends to publish a public version of this Order. Accordingly, **IT IS FURTHER ORDERED** that the parties, on or before **August 29, 2024**, shall each (1) file specific and reasonable proposed redactions of this Order; and (2) provide written justifications as to each proposed redaction.

**IT IS FURTHER ORDERED** that the Final Pretrial Conference set for September 4, 2024, and the Trial set for September 23, 2024, are **VACATED**.

**IT IS FINALLY ORDERED** that Microsoft shall move to dismiss its counterclaims or file a status report on or before **August 29, 2024**.

**SIGNED** on August 15, 2024.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| EXAFER LTD,<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Case No. 1:20-cv-00131-RP<br><br>**JURY TRIAL DEMANDED** |

**FINAL JUDGMENT**

**IT IS ORDERED AND ADJUDGED** that Microsoft's Motion for Summary Judgment Based on Absence of Remedy [Dkt. 243] is **GRANTED**; Exafer's claims against Microsoft are **DISMISSED** with prejudice; Microsoft's counterclaims against Exafer are **DISMISSED** without prejudice; Final Judgement is **ENTERED** against Plaintiff Exafer; and the case is **CLOSED** from the docket of the Court.

**SIGNED** this 30th day of August.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

US008325733B2

(12) **United States Patent**
**Harel et al.**

(10) **Patent No.: US 8,325,733 B2**
(45) **Date of Patent: Dec. 4, 2012**

(54) **METHOD AND SYSTEM FOR LAYER 2 MANIPULATOR AND FORWARDER**

(75) Inventors: **Amir Harel**, Ein-Vered (IL); **Alon Lelcuk**, Ramot-Meir (IL); **Ronit Nossenson**, Kfar-Sava (IL); **Avinoam Zakai**, Sharona (IL)

(73) Assignee: **Exafer Ltd**, Ein-Vered (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 214 days.

(21) Appl. No.: **12/876,910**

(22) Filed: **Sep. 7, 2010**

(65) **Prior Publication Data**

US 2011/0058549 A1 Mar. 10, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/240,855, filed on Sep. 9, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 12/28*** | (2006.01) |
| ***H04L 12/56*** | (2006.01) |
| ***H04L 1/00*** | (2006.01) |
| ***H04L 12/26*** | (2006.01) |

(52) **U.S. Cl.** .................. **370/395.3**; 370/230.1; 370/231; 370/236

(58) **Field of Classification Search** .......... 370/229–231, 370/235, 236, 389, 392, 395.3
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,597,078 | A | 6/1986 | Kempf |
| 5,214,646 | A | 5/1993 | Yacoby |
| 5,249,292 | A | 9/1993 | Chiappa |
| 5,274,631 | A | 12/1993 | Bhardwaj |
| 5,319,644 | A | 6/1994 | Liang |
| 5,477,541 | A | 12/1995 | White et al. |
| 5,600,644 | A | 2/1997 | Chang et al. |
| 5,602,851 | A | 2/1997 | Terashita et al. |
| 5,608,726 | A | 3/1997 | Virgile |
| 5,633,865 | A | 5/1997 | Short |
| 5,633,866 | A | 5/1997 | Callon |
| 5,740,171 | A | 4/1998 | Mazzola et al. |
| 5,790,546 | A | 8/1998 | Dobbins et al. |
| 5,892,924 | A | 4/1999 | Lyon et al. |
| 5,909,441 | A | 6/1999 | Alexander, Jr. et al. |
| 5,910,954 | A | 6/1999 | Bronstein et al. |
| 6,006,264 | A | 12/1999 | Colby et al. |

(Continued)

OTHER PUBLICATIONS

Haito Wu, Yunxin Liu, Qian Zhang, and Zhi-Li Shang, SoftMAC: Layer 2.5 Collaborative MAC for Multimedia Support in Multihop Wireless Networks, IEEE Transactions on Mobile Computing, Jan. 2007, pp. 12, vol. 6, No. 1.

*Primary Examiner* — Ronald Abelson
(74) *Attorney, Agent, or Firm* — Smith Risley Tempel Santos LLC; Gregory Scott Smith

(57) **ABSTRACT**

The disclosure describes method and system for forwarding frames of a flow via a layer 2 forwarder and manipulator (L2FM) for improving network utilization and improving users experience by reducing the latency associated with the flow. When a new flow is identified, forward control information for frames of the new flow is obtained. The forward control information can include re-writing of at least one field in an original header of the frames of the new flow. At least one field in an original header of the frames of the new flow is manipulated according to the obtained forward control information, and the manipulated frames of the new flow are forwarded accordingly.

**42 Claims, 7 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,061,334 | A | 5/2000 | Berlovitch et al. | |
| 6,067,298 | A * | 5/2000 | Shinohara | 370/395.71 |
| 6,088,356 | A | 7/2000 | Hendel et al. | |
| 6,147,993 | A | 11/2000 | Kloth et al. | |
| 6,243,667 | B1 | 6/2001 | Kerr et al. | |
| 6,424,659 | B2 | 7/2002 | Viswanadham et al. | |
| 6,639,901 | B1 | 10/2003 | Katzri et al. | |
| 6,674,769 | B1 | 1/2004 | Viswanath | |
| 6,717,949 | B1 | 4/2004 | Boden et al. | |
| 6,792,471 | B2 | 9/2004 | Nomura et al. | |
| 6,853,638 | B2 | 2/2005 | Cohen | |
| 6,944,130 | B1 | 9/2005 | Chu et al. | |
| 7,197,550 | B2 | 3/2007 | Cheline et al. | |
| 7,197,556 | B1 | 3/2007 | Short et al. | |
| 7,325,071 | B2 | 1/2008 | Krishnan | |
| 2003/0058872 | A1 * | 3/2003 | Berggreen et al. | 370/401 |
| 2007/0206565 | A1 * | 9/2007 | Evans | 370/352 |
| 2010/0325280 | A1 * | 12/2010 | Jindal et al. | 709/226 |

* cited by examiner


115
Remote admission and information controller (RAIC)
Incoming data
110
130a
140
Port1
Flow1
Flow 1 Manager
Forward Flow Manager
Flow Identifier
Flow n
Port M
120
150
RAIC DB
Flow n Manager
130n
Layer- 2 forwarder manipulator (L2FM)
100
Control Lines
Data lines

FIG. 1


200
Flow identification process-
Per each received frame
Get the next frame
201
Remove tunneling encapsulation
202
Discover flow information
204
206
First frame of a flow?
No
Get the proper line from the flow table
208
Yes
210
Create a new line in the flow table
212
Assign a new flow manager
Direct the frame to the proper flow manager
214

FIG. 2


300
Forwarding rules assignment process
received a frame?
302
No
Yes
frame flow forwarding plan is complete?
304
Yes
Forward the frame accordingly
305
No
first frame in the flow?
306
Yes
Generate trivial line in forwarding rules table
307
No
Collect the control information
308
frame flow forwarding plan is complete?
312
Yes
Forward the frame and all frames in buffer accordingly
315
No
Save the frame in the buffer
330

FIG. 3


collecting control information process
400
Static control info available?
404
Yes
Get the proper line from the forwarding rules table
412
Additional info . required?
413
No
Yes
No
In-band control info . available?
406
Yes
Fetch the control information from the headers
414
Update line in the forwarding rules table
416
Additional info. required?
418
No
Yes
No
Out-band control information available?
408
Yes
Create the control channel and get the control information
420
Update line in the forwarding rules table
422
No
End

FIG. 4


500
515
513
516
L2
Peer D
Peer C
Tracker T
502
531
R2
540
Internet
533
R1
Layer 2
Forwarder
Manipulator
(L2FM )
555
L1
501
511
510
Peer B
Peer A

FIG. 5


Peer A
Tracker T
L2FM
Peer B
510
516
555
511
T0
Get virtual IP on L1
T2
Configuration with virtual IP
T4
File X information request
T6
File X information response with tracker T virtual IP address on L1
T8
N chunks request with tracker T virtual IP as destination IP
T10
Identify new application controlled flow
T12
Ask for additional control info
T14
Provide peer B addresses
T16
Flow re-write and forwarding rules
N chunks anonymous transfer
T20
N chunks anonymous transfer

FIG. 6


716
Control
Data
Tracker T
701
555
711
L1
710
AB
BA
BA'
AB'
Peer A
Layer 2 Forwarder Manipulator (L2FM)
Peer B
720
SA
DA
Source IP
Destination IP
•••
Ethernet header
IP header
722
AB
Peer A MAC
L2FM MAC
Peer A IP
Tracker T Virtual IP
•••
724
AB'
L2FM MAC
Peer B MAC
Tracker T Virtual IP
Peer B IP
•••
726
BA
Peer B MAC
L2FM MAC
Peer B IP
Tracker T Virtual IP
•••
728
BA'
L2FM MAC
Peer A MAC
Tracker T Virtual IP
Peer A IP
•••

FIG. 7

# METHOD AND SYSTEM FOR LAYER 2 MANIPULATOR AND FORWARDER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a non-provisional application being filed under 35 USC 111 and 37 CFR 1.53(b) and claiming the benefit under 35 USC 119(*e*) of the U.S. Provisional Application for Patent that was filed on Sep. 9, 2009 and assigned Ser. No. 61/240,855, which application is hereby incorporated by reference.

## BACKGROUND

The present disclosure relates generally to data communication over a plurality of networks that comply with the Open System Interconnection (OSI) model. More particularly the disclosure relates to optimizing communication paths between a source and destination of a flow.

In networks, data is typically exchanged between communicating devices in the form of frames. A frame is a digital data transmission unit on the layer 2 of the Open System Interconnection (OSI) reference model, for example. It is used for data exchange between two points via a direct physical or logical link. The frame can include information on the communicating devices. Information such as, but not limited to: a source MAC (Media Access Control) address (SA), a destination MAC address (DA) in an Ethernet protocol frame. The frame can also include information on the specific connection defined between these two communicating devices: the Data Link Connection Identifier in the Frame Relay (FR) protocol, for example. Additional information on the communicating devices can reside in the headers of higher OSI layers such as, but not limited to: source and destination IP addresses in an Internet Protocol (IP) layer 3 protocol, source and destination ports in a layer 4 Transmission Control Protocol (TCP) protocol, etc.

In the present description, a flow is a sequence of frames associated with a single logical connection between communicating devices. A flow can be defined by a one-to-one relation between two communicating devices (uni-cast) or by a one-to-many relation, between one to two or more communicating devices (multi-cast and broadcast). A flow is identified for each data frame based on various headers' fields combinations. The headers' fields combination can be formed by selecting all fields or specific fields within the headers of the multiple layers protocols. An exemplary headers' fields combination for identifying a flow frame can be a source MAC address field and a destination MAC address field in the header of the layer 2 Ethernet protocol together with a source port field and a destination port field of the layer-4 TCP header. Another example of a flow can be associated with a specific TCP connection. In this case, the flow frames can be identified using the quartet of the fields: source IP address, destination IP address, source port and destination port, for example.

A session is a series of communications in the OSI application layer, initiated by a user or a device. A Point to Point Protocol (PPP) session is initiated when a user logs into the network with a user-id and a password, for example. A Dynamic Host Configuration Protocol (DHCP) session is initiated when a user device obtains an IP address from the network. A user may initiate multiple sessions on the same device. For example, a user may be using a computer that is downloading a Video on Demand movie in a first session and the user may also be browsing the WWW (World Wide Web) in a second session. Note that a session consists of one or more flows depending on the application. An HTTP browsing session to a particular web page consists of multiple TCP connections (multiple flows) downloading the page objects, for example. Real Time Streaming Protocol (RTSP) session may include several UDP flows that can originate from multiple servers is another example for a complex network session.



A layer 2 switch can use information in the layer 2 protocol headers to make traffic forwarding decisions. Such device is usually called a switch in Ethernet traffic. Using network topology information, smart switches can learn which ports have which end stations attached to it, by recording the Ethernet MAC addresses of the ingress packets. Using this information along with Layer 2 switches ability to use single dimension classification to parse the layer 2 headers of all frames and to classify the frames, enables smart layer 2 switches to forward frames out of the ports that it knows the end station is connected to. Frames with unknown destination MAC addresses, such as the case with frame destined to station addresses that have not yet been learned, are flooded out of every port in the switch forcing the recipient to reply. This allows the switch to learn the relevant MAC address, which is the source address on the reply frame. Many smart layer 2 switches offer the ability to configure smart services such as Quality of Service (QoS), bandwidth shaping, or Virtual Local Area Network (VLAN) membership based on the layer-2 information of the frames and the network topology.

Current type of smart switches such as, but not limited to Hammerhead Systems HSX 6000, or Alcatel-Lucent 7450 Ethernet Service Switch, can be remotely configured by an external management entities. However, there are no remotely controlled supporting admission mechanisms that are capable of communicating with a forwarding device for delivering control information on a per session basis or per flow basis. Meaning there is no method that verifies per each flow/session if the path chosen (forward information) is optimal.

A Deep Packet Inspection (DPI) Device such as but not limited to Cisco SCE or Allot NetEnforcer is an IP network equipment which is not an endpoint of a communication. DPI device has the ability to look at Layer 2 through Layer 7 of the OSI model, this includes headers and data protocol structures as well as the actual payload of the packets. DPI device identifies and classify the traffic based on a signature database that includes information extracted from the data part of a packet, allowing finer control than classification based only on header information. DPI devices can identify packet flows (rather than packet-by-packet analysis), allowing control actions based on accumulated flow/session information. DPI uses multi dimension classification are computational intensive, consume a lot of power and expensive while generally delivering more than an order magnitude slower throughput.

## BRIEF SUMMARY

Therefore there is a need for a novel system and method that will control and manipulate forwarding rules and information of flows on a per session basis or per flow basis at intelligent switches. A need for a novel system and method that will check and verify per flow and/or per session basis if the control information can be optimized and change it accordingly at different novel intelligent switches along communication paths.

The above-described deficiencies, do not limit the scope of the inventive concepts of the present disclosure in any manner. The deficiencies are presented for illustration only.

The present disclosure provides a novel system and method that enables to dynamically control and manipulate layer-2 forwarding information and rules on per flow basis for specific flows or sessions at intelligent switches. The novel system and method comprise one or more intelligent switches along communication paths. The intelligent switches are capable of performing a low-OSI-layer inspection and accordingly identify and allocate a Remote admission and information controller (RAIC). Exemplary RAIC can be admission control servers such as but not limited to Radius and other AAA (authentication, authorization and accounting), application control servers such as but not limited to Peer-to-Peer applications, specific video streaming services, Web servers, etc. In addition to their common operation the different RAICs are adapted to communicate with the intelligent switches as well as to modify a relevant session in order to enable forwarding its frames toward an optimal path. The RAIC Remote admission and information controller can deliver information how to re-write headers of the flows at the intelligent switches according to a forwarding-rule-table associated to the intelligent switch. The forwarding-rule-table can be dynamically built, updated, and modified according to the different sessions and communication loads. The Session Description Protocol (SDP) or Web Services as in SOA (Service Oriented Architecture) as well as RADIUS and Diameter can be used, for example, for communication between the RAIC and the intelligent switches.

The novel system and method can yield many possibilities, advantages and benefits. Exemplary possibilities, advantages and benefits can be, but not limited to: Smart and efficient traffic forwarding without creation, administration and maintenance of complex polices, flexible per session forwarding decisions, traffic load reduction, traffic optimization, efficient solutions to security problems and flexible services and service set where the service logic is completely de-coupled from switch implementation while reducing the latency time and reducing the number of device which flows pass through in a path.

Furthermore, the novel system and method can optimize resource allocation and improve the resource and security management of an entire network. The novel system and method has an advanced control mechanism which enables the intelligent switches to "ask" control questions per session and/or flow basis in addition to enforcing traditional forwarding rules. Furthermore, per each flow the advanced control mechanism enables the intelligent switches to know where to find or request the control information.

Henceforth, the description, drawings and claims of the present disclosure may use the term layer 2 forwarder manipulator (L2FM) as a representative term for embodiments of the present disclosure intelligent switches. An exemplary embodiment of the present disclosure can operate in the following manner. First, one or more flows frames at the ingress of layer 2 forwarder manipulator (L2FM) are identified. If they are identified as new session flows then a request/search for forwarding control information begins. Next a flow-forwarding plan can be generated for each flow. The flow-forwarding plan can include a destination port or a virtual port, re-encapsulation instructions (not necessary according to the original encapsulation) and re-writing instructions of the original headers frames of the flow, etc. An original header is one of the headers that is associated with the frame at the host that created the frame, the source host. Headers such as but not limited to: layer 2 header (Ethernet header), IP header, etc. Finally, the flow-forwarding plan can be executed, and the L2FM can forward the flow frames properly.

Identifying a new flow and its associated frames can be quite complicated and might involve addresses discovery, protocol discovery, and/or tunneling encapsulation striping, for example.

After identifying the flow, a flow-forwarding plan can be generated. The flow forwarding rules can be defined according to the information received from one or more RAIC. The information can be static and known in advance; or it can be provided in-band in the frame headers, for example. Furthermore, the control information can be provided in an out-band manner. An exemplary embodiment of the present disclosure can comprise an authorized remote admission and information controller (RAIC). The RAIC can provide dynamic control information regarding the forward rules of flows. For example, the forwarding rules can include re-writing instructions and/or assignment of this traffic into a specific private network (e.g., VLAN) which its access can be controlled by the RAIC itself. Exemplary RAIC can comprise remote admission applications such as, but not limited to: Peer-to-Peer applications, specific video streaming services, and browsing services. The decision to forward data can be taken per flow. If necessary a unique control channel can be established to an RAIC, using Session Description Protocol (SDP) format, for example. The flow forwarding rules can be saved in a flow-forwarding table, for example.

Once the forwarding information is available and the forwarding plan is complete, an embodiment of the present disclosure can perform all necessary operations to support the data forwarding to the proper port or virtual port. These operations can include mapping and translating of the new addresses and ports, frame re-writing and modification (e.g., VLAN ID header, MAC addresses), frame encapsulation and so on.

An exemplary embodiment of the present disclosure may include a propagation mechanism of the relevant control information. The propagation mechanism can enable two or more L2FM to communicate efficiently and avoid data loop due to conflicting control rules, while maintaining their access to all devices. An exemplary propagation mechanism can be implemented using an appointed protocol, for example. An additional exemplary option can be to notify other devices by marking the manipulated frames using an agreed field or header, and so on.

The foregoing summary is not intended to summarize each potential embodiment or every aspect of the present disclosure, and other features and advantages of the present disclosure will become apparent upon reading the following detailed description of the embodiments with the accompanying drawings and appended claims.

Furthermore, although specific exemplary embodiments are described in detail to illustrate the inventive concepts to a person skilled in the art, such embodiments can be modified to various modifications and alternative forms. Accordingly, the figures and written description are not intended to limit the scope of the inventive concepts in any manner.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING

Exemplary embodiments of the present disclosure will be understood and appreciated more fully from the following detailed description, taken in conjunction with the drawings in which:

FIG. **1** depicts a block diagram with relevant elements of an exemplary Layer-2 Forwarder Manipulator (L2FM) according to an exemplary embodiment of the present disclosure.

FIG. **2** illustrates a flowchart with relevant acts of an exemplary method for flow identification according to an exemplary embodiment of the present disclosure.

FIG. **3** illustrates a flowchart with relevant acts of an exemplary method for flow forwarding rules assignment according to an exemplary embodiment of the present disclosure.

FIG. **4** illustrates a flowchart with relevant acts of an exemplary method for collecting the control information executed by a L2FM according to an exemplary embodiment of the present disclosure.

FIG. **5** is a simplified network diagram illustration of an exemplary portion of a common P2P network in which an exemplary embodiment of the present disclosure can be used.

FIG. **6** illustrates a time diagram of an exemplary embodiment of the present disclosure used to solve an anonymous P2P traffic problem.

FIG. **7** illustrates exemplary re-writing changes which can be executed by an exemplary embodiment of the present disclosure.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

Turning now to the figures, in which exemplary embodiments of the present disclosure are described. For convenience, only some elements of the same group may be labeled with numerals. The purpose of the drawings is to describe exemplary embodiments and is not for production purpose. Therefore features shown in the figures were chosen only for convenience and clarity of presentation.

FIG. **1** depicts a block diagram with relevant elements of an exemplary Layer-2 Forwarder Manipulator **100** (L2FM), according to an exemplary embodiment of the present disclosure. Layer-2 Forwarder Manipulator **100** (L2FM) can comprise: a flow identifier **120**, one or more flow managers **130***a-n*, a forward flow manager **140** and a RAIC database **150**.

At initiation, all resources relevant to the L2FM **100** can be allocated, reset, and\or introduced to each other. Resources such as, but not limited to: forward flow manager **140**, session flow manager **130***a-n*, and so on. L2FM **100** can be updated with different parameters. Exemplary parameters can be: forwarding rules, traffic policies, priorities, etc.

Each ingress data frame is associated with a flow and a protocol. The flow identifier **120** can use connection information and protocol information regarding the data frame in order to determine the associated flow manager **130***a-n* for handling the data frame. The flow identifier module **120** can be responsible to identify each new incoming flow and its associated frames received via incoming connection **110**, for example. For each incoming flow, a new line can be created in a flow table. The flow table can be used for efficiently identifying multiple flows of the same subscriber (network node), and/or multiple flows of the same application, and/or multiple flows of the same application session, for example. Exemplary information in a flow line can include addresses, ports, protocols and other information required to identify a frame belonging to this flow. In addition, flow line can include information regarding the relevant flow manager **130***a-n* (FIG. **1**). Once a flow is terminated, the associated flow line can be removed from the table. A flow table can be implemented as a part of a forwarding rules table, or as a separate table.

The identification of a new flow and its associated frames might be quite complicated and might involve addresses and ports discovery, tunnel encapsulation striping, and some Deeper Packet Inspection operations, for example. However, in many cases it can be done simply and directly using a single dimension field such as destination IP address and destination port, for example. That is, the identification can be done by parsing of particular fields with constant offsets from the beginning of the frame, for example. In some cases a bit mask can be used for parsing of certain fields.

The flow manager **130***a-n* can process control information provided either solely by one or more Remote admission and information controller (RAIC) **115** or by additional sources such as admission control server, for example. In addition, the RAIC can instruct the flow manger **130***a-n* to communicate with another network entity, such as but not limited to a DPI helper or any other third party entity. The control information can be saved, by the flow manager **130***a-n*, in the RAIC database **150** for further use in additional flows. The flow manager modules **130***a-n* can be responsible for generating flows forward plan. The flow manager **130***a-n* can direct the flow frames to the forward flow manager **140** (FIG. **1**) together with relevant control information. Relevant information can be desired port or virtual port (port **1** to port M), for example.

An authorized remote admission application can provide dynamic control information regarding the forward rules of its associated flows. For example, the forwarding rules can include re-writing instructions and/or assignment of its traffic into a specific private network (e.g., VLAN or MPLS), which its access can be controlled by the Remote admission and information controller (RAIC) **115**. Exemplary remote admission applications can be, but are not limited to, Peer-to-Peer applications, specific video streaming services, and browsing services.

The Flow manager **130***a-n* (FIG. **1**) can direct the flow frames to the Forward flow manager module **140** (FIG. **1**) together with information of the forwarding and re-writing rules. Additional operations such as, but not limited to: Mapping and translating of the new addresses and ports may be performed as well.

In some embodiments the Flow manager **130***a-n* (FIG. **1**) can generate a single forwarding plan to be used collectively for several different flows which use the same RAIC for example a RTSP session with associated RTP flows. Such information can be saved in the RAIC database **150**.

The forward flow manager module **140** is responsible to perform all necessary operations to support the data forwarding to the proper port or virtual port (port **1** to port M). The forward flow manager module **140** is responsible to modify the flow frames according to the information in the flow forwarding rules line. Exemplary operations can be: possible modification of the flow frames, broadcast to Uni-cast, forcing a frame that leaves the L2FM to return to the L2FM, and SCTP (Stream Control Transmission Protocol) to TCP.

A special treatment can be given to tunneled traffic in the forwarding plan. The forwarder manager module **140** can either reconstruct tunneling encapsulation (such as PPPoE, L2TP or GRE) information of a specific originally tunneled flow or it can add selective new tunneling encapsulation information for the flow (regardless of the flow original tunnel). It can also choose to remove encapsulation all together and forwarded the traffic as non-encapsulated. Additional option is not to add any tunneling encapsulation information

The forwarder flow manager **140** can handle multiple flows simultaneously. For each frame from a particular flow manager **130***a-n*, the forwarder flow manager **140** can modify the frame address/ports and direct the frame to the proper port or virtual port (port **1** to port M).

The forward flow manager **140**, in certain cases, can forward the flow frames to the relevant port, using the standard MAC address discovery as done regularly on layer 2 forwarder. Exemplary cases can be: when the flow has no control information or insufficient control information.

For each frame, the forward flow manager **140** can use the flow table to verify whether the frame tunneling encapsulation should be reconstructed or not. If no tunneling encapsulation is needed, the frame can be transmitted toward the proper output ports (port **1** to port M); else, the tunneling encapsulation is added and the frame is transmitted afterward toward the proper output port.

The RAIC database **150** unit can be used for saving information and collecting statistics regarding multiple flows of a RAIC, for example. Additional examples are, counters of QoS of specific RAICs, information for RAICs accounting, etc. Each RAIC **150** can be associated with a RAIC **115**.

An exemplary traffic forwarding done by L2FM **100** (FIG. **1**) can be: forwarding traffic between anonymous peers in a P2P network. In common P2P networks hiding the peer's identity might be a valuable improvement for the peers. An exemplary embodiment of L2FM over a P2P network is disclosed below in conjunction with FIG. **5**.

FIG. **2** illustrates a flowchart with relevant acts of an exemplary method **200** for flows identification per each received frame according to an exemplary embodiment of the present disclosure. Method **200** can be executed, per each received frame, by a flow identifier module **120** (FIG. **1**), for example. At act **201***a* next frame is fetched to be processed. At act **202**, tunneling encapsulation information (if exist) can be removed from the received frame. Tunneling might belong to PPP (Point to Point Protocol), PPPoE (Point to Point Protocol over Ethernet), for example. The tunneling encapsulation information can be saved as described below at act **210**. The encapsulation information of the flow might be used when the flow forwarding plan include re-encapsulation.

At act **204**, method **200** discovers flow information. Exemplary flow information can be discovered using layer 2 and/or layer 3 addresses, ports, some protocols information, and so on.

Next, a decision **206** needs to be made, whether the frame is the first frame of a flow. Method **200** can utilize the flow table in search of a matching line for the flow. If such line does not exist, then the frame is a first frame of a flow. If such line exists, the frame belongs to an ongoing flow.

If **206**, the frame is not a first frame of a flow, then, at act **208** a suitable flow line can be retrieved from the flow table. And the frame with the retrieved data, or with a pointer to the flow line, can be directed **214** to the proper flow manager **130***a-n* (FIG. **1**). If **206** the frame is the first frame of a flow, then method **200** proceeds to act **210**.

Information about the flow identification that has been collected from the frame (including the tunneling encapsulation information if exists) and a new flow line is created **210** in the flow table storing the collected information.

Next a flow manager **130***a-n* (FIG. **1**) can be assigned **212** to the new discovered flow and the frame can be directed **214** toward the proper flow manager **130***a-n* (FIG. **1**) listed in the flow line and method **200** returns to act **201** for processing the next frame.

FIG. **3** illustrates a flowchart with relevant acts of an exemplary method **300** for flow forwarding rules assignment according to an exemplary embodiment of the present disclosure. Method **300** can be executed by flow manager **130***a-n* (FIG. **1**), for example. Method **300** can utilize the two above mentioned tables: a flow table and a forwarding rules table.



The forwarding plan of a flow should be determinate at the beginning of a flow, meaning upon the arrival of its first few frames. Once a frame is sent to the proper flow manger **130***a-n* (FIG. **1**) by flow identifier **120** (FIG. **1**), the flow manager **130***a-n* can start to process the frame. The first few frames of the flow can be used by the flow manager **130***a-n* to calculate the forwarding plan. Since the flow forwarding plan determinate the flow frame port or virtual port (port **1** to port M), all frames arriving to the flow manager while calculating the plan can be saved in a buffer till the completion of the flow forwarding plan. These first few frames receive different processing operations in comparison to the processing operations of the frames arriving after the completion of the flow forwarding plan as described in FIG. **3**.

Upon a new frame arrival **302**, the flow manager **130***a-n* can check if the forwarding plan of the flow is ready **304**. If **304** the plan is ready, then the frame is forwarded **305** according to the information written in the forwarding rule table and process **300** returns to act **302**. The matching between the frame information and the proper record in the forwarding rules table can be done in a single or in a multiple dimension manner.

If **304**, the flow forwarding plan is not completed yet, the flow manager **130***a-n* can check if the frame is the first frame of the flow **306** and if so it can generate 307 a trivial line in the forwarding rules table according to the standard MAC address discovery as done regularly on layer 2 forwarder.

Then, the flow manager **130***a-n* can request and collect control information descriptor from the Remote admission and information controller (RAIC) **115** (FIG. **1**) at act **308**. If at act **306** the frame is not a first frame of a flow, then method **300** proceeds to act **308** to request and collect relevant control information. The control information descriptor can be predefined or received in-band or received out-of-band. An exemplary method for the control information collection is described in detailed in FIG. **4**.

The application control information provided can help the flow manager **130***a-n* to complete the flow forwarding plan calculation. If **312** flow forwarding plan calculation is complete, then the frame together with all previous frames in buffer of the flow can be forwarded **315** toward the forward manager **140** (FIG. **1**) and method **300** returns to act **302**. If **312** the flow forwarding plan calculation is not ready yet, the frame can be saved **330** in its buffer and method **300** returns to act **302**.

A flow control descriptor can be static and pre-defined in the forwarding table; or it can be embedded in the flow frames (using HTTP cookies headers or Ethernet tags, for example); or flow control descriptor might be passed using a specific control channel between the Remote admission and information controller (RAIC) **115** (FIG. **1**) and the Flow manager **130***a-n* (FIG. **1**). Additional control information may arrive from other network entities such as, but not limited: to Radius/Diameter server, AAA server, etc. The flow manager **130***a-n* (FIG. **1**) can be responsibility to initiate a proper control channel to an appropriate RAIC **115**. The flow manager **130***a-n* (FIG. **1**) can determine when to search and request flow control information, and from whom to request it.

FIG. **4** illustrates a flowchart with a relevant process of an exemplary method **400**. Method **400** can be executed by flow manager module **130***a-n* (FIG. **1**), to collect control information required to prepare a forwarding plan. Exemplary method **400** can be executed at act **308** (FIG. **3**).

At act **404** a decision is made, whether static pre-defined control information (forwarding information) regarding a flow is available in the forwarding rules table. An exemplary

Flow manager **130***a-n* (FIG. **1**) can use a static control scheme to pre-define specific forwarding rules. Such a scheme can be loaded from a relevant RAIC **115**, for example. Such rules can apply to a particular subscriber (network node) set, to a particular destination address, and so on. For example: forward all traffic designated to address x.x.x.x to virtual port associated with VLAN "a". This type of control scheme/plan is the simplest one but it provides less flexibility. The flow manager **130***a-n* can search for relevant static control rules at the forwarding rules table, for example. The pre-defined control information can be stored in a single forwarding rules table serving all flow managers **130***a-n* or it can be distributed between the flow managers **130***a-n* according to session type/subscriber etc.

If **404** pre-defined information is available, then it is fetched **412** and method **400** proceeds to act **413**. In act **413**, the pre-defined forwarding rules information is processed and the method **400** checks if additional control information is required. Additional information such as user priority profile, for example. If **413** yes, then method **400** proceeds to act **406**. If **413** not, then method **400** ends.

If **404** a static pre-defined control information regarding the flow is not available, then method **400** proceeds to act **406**. Either the static pre-defined control information is not sufficient to perform the forwarding decision or there is no pre-defined control information for this flow. In both cases, the flow manager searches **406** for in-band control information according to the session type/protocol/subscriber.

If in-band control information is available **406**, then method **400** fetches **414** the in-band control information and accordingly updates **416** the forwarding rules table. In-band control scheme can be used to define specific forwarding rule per flow. The control information can resides in one or more specific headers of the protocols used in the frame, the cookie header in HTTP protocol or the application extension header in RTSP/RTP, for example. The flow manager **130***a-n* can fetch the control information from the protocol headers of the frames and perform the forward decision accordingly. Once the forwarding rules have been determined, it can be stored in the forwarding rules table to reduce the processing time of the following data frames.

Next method **400** can check **418** if additional control information is required. If **418** yes, then method **400** proceeds to act **408**. If **418** not, then method **400** ends.

Returning to act **406** if in-band control information is not available or any other control information is not sufficient, then method **400** proceeds to act **408**. At act **408** method **400** can request and/or search for out-off-band control information according to the session, protocol or the network node. For example, information from a Peer to Peer (P2P) tracker regarding priority of a particular user (peer). In this case, the control information can be provided by the RAIC **115** (FIG. **1**) through an appointed control protocol or through additional information from other network entities such as Radius server or AAA server. It is the flow manager responsibility to initiate the proper control channel to the RAIC **115** (FIG. **1**) and to the other required network entities. For example, it should contain Radius client capabilities. The RAIC can instruct the flow manger **130***a-n* (FIG. **1**) to communicate with another network entity, such as but not limited to a DPI helper or any other third party entity to receive additional control information.

If some out-off-band control information is available **408**, then out-off-band control information channel is established **420** and control information is fetched. This channel can be defined by client/server relations (for example, Radius client/server) or by peers relations (for example, appointed control protocol), and so on. Next, the out-off-band control information is used to update the forwarding rules table **422** and method **400** ends.

In acts **416** and **422**, the forwarding rules line is updated with the relevant information. This might include mapping and translating of the new addresses and ports, for example. In addition, special NAT (Network Address Translation) treatment such as multi-cast to uni-cast, broadcast to Uni-cast and SCTP (Stream Control Transmission Protocol) to TCP can be included. Note that additional processing such as ARP (Address Resolution Protocol) might be triggered here.

While collecting control information of a specific flow, the flow manager might reveal control information of additional associated flows. A simple example is a bi-directional TCP connection. Consider a TCP connection between a host "A" and a host "B". Once the flow manager assigned to handle the flow from host "A" to host "B" has completed its forwarding plan, at this point, it can usually generate the associated forwarding plan for the flow from host "B" to host "A" without additional control information. To optimize the present disclosure performance, the relevant forwarding rules for the flow from host "B" to host "A" can be inserted to the forwarding rules table too.

FIG. **5** is a simplified network diagram **500** illustration of an exemplary portion of a common P2P network in which an exemplary embodiment of the present invention can be used. Exemplary P2P network can be a BitTorrent or an eDonkey, etc. over the Internet, for example. In a common P2P network, usually, if a peer member "A" **510** wishes to download a file X it relies on a tracker "T" **516** to find other peers and to find out what chunks of the file X they have. A few chunks of file X can be located in peers nearby "A", such as a peer "B" **511**, for example. More chunks of file X can be located on far peers, such as a peer "C" **513** and a peer "D" **515** for example. In the exemplary network diagram **500** Peer C, Peer D, and tracker T are connected via local area network L**2** **502**. Peer A, and Peer B are connected via local area network L**1** **501**. Routers R**1** **533** and R**2** **531** connect LAN L**1** and L**2** via a Internet **540**, for example. The L2FM **555** can be implemented as a local network L**1** **501** switch.

Some peers might not want to reveal their identity to some other peers in the network. A novel efficient solution to this privacy problem can be easily implemented with the L2FM. Let assume that the peers in our example wish to keep their privacy and each peer reveal its identity to tracker "T" **516** only. A simple but not efficient solution to the peer privacy problem is to always transfer the chunks via the tracker "T" **516**. Consequently in a prior art situation a packet from peer "B" **511** to peer "A" **510** has to go all the way to tracker "T" **516** via a common switch, which would be placed in the location of L2FM **555**, router R**1** **533**, the Internet **540**, router R**2** **531** and back al the way to network **501** and to peer "A" **510**. An exemplary embodiment of the present invention can be used to improve the efficiency of this solution as it is disclosed below.

Details on exemplary solution for handling data flow of the anonymous P2P traffic transfer is described in FIG. **6**. FIG. **6** illustrates a time diagram having four axes: Peer "A" **510**, Tracker "T" **516**, L2FM **555** and Peer "B" **511**. It should be noted that the axes are drawn for illustration only. The time axes are not in scale and equal segments along the time scale may not represent equal time intervals. At TO in order to benefit from the advantages of an exemplary L2FM **555** an exemplary admission control server such as tracker "T" **516**, which is adapted to act according to the present disclosure, can contact the network administrator of network L**1** **501** (FIG. **5**), to receive a virtual IP address in network L**1** **501**

(FIG. **5**). In addition, the admission control server tracker "T" **516** can configure at T**2** L2FM **555**, to identify flows with destination IP equal to tracker "T" virtual IP in L **1501** (FIG. **5**). In the example of FIG. **5** tracker "T" **516** acts as an exemplary RAIC **115** (FIG. **1**)

At time T**4**, peer "A" **510** can submit a request for information on file X to tracker "T" **516**, using the public IP address of the "T". Then, tracker "T" **516** can response T**6** with the information on the file X with its virtual IP address on network L**1** **501** (FIG. **5**). As a result, peer "A" **510** can generate T**8** a request for N chucks on network L**1** **501** (FIG. **5**) using the virtual IP address of tracker "T". The request can arrive to L2FM **555**. Next, L2FM **555** can identify T**10** this flow as a new flow and can create a new line in the flow table. Since the tracker application **516** configured the L2FM **555** to identify such flow (that is, a flow with its virtual IP as destination IP) as its controlled flow, a flow that can be forward by the tracker and L2FM toward an optimal path, then L2FM **555** can collect and or request additional control information. L2FM **555** can create T**12** a proper control channel with the tracker "T" **516**. On this control channel L2FM **555** can ask tracker "T" **516** for additional required control information. At time T**14** tracker "T" **516** can response with the addresses of peer "B" **511**, for example.

Using the tracker "T" control information regarding the addresses of peer "B" **511**, the relevant flow manager **130** (FIG. **1**) can update T**16** the flow table and can set the exact re-writing and forwarding rules for this flow. Exemplary rules are described in details below. Then, flow manager **130** (FIG. **1**) can direct all flow frames arrived so far (and saved in a buffer) to the forward flow manager **140** (FIG. **1**). At time T**20**, the forward flow manager **140** can finally anonymously transmit the frames between to the proper ports, the port of peer "A" and the port of peer "B". Note that L2FM **555** can identify the associated flow from peer "B" **511** (FIG. **5**) to peer "A" **510** and can set the re-writing and forwarding rules to hide their identity in this direction as well at the same time without requesting additional control information from the tracker "T" **516** (FIG. **5**) that act as RAIC **115** (FIG. **1**).

FIG. **7** illustrates results of exemplary re-writing and forwarding rules in modifying the headers in this P2P anonymous traffic session. For the simplicity of the example frame **720** uses Ethernet as OSI layer-2 protocol and IP as OSI layer-3 protocol. Consider a flow AB of frames **722** in the direction from peer "A" **710** to a virtual address of a tracker T **716** on a network L**1** **701**. As presented in FIG. **7**, the frames **722** in flow AB include an Ethernet header with the values of peer "A" **710** MAC address as Source Address (SA) and the L2FM **555** MAC address as the Destination Address (DA). In addition, the IP addresses are the peer "A" **710** IP (source) and the virtual IP address of the tracker "T" (destination). To keep peer "A" anonymous to peer "B". The headers re-writing instructions can include the following: replacing the SA of peer "A" **710** with the MAC address of the L2FM **555**; replacing the DA of the L2FM **555** with the MAC address of peer "B" **711**. Replacing the source IP address of peer "A" **710** with the virtual address of the tracker "T" on the network L**1** **701**; replacing the destination IP address of the virtual address of the tracker "T" with the IP address of peer "B" **511**. The result a flow of frames **724** AB' from L2FM **555** to peer "B" **711**. The forwarding rules of flow AB' can be: to direct this flow to the port associated with the MAC address of peer "B" **711**.

Now, consider a flow BA of frames **726** in the direction from the peer "B" **711** to the virtual address of the tracker "T" on the network L**1** **701**. The frames **726** include an Ethernet header with the values of peer "B" **711** MAC address as Source Address (SA) and the L2FM **555** MAC address as the Destination Address (DA). In addition, the IP addresses are the peer "B" **711** IP (source) and the virtual IP address of the tracker "T" (destination). To keep peer "B" anonymous to peer "A", the headers re-writing rules can change BA to BA' by: replacing the SA of the peer "B" **711** with the MAC address of the L2FM **555**; replacing the DA of the L2FM **555** with the MAC address of peer "A" **710**; replacing the source IP address of peer "B" **711** with the virtual address of the tracker "T" on network L**1** **701**; replacing the destination IP address of the virtual address of the tracker "T" with the IP address of peer "A" **710** as illustrated by frame **728**. The forwarding rules of flow BA' can be to direct this flow to the port associated with the MAC address of peer "A" **710**.



The collection of devices such as Layer-2 Forwarder Manipulator (or other layer-2 forwarders) can be considered as a network graph whose nodes are the devices and whose edges (connections) are the cables connecting the devices. To break loops in the graph while maintaining access to all graph segments, the devices collectively can compute a spanning tree similar to other switches implementation. The spanning tree is not necessarily a minimum cost spanning tree. A network administrator can reduce the cost of a spanning tree, if necessary, by altering some of the configuration parameters (such as device ID) in such a way as to affect the choice of the root of the spanning tree.

The devices need to have topologies with one active path between two points to avoid loops. The older IEEE 802.1 D spanning tree protocol could be used but it is quite slow, with forwarding stopping for 3090 seconds while the spanning tree would re-converge. A Rapid Spanning Tree Protocol was introduced as IEEE 802.1w and can be used as well.

In the description and claims of the present disclosure, each of the verbs, 'comprise', 'include' and 'have', and conjugates thereof, are used to indicate that the object or objects of the verb are not necessarily a complete listing of members, components, elements, or parts of the subject or subjects of the verb.

In this disclosure the words 'module', 'unit', and 'device' are used interchangeably. Anything designated as a module, unit, or device may be a stand-alone unit or a specialized module. A module, unit, or a device may be modular or have modular aspects allowing it to be easily removed and replaced with another similar module or device. Each module, or unit or device may be any one of, or any combination of, software, hardware, and/or firmware. Exemplary HW components can be such as but not limited to ASIC based NPU and FPGA based NPU. Software of a logical module can be embodied on a computer readable medium such as a read/write hard disc, CDROM, Flash memory, ROM, etc. In order to execute a certain task a software program can be loaded to an appropriate processor as needed.

The present disclosure has been described using detailed descriptions of embodiments thereof that are provided by way of example and are not intended to limit the scope of the invention. The described embodiments comprise different features, not all of which are required in all embodiments of the invention. Some embodiments of the present invention utilize only some of the features or possible combinations of the features. Many other ramification and variations are possible within the teaching of the embodiments comprising different combinations of features noted in the described embodiments.

It will be appreciated by persons skilled in the art that the present invention is not limited by what has been particularly shown and described herein above. Rather the scope of the invention is defined by the following claims.

What is claimed is:

**1**. A layer 2 forwarder and manipulator (L2FM) located in a layer 2 network and serves a plurality of networks entities, the L2FM comprising:

a flow identifier;

one or more flow managers; and

a forward-flow manager;

wherein the flow identifier receives a plurality of frames, from a plurality of entities, identifies one or more flows and accordingly, associates a flow to a flow manager out of the one or more flow managers and forwards the flow frames to the associated flow manager;

wherein per each new flow the flow manager, obtains forwarding control information for the new flow from a remote-admission-and-information controller (RAIC) and based on the obtained information, defines rules for forwarding the flow frames, and assigns the forwarding rules and the flow frames to the forward-flow manager, wherein the flow manager, based on the received frame of the flow, obtains the forwarding control information by selecting the RAIC from one or more different RAICs and the RAIC is an external entity to the network served by the L2FM; and

wherein the forward-flow manager, handles the flow frames and forwards the flow frames to an appropriate port based on the forwarding rules.

**2**. The L2FM of claim **1**, wherein at least part of the forwarding-control information is obtained from the selected RAIC after transferring one or more frames of the new flow toward the selected RAIC.

**3**. The L2FM of claim **1**, wherein the RAIC can instruct the L2FM to transfer one or more frames of the new flow toward another entity for further analysis.

**4**. The L2FM of claim **1**, wherein the L2FM send instruction data to another RAIC.

**5**. The L2FM of claim **1**, wherein the communication with the RAIC is done out of band.

**6**. The L2FM of claim **1** wherein at least part of the forwarding-control information is embedded in the frames of the flow.

**7**. L2FM of claim **1**, wherein the selected RAIC is a virtual member in the Layer 2 network.

**8**. The L2FM of claim **1**, wherein at least portion of the forwarding control information is embedded in-band.

**9**. The L2FM of claim **1**, wherein the forwarding rules comprises re-writing one or more fields in one more of the original headers of at least one of the flow frames.

**10**. The L2FM of claim **9**, wherein re-writing further comprising manipulating the encapsulation casing of the flow.

**11**. The L2FM of claim **9**, wherein the RAIC can instruct the L2FM to copy a frame to plurality of addresses.

**12**. The L2FM of claim **9**, wherein re-writing can manipulate uni-cast frames to multicast or broadcast frames and vice versa.

**13**. The L2FM of claim **11**, wherein re-writing comprise converting SCTP frames to TCP frames and vice versa.

**14**. The L2FM of claim **11**, wherein the copy of a frame is done across different virtual networks.

**15**. The L2FM of claim **12**, wherein manipulating uni-cast frames to multicast frames is done across different virtual networks.

**16**. The L2FM of claim **13** wherein newly created TCP flows can access different virtual interfaces.

**17**. The L2FM of claim **9**, wherein the one or more fields in the original header are associated with the RAIC.

**18**. The L2FM of claim **9**, wherein the original header is a header that was associated to the frame at the host that created the frame.

**19**. The L2FM of claim **9**, wherein the layer 2 network is based on a Ethernet protocol, the layer 3 is based on Internet Protocol, the flow is Peer-to-Peer flow between a user "A" and a user "B" of the layer 2 network and the RAIC is a Tracker server having virtual address; then the re-writing one or more fields at the headers within frames received from user "A" and targeted toward the virtual address of the Tracker server further comprising replacing the destination IP address of the Tracker address with the IP address of peer 'B', and replacing the Source IP address of peer 'A' with the virtual address of the Tracker server.

**20**. The L2FM of claim **17**, wherein the forward flow manager manipulated the addresses at the headers within frames received from user "B" and targeted toward the address of the tracker server by re-writing the source IP address of the packet received from user "B" as the address of the Tracker server and the destination IP address as the IP address of user "A".

**21**. The L2FM of claim **19**, wherein the re-writing further comprising replacing the destination MAC address of the L2FM with the MAC address of peer 'A', and replacing the source MAC address of peer 'B' with the MAC address of the L2FM.

**22**. The L2FM of claim **1**, wherein the RAIC registers at an administrator of the layer 2 network and gets a virtual address; configures the L2FM to transfer a first frame, of a new flow, in which the destination address of the first frame is the virtual address, toward the RAIC in order to get forwarding control information; sends to the L2FM re-writing instruction of the frames and encapsulated header of the flow.

**23**. The L2FM of claim **1**, wherein the RAIC is a network device selected from a group consisting of admission control server and application control server.

**24**. The L2FM of claim **23**, wherein the application control server is a server selected from a group consisting of: Peer-to-Peer application servers, video streaming servers, and Web servers.

**25**. The L2FM of claim **1**, wherein each RAIC has an account at the L2FM and the accounting information is calculated for the RAIC.

**26**. A method for forwarding frames of a flow via a layer 2 forwarder and manipulator (L2FM), the method comprising:

a. identifying, at the L2FM, one or more first frames of a new flow;

b. obtaining forward control information for frames of the new flow, wherein the forward control information includes re-writing of at least one field in an original header of the frames of the new flow, wherein obtaining forward control information is done out of band;

c. changing the at least one field in an original header of the frames of the new flow according to the obtained forward control information; and

d. forwarding the frames of the new flow according to the forward control information;

wherein at least portion of the control information is obtained from a remote-admission-and-information controller (RAIC).

**27**. The method of claim **26**, wherein obtaining forward control information is done by sending the one or more first frames toward the RAIC.

**28**. The method of claim **26**, wherein the original header is a header that was associated to the frame at the host that created the frame.

**29**. The method of claim **26**, wherein at least portion of the control information is embedded in-band.

**30**. The method of claim **26**, wherein one or more of the fields in the original headers is associated with the RAIC.

**31**. The method of claim **26**, wherein forwarding the flow frames according to the forward control information further comprising re-writing the IP header of the original frame by re-writing the virtual address of the RAIC as the source IP address of the flow frames instead of the destination IP address.

**32**. The method of claim **26**, wherein the RAIC is a network device selected from a group consisting of admission control server and application control server.

**33**. The method of claim **32**, wherein the application control server is a server selected from a group consisting of: Peer-to-Peer application servers, video streaming servers, and Web servers.

**34**. The method of claim **26**, wherein the RAIC can instruct the L2FM to transfer one or more frames of the new flow toward another entity for further analysis.

**35**. The method of claim **26**, wherein re-writing further comprising manipulating the encapsulation casing of the flow.

**36**. The method of claim **26**, wherein the RAIC instructs the L2FM to copy a frame to plurality of addresses

**37**. The method of claim **26**, wherein re-writing can manipulate uni-cast frames to multicast or broadcast frames and vice versa.

**38**. The method of claim **26**, wherein copy a frame is done across different virtual networks.

**39**. The method of claim **26**, wherein manipulating uni-cast frames to multicast frames is done across different virtual networks.

**40**. A layer 2 forwarder and manipulator (L2FM) located in a layer 2 network and serves a plurality of networks entities, the L2FM comprising:

a flow identifier;

one or more flow managers; and

a forward-flow manager;

wherein the flow identifier receives a plurality of frames, from a plurality of entities, identifies one or more flows and accordingly, associates a flow to a flow manager out of the one or more flow managers and forwards the flow frames to the associated flow manager;

wherein per each new flow the flow manager, obtains forwarding control information for the new flow from a remote-admission-and-information controller (RAIC) and based on the obtained information, defines rules for forwarding the flow frames, and assigns the forwarding rules and the flow frames to the forward-flow manager, wherein the flow manager, based on the received frame of the flow, obtains the forwarding control information by selecting the RAIC from one or more different RAICs and wherein at least part of the forwarding-control information is obtained from the selected RAIC after transferring one or more frames of the new flow toward the selected RAIC; and



wherein the forward-flow manager, handles the flow frames and forwards the flow frames to an appropriate port based on the forwarding rules.

**41**. A layer 2 forwarder and manipulator (L2FM) located in a layer 2 network and serves a plurality of networks entities, the L2FM comprising:

a flow identifier;

one or more flow managers; and

a forward-flow manager;

wherein the flow identifier receives a plurality of frames, from a plurality of entities, identifies one or more flows and accordingly, associates a flow to a flow manager out of the one or more flow managers and forwards the flow frames to the associated flow manager;

wherein per each new flow the flow manager, obtains forwarding control information for the new flow from a remote-admission-and-information controller (RAIC) and based on the obtained information, defines rules for forwarding the flow frames, and assigns the forwarding rules and the flow frames to the forward-flow manager, wherein the flow manager, based on the received frame of the flow, obtains the forwarding control information by selecting the RAIC from one or more different RAICs and the RAIC can instruct the L2FM to transfer one or more frames of the new flow toward another entity for further analysis; and

wherein the forward-flow manager, handles the flow frames and forwards the flow frames to an appropriate port based on the forwarding rules.

**42**. A layer 2 forwarder and manipulator (L2FM) located in a layer 2 network and serves a plurality of networks entities, the L2FM comprising:

a flow identifier;

one or more flow managers; and

a forward-flow manager;

wherein the flow identifier receives a plurality of frames, from a plurality of entities, identifies one or more flows and accordingly, associates a flow to a flow manager out of the one or more flow managers and forwards the flow frames to the associated flow manager;

wherein per each new flow the flow manager, obtains forwarding control information for the new flow from a remote-admission-and-information controller (RAIC) and based on the obtained information, defines rules for forwarding the flow frames, and assigns the forwarding rules and the flow frames to the forward-flow manager, wherein the flow manager, based on the received frame of the flow, obtains the forwarding control information by selecting the RAIC from one or more different RAICs and the L2FM send instruction data to another RAIC; and

wherein the forward-flow manager, handles the flow frames and forwards the flow frames to an appropriate port based on the forwarding rules.

* * * * *

US008971335B2

(12) **United States Patent**
**Harel et al.**

(10) **Patent No.:** **US 8,971,335 B2**
(45) **Date of Patent:** **Mar. 3, 2015**

(54) **SYSTEM AND METHOD FOR CREATING A TRANSITIVE OPTIMIZED FLOW PATH**

(75) Inventors: **Amir Harel**, Ein-Vered (IL); **Alon Lelcuk**, Ramot-Meir (IL); **Ronit Nossenson**, Kfar-Sava (IL); **Avinoam Zakai**, Sharona (IL)

(73) Assignee: **Exafer Ltd**, Ein-Vered (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 545 days.

(21) Appl. No.: **12/827,439**

(22) Filed: **Jun. 30, 2010**

(65) **Prior Publication Data**

US 2011/0002240 A1 Jan. 6, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/222,615, filed on Jul. 2, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 12/28*** | (2006.01) |
| ***H04J 3/16*** | (2006.01) |
| ***G06F 15/16*** | (2006.01) |
| ***G06F 15/173*** | (2006.01) |
| ***H04L 12/721*** | (2013.01) |
| ***H04L 12/751*** | (2013.01) |
| *H04L 12/46* | (2006.01) |

(52) **U.S. Cl.**

CPC ................ ***H04L 45/38*** (2013.01); ***H04L 45/02*** (2013.01); *H04L 12/4641* (2013.01)

USPC ........... **370/401**; 370/466; 370/467; 709/228; 709/239

(58) **Field of Classification Search**

CPC .............. H04L 12/66; H04L 29/06163; H04L 29/06068; H04L 45/16; H04L 45/124–45/127

USPC ........... 370/400–418, 466, 467; 709/220–240

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,597,078 | A | | 6/1986 | Kempf |
| 5,214,646 | A | * | 5/1993 | Yacoby ........................ 370/402 |
| 5,249,292 | A | | 9/1993 | Chiappa |
| 5,274,631 | A | | 12/1993 | Bhardwaj |
| 5,319,644 | A | | 6/1994 | Liang |
| 5,477,541 | A | | 12/1995 | White et al. |

(Continued)

OTHER PUBLICATIONS

Haito Wu, Yunxin Liu, Qian Zhang, and Zhi-Li Shang, SoftMAC: Layer 2.5 Collaborative MAC for Multimedia Support in Multihop Wireless Networks, IEEE Transactions on Mobile Computing, Jan. 2007, pp. 12, vol. 6, No. 1.

*Primary Examiner* — Un C Cho
*Assistant Examiner* — Jeremy Costin
(74) *Attorney, Agent, or Firm* — Smith Risley Tempel Santos LLC; Gregory Scott Smith

(57) **ABSTRACT**

Traffic paths based on common devices available in a network are optimized, controlled, manipulated and created. The new paths used to optimize are not limited to the original OSI layer and/or original networks. Thus, various kinds of users/computers/devices, working in the same or in different abstraction layer networks, are combined into one collective virtual network providing the ability to compute and utilize the best (optimal) traffic path for each flow at each given time. The traffic path can be constructed especially for each flow. All or most devices and layer networks are combined in a collective virtual network when computing and constructing an optimized path for a flow. Thus, there is no need to add additional headers to a flow thereby eliminating the addition of overhead to the flow.

**30 Claims, 14 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,600,644 | A | 2/1997 | Chang et al. | |
| 5,602,851 | A | 2/1997 | Terashita et al. | |
| 5,608,726 | A | 3/1997 | Virgile | |
| 5,633,865 | A | 5/1997 | Short | |
| 5,633,866 | A | 5/1997 | Callon | |
| 5,684,967 | A * | 11/1997 | McKenna et al. | 715/853 |
| 5,740,171 | A | 4/1998 | Mazzola et al. | |
| 5,790,546 | A | 8/1998 | Dobbins et al. | |
| 5,892,924 | A | 4/1999 | Lyon et al. | |
| 5,910,954 | A | 6/1999 | Bronstein et al. | |
| 6,006,264 | A | 12/1999 | Colby et al. | |
| 6,061,334 | A | 5/2000 | Berlovitch et al. | |
| 6,088,356 | A | 7/2000 | Hendel et al. | |
| 6,147,993 | A * | 11/2000 | Kloth et al. | 370/392 |
| 6,243,667 | B1 | 6/2001 | Kerr et al. | |
| 6,424,659 | B2 | 7/2002 | Viswanadham et al. | |
| 6,628,617 | B1 * | 9/2003 | Karol et al. | 370/237 |
| 6,639,901 | B1 | 10/2003 | Katzri et al. | |
| 6,674,769 | B1 | 1/2004 | Viswanath | |
| 6,717,949 | B1 | 4/2004 | Boden et al. | |
| 6,792,471 | B2 | 9/2004 | Nomura et al. | |
| 6,853,638 | B2 | 2/2005 | Cohen | |
| 6,944,130 | B1 | 9/2005 | Chu et al. | |
| 7,197,550 | B2 | 3/2007 | Cheline et al. | |
| 7,197,556 | B1 | 3/2007 | Short et al. | |
| 7,325,071 | B2 | 1/2008 | Krishnan | |
| 2001/0037409 | A1 * | 11/2001 | Ricciulli | 709/310 |
| 2003/0167338 | A1 * | 9/2003 | Hare et al. | 709/236 |
| 2006/0133405 | A1 * | 6/2006 | Fee | 370/437 |
| 2007/0160042 | A1 * | 7/2007 | Dollo et al. | 370/389 |
| 2009/0077228 | A1 * | 3/2009 | Weil et al. | 709/224 |
| 2009/0116404 | A1 * | 5/2009 | Mahop et al. | 370/254 |

* cited by examiner




PRIOR ART

FIG. 1A




PRIOR ART

FIG. 1B


200
N
215
213
212
L2
User D
User C
User E
202
S2
222
R1
R2
233
231
220
S1
201
211
L1
210
User B
User A

FIG. 2


300
Vn
Vd
202
L2
S2
222
312
201
L1
S1
314
220
310
Graph A
324
328
322
V2
V1
326
202
314
L1
201
320
Graph B
332
P1
R1 U R2
334
P2
336
L2
L1
330
Graph C

FIG. 3


400
Admission control servers
Application control servers
Radius
AAA
DPI
462
Streaming
Web Server
464
468
454
NAT
472
Global Data Bases
Flow path optimzer and creator FPOC
410
Monitoring tools/ statistic collectors
442
DHCP
432
DHCP
434
422
423
403
User A
User B
404
412
Server
Management and control information

FIG. 4


500
504
Device Initialization
506
Wait for new network message
510
No new network messages arrived
New network message arrived
512
Perform network registration process
513
Perform network update process
Update network message arrived
New network message arrived
516
Wait for new \ update network or session message
518
No" new "or" update "network or session messages arrived
535
Perform session update process
Update session message arrived
New session message arrived
Perform session virtualization process
530

FIG. 5


Admission Control ,
DNS ,NAT ,DHCP ,
Monitoring tools...
Application Control
600
660
662
Flow path optimizer and creator
(FPOC)
To TDSPRC
Event
trigger
information
610
Data
traffic
(optional)
611
Modified
Data traffic
(optional)
613
614
Flows
forwarding
rules
CPN
information
616
Networks
forwarding
rules
618
619
Networks event
triggers rules
630
Control
Interface
Translator
638
Session1
events
triggers
621
Session 1
data traffic
(optional)
622
Session1
modified
data traffic
(optional)
625
624
Session1
flows
forwarding
rules
Session 1
Manager
620
CPN
Database
650
640
CPN
Manager
Coupled Promiscuity Network
(CPN) information
632
Networks forwarding rules
634
Networks event triggers rules
636

FIG. 6


700
704
Discover a new network
706
Update networks topology graph
708
Search for predefined network information
710
Fetch in-band network information
714
Fetch out-of-band network information
716
Update the CPN database
720
Join the collective virtual network (CVN)
724
Update counters and statistics
726
Create the networks event triggers and forwarding rules

FIG. 7


800
IDENTIFY A NEW SESSION
802
ESTABLISH SESSION OPTIMIZATION PLAN
806
VERIFY SESSION OPTIMIZATION PLAN
808
PROVIDE SESSION FORWARDING RULES
812

FIG. 8


900
DSL Modems
Operator Information systems
934
DSLAM
920
FPOC
903
Peer“ B”
410
Tracker “T”
907
924
Metro switch
910
940
B-RAS
901
Metro
ISP
Internet
Peer“ A”
930
905
Peer“ D”
921
904
Peer“ C”

FIG. 9


A. Common P2P connection
1000
901
920
924
930
905
ISP
Internet
DSLAM
Metro switch
B-RAS
940
Peer" A"
Peer" D"
Prior Art
B. Common P4P Optimization
1100
920
924
930
ISP
901
Peer" A"
Metro switch
B-RAS
940
DSLAM
Prior Art
903
Peer" B"
C. Novel P2P Optimization using an FPOC
1200
920
924
Metro switch
901
DSLAM
Peer" A"
410
FPOC
903
Peer" B"

FIG. 10


Peer B
TDSPRC
FPOC
Tracker T
Peer A
FPOC DNS publish
T0
Admission request
T2
T4
Admission response
File 'X' information request
T6
Peer list information request
T8
Peer list information response and FPOC addresses
T10
Re-calculation
T12
T14
File 'X' information response with FPOC addresses
P2P direct connections according to FPOC addresses
T16
Event trigger msg
T18
Admission request
T20
Admission response
T22
Re-write and forward rules
T23
File 'X' chunks direct transfer
File 'X' chunks virtualized transfer
T24

FIG. 11


1300
DSL Modems
Operator Information systems
DSLAM
FPOC
1320
410
1302
User "B"
1325
Metro switch
1327
Server "S"
1301
Metro
B-RAS
ISP
Internet
1305
User "A"
1330
1340

FIG. 12


A. Classic HTTP video:
1400
ISP
Internet
1301
1320
1325
1330
1340
1305
User "A"
DSLAM
Metro switch
B-RAS
Server "S"
Prior Art
B. An optimized HTTP video:
1360
1500
Private Content network
1301
1320
1325
1305
User "A"
DSLAM
Metro switch
Server "S"
FPOC
410

FIG. 13


Server S
TDSPRC
FPOC
User A
ANTO
DNS
publish
N0
N2
Admission request
N4
Admission response
N6
TCP SYN
N7
Event trigger msg
N8
Optimization
plan
N10
Re-write and forward rules
Virtualized transfer
N12
Direct transfer (PPP)

FIG. 14

# SYSTEM AND METHOD FOR CREATING A TRANSITIVE OPTIMIZED FLOW PATH

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a non-provisional application being filed under 35 USC 111 and 37 CFR 1.53(b) and claiming the benefit under 35 USC 120 of the United States Provisional Application for Patent that was filed on Jul. 2, 2009 and assigned Ser. No. 61/222,615, which application is hereby incorporated by reference.

## BACKGROUND

The embodiments described within this disclosure relate generally to optimizing traffic paths between networks, and more particularly, to creating a transitive-optimized flow path between Coupled Promiscuity Networks.

A network can be defined as a collection of computers and devices that are connected to each other. Such a network allows users and computers to communicate with each other and share resources and information. However, this classic definition of network is not sufficiently broad to capture the wide intuitive concept, which people today consider as a "network". Many different networks can be defined on connected computers, in any abstraction layer of the Open System Interconnection (OSI) reference model.

For example, in the data link abstraction layer, some computers may be connected directly to each other and belong to the same Local Area Network (LAN), while a pair of devices with indirect connection can construct a network using a Point-to-Point Protocol (PPP) connection between them. As another example, in the application abstraction layer, users of sets of computers and devices might be connected to a particular social network via a particular web page. Another example is an Internet Protocol (IP) address that can represent a server cluster and can describe a specific network in the network abstraction layer.

In networks, data is typically exchanged between communicating nodes in the form of data chunks. Each data chunk comprises a header and a payload. In an Ethernet network, a data chunk is referred as a frame. A frame is a digital data transmission unit having a header and a payload on the data link layer 2. The header can include information about the communicating devices and may include, but is not limited to: the source MAC address (SA) and the destination MAC address (DA) in an Ethernet protocol frame; the information on the specific connection defined between these two communicating devices Data Link Connection Identifier in the Frame Relay (FR) protocol, and so on. The payload can include the data carried by the frame and can carry a wide variety of information. In an Internet Protocol network, a data chunk is referred as a packet. In an ATM network, a data chunk is referred as a cell. Thus, within the context of this description, the terms: data chunk, frame, packet and cell can be used interchangeably to refer to similar, underlying data formats that include a header and a payload. Henceforth, in context of this description, drawings and claims, the term frame may be used as a representative term for data chunk.

A flow is a sequence of frames associated with a single logical connection between communicating devices. A flow can be defined by a one-to-one relationship between two communicating devices (uni-cast) or by a one-to-many relationship between two or more communicating devices (multicast and broadcast). A flow can be identified for each data frame based on the various headers-fields-combinations. The headers-fields-combination can be formed by selecting all fields, or a specific field within the headers of the multiple layers protocols. For example, a flow can be identified using a source MAC address field and a destination MAC address field in the header of a layer 2 Ethernet protocol together with a source port field and a destination port field of a layer 4 TCP header. Another example of a flow can be associated with a specific TCP connection. In this case, the flow frames can be identified using the quartet fields: a source IP address, a destination IP address, a source port and a destination port, for example.

A session is a series of communications in an application layer, initiated by a user or a device. A point-to-point protocol (PPP) session can be initiated when a user logs into a network with a user-id and a password, for example. Another example can be a Dynamic Host Configuration Protocol (DHCP) session, which can be initiated when a user device obtains an IP address from a network. A user may initiate multiple sessions on the same device. For example, a user may be using a computer that is downloading a Video on Demand movie in a first session and the user may also be browsing the World Wide Web (WWW) in a second session. Note that a session can be comprised of one or more flows depending on the application. An HTTP browsing session to a particular web page can be comprised of multiple TCP connections downloading the page objects, for example.

The task of identifying a complete set of flows associated with a specific session is complicated as can be understood from the above described example of an HTTP browsing session. A web page can consist of multiple objects in multiple domains. A browser application might open several Transmission Control Protocol (TCP) connections to download the objects associated with a requested web page. Because each domain might have a different IP address, it is impossible to associate these TCP flows with the same hypertext transfer protocol (HTTP) session without analyzing the origin of the HTML objects and/or performing a Deep Packet Inspection (DPI) operation on the HTTP referrer headers. Henceforth throughout this disclosure the term "session" will be used with respect to a set of flows that have a simple logical connection in an application layer. For example, this may consist of two flows that produce a bi-directional TCP connection. Note that this flow set might not include all flows associated with a particular session.

Various devices exist for transmitting frames within a network or between networks. These devices may operate at one or more OSI model layers, including the physical, data link, network, or transport layers, for example. A switch, a bridge and a gateway are examples of hardware devices providing physical connections within or between different networks and that operate at the data link layer. Routers usually route frames using higher protocol information, to determine the ultimate destination of the frame and to determine an optimum path from the source network to the destination network, for example.

Classic routing algorithms, such as those used by a Border Gateway Protocol (BGP), for example, are designed to optimize the routing path between source and destination addresses, in the Internet, for example. FIG. **1**A illustrates the prior art public network topology **100** that is assumed to be in place for such routing algorithms. As can be seen from this FIG. **1**A, the public network **100** can be comprised of multiple networks separated by long distances, measured in the number of hops, between a plurality of users **101**,**103**,**105** and server **110**. An exemplary long routing path between user "A" **101** and the server **110**, can be through a plurality of routers: **120**, **121**, **123**, **125**, **127** and **129** and switch **130**.

Today, with the existence of large Content Networks **150** (FIG. **1**B, a prior art network), the above described topology **100** has changed. The content networks are huge and highly connected to other networks, resulting in a flatter topology **140** as illustrated in FIG. **1**B, for example. In the typical prior art flat topology **140**, the distance between a plurality of users **102**,**104**,**106** and their requested content on servers **122**,**124** is shortened.

In the prior art, a Session Border Controller (SBC) is a device used in some Voice over IP (VoIP) networks to exert control over the signaling and the media flows involved in setting up, conducting, and tearing down calls. The fact that most of the signaling and media packets pass through the SBC allows the SBC to provide a number of services, including, but not limited to: measurement, access control, routing of media packets and signaling packets based on present rules and policies, protocol conversion and codec trans-coding, firewall and network address translator (NAT) traversal, quality of service (QoS) enforcement, and topology hiding. These functions can be implemented by one or more application servers running on the SBC.

In common communication networks it is possible to change a path of a flow to a different network and/or to a different OSI layer. In such communication networks, the flow is encapsulated and additional headers are added to it thereby increasing the overhead of the data packets of the flow. A few non-limiting examples of communication networks that use this technique/protocol include: MPLS, GMPLS, etc. When a GMPLS and/or MPLS network decides to change a path of a flow, among other actions, GMPLS and/or MPLS encapsulates the flow by adding a header with forwarding information (referred to as a label). This operation results in increasing the overhead of the data packets of the flow.

Communication networks that add additional headers are fast but not sophisticated networks. Flows can accumulate many headers across the path that it needs to be transferred through. For example, a common situation can be one in which a flow is transferred over Voice IP, over the Internet, over switching, over IP over the Internet, and so on. Adding more headers (encapsulation of the data traffic) increases the bandwidth consumption of the flow.

Furthermore existing communication networks that calculate an optimized path and modify the flow accordingly can require edge devices at the edges of the flow path. The edge devices are needed for encapsulating and\or de-encapsulation and adding additional headers with forwarding information in order to divert the flow to a new path according to the optimization plane. In GMPLS and MPLS, the edge devices can be routers, referred as label edge routers (LER), for example. Common communication networks may also require a link management system and or method because they create a new network on top of existing networks, creating more complexity and so on. Therefore there is a need for an elegant, sophisticated, and uncomplicated method and system that will enable creating an optimized path for a flow with minimal or no overhead.

## BRIEF SUMMARY

Exemplary embodiments of the present disclosure provide examples of novel systems and methods that optimize, control, manipulate and create traffic paths using means and common devices readily available for installation or already existing and/or operating on these networks, without being limited to the original OSI layer and/or original networks. Exemplary embodiments of such flow optimizers unite various kinds of users/computers/devices, working in the same or in different abstraction layer networks, into one collective virtual network. Advantageously, this provides the ability to compute and utilize the best (optimal) traffic path for each flow at each given time. The traffic path can be constructed especially for each flow. The novel system and method can utilize and control all devices and layer networks in its collective virtual network when computing and constructing an optimized path for a flow. Thus, there is no need to add additional headers to a flow thereby eliminating the addition of overhead to the flow. Furthermore, embodiments of the flow optimizer seek to peel off as many headers as possible from the flow, thus actually reducing the bandwidth consumption of the flow. Furthermore, as will be described below, embodiments of the flow optimizer do not create a new network, but rather, the various embodiments use the existing networks with their existing protocols, and therefore exemplary embodiments do not require a link management protocol, for example. Exemplary embodiments of the flow optimizer may use different criteria to compute an optimal path. A traffic path can be, but is not limited to: the traffic path with the shortest latency, the less loaded path, etc.

In the various network layers of the OSI model, different network types may exist. For example, in the data link layer network, computers can belong to a specific Local Area Network. In the application layer network, users (of computers, devices and etc.) can be connected to a particular Social network via a particular web page. Embodiments of the flow optimizer enable different connected sets of users/computers/devices in different abstraction layer to be considered and/or referred to as a collective virtual network (CVN). Advantageously, this enables the computation of an alternative and optimized path for a flow regardless of the OSI layer and/or other network boundaries.

Throughout the description, two or more networks, such as **N1** and **N2**, are referred to as "Coupled Promiscuity Networks" (CPN) if a set of devices D collectively receives and transmits, or passes through, all the frames of networks **N1** and **N2** (**N1** and **N2** networks might belong to different abstraction layers). By controlling the device set D, one can modify and manipulate the traffic on both networks **N1** and **N2**. The device set D, consisting of one or more devices that collectively exhibit promiscuous transmitting of data with rewrite capabilities is referred to as the "Transmitting Device Set with Promiscuous and Re-writing Capabilities" (TDSPRC). If a device from the set D does not have promiscuous capabilities, for example a layer-2 switch, then a commercial promiscuous device can be associated with the device to create a TDSPRC set. An exemplary commercial promiscuous device can be a DPI device such as, but not limited to, Cisco's SCE or Allot's NetEnforcer.

An embodiment of the flow optimizer operates to optimize the delivery of information between a first node on a first network and a second node on the same or different network. In general, the delivery is accomplished through a networked system in which one or more paths between the first node and second node are known, such as by a common addressing and a known connectivity mechanism, and a promiscuous device that receives and retransmits all frames of the first network and the different network. In operation, alternate paths between the first node and the second node are identified. In one embodiment this is accomplished by receiving a message, identifying a new network associated with the message, and including the new network in the collective virtual network. In other embodiments, various triggering events may occur to invoke this process. Next, a collective virtual network is created which includes the known paths and the

alternate paths. For a particular flow, the data is delivered by identifying an optimal path in the collective virtual network and then modifying the data flows to be compatible with the network technology employed by the identified optimal path.

FIG. **2** is a simplified portion of a network diagram illustrating an exemplary communications network N **200** in which an exemplary embodiment of the flow optimizer can be used. It should be appreciated that the various embodiments described may include a variety of structures, capabilities and functionality and that not all embodiments must incorporate all such structure, capabilities and functionality. However, the term flow optimizer, although it may not accurately describe all embodiments, is used to refer to a generic embodiment. Network N **200** is shown as including a Local Area Network (LAN) L**1** **201** with a single switch S**1** **220** and a LAN L**2** **202** with a single switch S**2** **222**. Users A **210** and B **211** belong to or are associated with LAN L**1** **201** and users C **215**, D **213** and E **212** belong to or are associated with LAN L**2** **202**. Routers R**1** **233** and R**2** **231** connect the local area networks L**1** **201** and L**2** **202**.

FIG. **3** schematically demonstrates different optional embodiments of Coupled Promiscuity Networks (CPN) utilizing a flow optimizer over network N of FIG. **2** by presenting three simplified examples of optional network topologies. The network topology graph associated with N **200** is described in graph "A" **310**, assuming that N does not include any other networks. The network vertex set Vn consists of the two LANs L**1** **201** and L**2** **202**. The transmitting device sets with promiscuous and re-writing capabilities (TDSPRC) is denoted by Vd and consists of two switches S**1** **220** and S**2** **222**. A set of a plurality of connections is shown between Vn and Vd and comprises two connections L**1** to S**1** (**314**) and L**2** to S**2** (**312**). Because the routers R**1** **233** (FIG. **2**) and R**2** **231** (FIG. **2**) do not transmit all traffic of LAN L**1**, or LAN L**2**, their node is not represented in graph "A" **310** (meaning they are not a TDSPRC to networks **201** and **202**). According to the present disclosure by definition: LANs L**1** **201** and L**2** **202** are considered Coupled Promiscuity Networks (CPN) under the set of switches S**1** **220** and S**2** **222** (switches S**1** and S**2** both have promiscuous capabilities).

Graph "B" **320** is another exemplary network. Exemplary network **320** includes two more networks in addition to the networks described in the first example, N **200** (FIG. **2**). The additional two networks are: a Virtual LAN V**1** **322** and a Virtual LAN V**2** **324**. V**1** **322** and V**2** **324** are defined within L**2** **202**, with user C **215** in V**1**, and users D **213** and E **212** in V**2**. The corresponding networks topology graph associated with N **200** and the added V**1** and V**2** is described in graph "B" **320**. The network set Vn consists of L**1** **201**, L**2** **202**, V**1** **322** and V**2** **324**. The set of TDSPRC, Vd, consists of switches S**1** **220** and S**2** **222**. A plurality set of connections exist as illustrated in the drawing: L**1** to S**1** (**314**), L**2** to S**2** (**312**), V**1** to S**2** (**326**), and V**2** to S**2** (**328**). In this graph, any pair of the networks V**1**, V**2** and L**2** is a Coupled Promiscuity Network (CPN) under the TDSPRC S**2**.

Graph "C" **330** is another exemplary network. Exemplary network **330** includes two more networks in addition to the networks described in the first example, N **200** (FIG. **2**): two Peer-to-Peer (P2P) networks P**1** **332** and P**2** **334**. User 'A' **210** and 'C' **215** belong to P**1** and user 'B' **211** and 'D' **213** belong to P**2**. The corresponding networks topology graph associated with N **200** including P**1** and P**2** is described in graph "C" **330**. Note that in this case, the device set R**1** **233** (FIG. **2**) U R**2** **231** (FIG. **2**) transmits all traffic of both P**1** **332** and P**2** **334** and as a result, P**1** and P**2** are Coupled Promiscuity Networks (CPN) under the TDSPRC R**1** U R**2** **336** (in addition to other device sets). The mathematic symbol R**1**UR**2** represents the union of R**1** and R**2**.



Coupled promiscuity is a transitive relationship. Thus, if N**1** and N**2** are CPNs under a set of TDSPRC devices D, and N**2** and N**3** are CPNs under this set of TDSPRC devices D, for example, then N**1** and N**3** are also CPNs under the set of TDSPRC devices D as well. As another example: if N**1** and N**2** are CPNs under a set of TDSPRC devices D**1**, and N**2** and N**3** are CPNs under a set of TDSPRC devices D**2**, then all networks N**1**, N**2**, N**3** are CPNs under the set D=D**1** U D**2**.

The present disclosure describes a novel collective virtual network topology. The novel collective virtual network topology utilizes a smaller set of TDSPRC to connect larger numbers of networks, thus creating a collective virtual network (CVN) of CPNs. This means that in the new CVN topology, controlling a small device set can provide the power to modify and manipulate traffic flows of many CPNs. The change of a path and/or creation of a new path for a flow in the CVN can be done at the existing TDSPRC along the optimized path, for example. The flow optimizer can re-write the existing flow headers and\or remove one or more of the existing flow headers at the TDSPRC, thus changing the flow path from one network of the CPN to another network of the CPN. In one exemplary embodiment, the novel system and method can manipulate the existing TDSPRC that transfers the network traffic flow, therefore creating new possibilities for flow path and flow path optimization. Therefore, in the flow optimizer there is no requirement for edge devices at the edges of the optimized path, unlike prior art systems. Furthermore exemplary embodiments of the flow optimizer do not add headers to the flow, unlike prior art systems and method. Unlike prior art methods in which the forwarding information is separated from the original data traffic headers, exemplary embodiments of the flow optimizer do not add forward information headers. An original header is one of the headers associated with the frame at the host that creates the frame—the source host. Headers such as, but not limited to, layer 3 headers (IP header), layer 2 header (Ethernet header), etc. Instead embodiments of the flow optimizer re-write or replace one or more existing original headers and\or removes one or more headers at the existing TDSPRC.

The novel approach of reducing and/or re-writing headers of a flow in order to change the flow path, instead of the common approach of adding headers, reduces the bandwidth of the flow. Decreasing the amount of headers creates many benefits, such as but not limited to: lower costs, smaller BW consumption thus faster communication, improved surfing experience, decrease of potential errors, and so.

The present disclosure does not require the addition of a link management system, because the present disclosure exploits a plurality of existing networks, their protocols and their existing link management system. Unlike prior art systems and methods, which create a new network, thus requiring link management protocols, additional headers, etc., the various embodiments of the flow optimizer is more efficient and cost effective.

In typical systems that are common in the arts, frames that are transmitted to/from a user device are encapsulated with additional layer (header), which defines a certain path. For example, the labeling of GMPLS and MPLS is added to a frame for indicating a certain path. In the various embodiments presented in the disclosure and their equivalents, the modification of the flow can be done in one or more headers in layers 2 to 7 of the frame that is sent from a user device, for example. For example one technique includes re-writing the MAC address destination in the data link layer.

The disclosure presents novel systems and methods for allowing traffic path optimization over CPN under the new collective virtual network topology, using different cost functions. Cost functions such as, but not limited to: short routing paths, low latency, etc. Low costs of broadcast and multi-cast session transmission on multi-networks can be achieved easily, for example.

The novel optimization system and method addresses the traffic path optimization between CPN in the CVN topology. Using application control information, the novel system and method can manipulate the TDSPRC to enable virtualization of sessions in CPN to provide traffic optimization. The session virtualization concept is described in detailed in conjunction with the description of FIG. **8**. The per-session virtualization on the CPN provides a flexible optimization method.

The novel and unobvious approach of the present disclosure includes exploiting an existing TDSPRC to generate an un-trivial and un-obvious connection between networks that do not have predefined communication connections between each other.

The foregoing summary is not intended to summarize each potential embodiment or every aspect of the present disclosure, and other features and advantages of the present disclosure will become apparent upon reading the following detailed description of the embodiments with the accompanying drawings and appended claims.

Furthermore, although specific exemplary embodiments are described in detail to illustrate the inventive concepts to a person skilled in the art, such embodiments can be modified to various modifications and alternative forms. Accordingly, the figures and written description are not intended to limit the scope of the inventive concepts in any manner.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING

Exemplary embodiments of the present invention will be understood and appreciated more fully from the following detailed description, taken in conjunction with the drawings in which:

FIG. **1*a*** is a simplified block diagram illustration of an exemplary prior art topology of a communication network.

FIG. **1*b*** is a simplified block diagram illustration of an exemplary prior art flat Internet topology of communication network.

FIG. **2** is a simplified portion of a network diagram illustration of an exemplary communication networks N **200** in which an exemplary embodiment of the present invention can be used.

FIG. **3** schematically demonstrates different optional Coupled Promiscuity Networks (CPN) over network N of FIG. **2**, according to an exemplary embodiment of the present disclosure.

FIG. **4** is a simplified block diagram illustration of an exemplary embodiment of a collective virtual communication network in which a novel flow path optimizer and creator interfaces to different networks and devices, according to an exemplary embodiment of the present disclosure.

FIG. **5** schematically illustrates an exemplary a finite state machine of a flow path optimizer and creator, according to an exemplary embodiment of the present disclosure.

FIG. **6** is a simplified block diagram with relevant elements of an exemplary flow path optimizer and creator.

FIG. **7** illustrates a flowchart with relevant steps of a network registration process, according to the teaching of the present disclosure.

FIG. **8** is an exemplary flowchart with relevant steps of a new session setup process, according to teaching of the present disclosure.

FIG. **9** is a simplified block diagram illustration of an exemplary embodiment of the present disclosure used to optimize P2P traffic.

FIG. **10** schematically demonstrates the benefits of an exemplary optimal P2P path according to an embodiment of the present disclosure compare to prior art paths.

FIG. **11** illustrates a time diagram of an exemplary process of an embodiment of the present disclosure used to optimize P2P traffic.

FIG. **12** is a simplified block diagram illustration of an exemplary embodiment of the present disclosure used to optimize video over HTTP traffic.

FIG. **13** schematically demonstrates the benefits of an exemplary optimal video over HTTP path according to an embodiment of the present disclosure compare to prior art paths for video over HTTP traffic.

FIG. **14** illustrates a time diagram of an exemplary embodiment of the present disclosure used to optimize a video over HTTP traffic.

## DETAILED DESCRIPTION OF EMBODIMENTS OF THE INVENTION

Turning now to the figures in which like numerals represent like elements throughout the several views, exemplary embodiments of the flow optimizer are described. For convenience, only some elements of the same group may be labeled with numerals. The purpose of the drawings is to describe exemplary embodiments and is not for production purpose. Therefore features shown in the figures were chosen only for convenience and clarity of presentation.

FIGS. **1**A, **1**B, **2** and **3** have been described above and are not addressed any further.

FIG. **4** is a simplified block diagram illustrating an exemplary embodiment of a collective virtual communication network (CVN) **400** in which an exemplary embodiment of a flow path optimizer and creator (FPOC) **410** can be implemented or deployed. The flow path optimizer and creator (FPOC) **410**, as illustrated, can interface with different networks and devices. The flow path optimizer and creator (FPOC) **410** can interact with several possible network entities as shown in FIG. **4**. For instance, the FPOC **410** can interface with the following elements: a TDSPRC such as switch **422** that can handle the traffic of a plurality of users (user A **403** and user B **404** and servers traffic **412**, for example) or other devices with promiscuous/re-write capabilities **423**. In addition, exemplary CVNs **400** can potentially include: switches, Quality-of-Service policies enforcers, router sets and etc (not shown in the drawing). The ability of the FPOC **410** to control and configure devices, such as switch **422**, allows the FPOC **410** to manipulate the traffic. The FPOC **410** can control and configure devices by sending control commands or information in-band and/or out-of-band.

The FPOC **410** can also interface with addressing servers **432** and **434** from some of the CPN, a Dynamic Host Configuration Protocol (DHCP) server or an LDAP server, for example. These servers can provide information that can be useful for managing some of the CPN that can be used in present disclosed processes such as, but not limited to, an optimization process. The FPOC **410** can also interface with one or more monitoring tools and statistic collectors **442**. These interfaces can be used to collect information that can be useful in the present disclosure optimization methods. In

addition, the FPOC **410** can supply these tools with internal information as well. The FPOC **410** can also Interface with one or more Global data bases **454** such as, but not limited to, a DNS (Domain Name Service) or Structured Query Language (SQL) servers. The FPOC **410** can use such databases to receive information on content servers or in the other direction to publish its own application servers, for example.

The FPOC **410** can also interface with one or more application control servers **462**. Exemplary application control servers can be streaming servers and\or Web servers. These servers can help the FPOC **410** with the present disclosure methods of optimizing a session traffic path, for example. The FPOC **410** can also interface with one or more admission control servers **464**. Admission control servers include, but are not limited to, Radius and other AAA (authentication, authorization and accounting). These servers can provide the FPOC **410** admission information on networks, users, servers and etc.

The FPOC **410** can also interface with one or more DPI (Deep Packet Inspection) helper servers **468**. Information from a DPI helper server **468** can be used for, but is not limited to, identifying additional sessions which are candidates for optimization. In some networks, in which a network device such as switch **422** does not have promiscuous or re-writing capabilities, then one or more DPI devices **468** or NAT (Network Address Translation) devices **472** can be associated with this network device in order to construct a TDSPRC. If switch **422** is a Layer 2.5 switch, a DPI device may not be needed, for example.

The FPOC **410** can also interface with one or more NAT devices **472**. Information from these NAT devices **472** can be used in the present disclosure session virtualization process\method in a CPN, by rewriting the flows frames addresses, for example. In addition, server NAT device can provide information on some of the CPNs that can be used in optimization methods.

More information about the integration and the interfaces of exemplary embodiments of the present disclosure is disclosed below in conjunction with two optimization examples in FIG. **9** and FIG. **12**.

Note that some of the above detailed entities can be implemented within the FPOC **410** as well. In addition, the FPOC **410** can interact with any other network entity that can provide information on the networks, the users, or the servers, etc. For example, the FPOC **410** could interact with a Home Location Register (HLR). Yet in an alternate embodiment, the FPOC **410** can be embedded within one of those entities.

FIG. **5** is an exemplary flow diagram illustrating relevant steps of an exemplary finite state machine (FSM) **500** used by an embodiment of an FPOC **410** (FIG. **4**). Initialization **504** of the FSM **500** can be during the power up process of the FPOC **410**, for example. At the initialization state, the FSM **500** can initially configure the TDSPRC to copy or pass relevant frames to the FPOC **410** ports. Exemplary relevant frames can be, but are not limited to, frames related to discovery of new networks, such as initialization of a point-to-point (PPP) session (PPP link establishment phase messages); frames related to a new DHCP session, and so on. After initialization, the FSM **500** can proceed to state **506**.

At state **506**, the FSM **500** waits for messages on a new network discovery. The FSM **500** can stay or loop back **510** into this wait state **506** until such message arrives. Once a new message arrives, the FSM **500** can perform a network registration process **512**. The network registration process **512** is described in detail in conjunction with the description of FIG. **7**.

The FSM **500** can maintain a dynamic database of the discovered CPN. Whenever a new network is discovered, the relevant information is collected using the FPOC control schema at the network registration process (detailed in conjunction with FIG. **7**). At the end of the network registration process **512**, the FSM **500** uses the network information to configure new rules for the relevant TDSPRC, which deals with future new sessions on this network or updates events on this network. These rules may define event triggers to be notified or forwarding rules for this network traffic. Exemplary event triggers can be, but are not limited to, TCP connection establishment (SYN message); RTSP session establishment (SETUP message); and so on.

After the registration **512** of the first discovered network, the FSM **500** waits **516** for an arrival of a new network message. An exemplary new network message may be: a message regarding a new CPN discovery; message regarding a discovery of a new session from a registered network; message regarding an update of a CPN; a message regarding a session from a registered network; etc. If a new CPN is discovered, then the FSM **500** can return to state **512** and perform the network registration process. If a new message regarding a new session on a registered network arrives, the FSM **500** can proceed to the state **530**. At state **530** the FSM **500** can perform a session virtualization process **530**. Session virtualization process **530** is described in detailed in conjunction with the description of FIG. **8**.

Generally, in the session virtualization process **530**, the FPOC **410** can create a session optimization plan using a control schema and verify this plan. Then, the FPOC **410** can configure additional new rules for the relevant TDSPRC, which deals with new flows of this session on this network. If an update message of a CPN arrives, then the FSM **500** can proceed to state **513** where it performs the required update operations **513**. Exemplary required update operations can be: updating the network information in the system, statistics, and etc. If an arrival of update messages regarding an active session from a registered network arrives, then the FSM **500** proceeds to state **535** where the FSM **500** can perform update operations. As an example, the FSM **500** may start to deal with a new flow of an active session. If no new or update network or session arrives, FSM **500** loops **518** at sate **516**.

Exemplary operations of such an FSM implementation are provided in two optimization examples such as the two presented in conjunction with the description of FIG. **10** and FIG. **13** below.

FIG. **6** is a simplified block diagram with relevant elements of a flow path optimizer and creator (FPOC) **600**, according to an exemplary embodiment. The FPOC **600** can comprise three main components: a control interface **630**, a session manager **620**, and a CPN manager **640**. The control interface **630** can be responsible for directing the received event triggers **610** to the proper session managers **620** together with (optionally) data traffic **611**. For example, the FPOC **600** might deal with the data traffic when the data traffic is encapsulated, and the TDSPRCs do not support manipulating of encapsulated data. Note that the FPOC can transfer such encapsulated traffic to another device capable of handling it in wire speed, such as a DPI (deep packet inspection) device or an application specific server or agent, for example.

In case of encapsulated traffic between two network entities A and B, an exemplary FPOC **600** can act as a proxy device, replacing the session between A and B with two sessions by manipulating the existing frame headers of the flow. Thus, the FPOC **600** can create a session between A and the FPOC **600** and one between the FPOC **600** and B. Alternatively, the FPOC **600** can act as a transparent proxy by

replacing the session between A and B with the two sessions one between A and the FPOC **600** and one between the FPOC **600** and B together with the additional condition that one side (for example, A) is not aware of the fact that the proxy exists, and the proxy mimics the behavior of the other side (B). Yet in another embodiment, the FPOC **600** can act as a transparent entity to both sides A and B and manipulate the frames without the awareness of any side. Manipulating frame headers can involve actions such as re-writing the headers, removing headers, etc. Thus, such operations in have the effect of changing the network on which the flow will be carried. More details regarding this aspect are disclosed in conjunction with the description of FIGS. **10** and **13**. In addition, the control interface **630** can send CPN information **632** to the CPN manager block **640**. The control interface **630** can use a translator **638** for translating the forwarding rules of flows and networks **618** according to the TDSPRC syntax, for example.

The external inputs of the control interface **630** can include: (i) All sessions event trigger information **610**; (ii) All sessions required data traffic, for example encapsulated PPPoE (Point-to-Point Protocol over Ethernet) or GPRS Tunneling Protocol (GTP), that the TDSPRC cannot handle **611**; (iii) CPN information **616**; and so on.

The internal input of the control interface **630** can comprise: (i) Modified data traffic **624** that the TDSPRC cannot handle per session; (ii) Flows forwarding rules **625** per session (might need translation according to TDSPRC); (iii) Networks forwarding rules **634**; networks event triggers rules **636** (that might need translation according to the TDSPRC); and so on.

The external output of the control interface **630** can comprise: (i) Modified data traffic **613** that the TDSPRC cannot handle; (ii) Flows forwarding rules **614** to all relevant flows; (iii) Networks forwarding and re-writing rules **618** to all relevant networks; and (iv) Networks event triggers rules **619**; and so on.

The internal outputs of the control interface module **630** can comprise: (i) Event trigger information per session **621**, that is, the control interface divides the triggers to sessions and submit the information to the corresponding session manager; (ii) Data traffic (for example PPPoE, GTP) that the transmitting devices cannot handle per session **622** (Again, the control interface associates the data traffic with its session manager and directs the traffic accordingly); and (iii) CPN information **632** is passed directly to the CPN manager block **640**; etc.

The CPN manager **640** can be responsible for building and dynamically maintaining the estimated networks topology graph for the FPOC **600**. For each new CPN discovered, the CPN manager **640** can update the estimated networks topology graph with the new network and estimates the device sets that transmit its entire traffic to construct the proper connections. The network topology graph can be represented and implemented using any common graph representation such as, but not limited to, vertex matrix.

The CPN manager **640** can initially configure the TDSPRC to receive all messages regarding a new network discovery. Examples of such messages can be: a new Peer-to-Peer network establishment, a first browsing session to a new content site, etc. For each new CPN discovered, the CPN manager **640** can perform a network registration process (described in details in conjunction with the description of FIG. **7**). At the end of this process, the CPN manager **640** can add the network record to a CPN database **650** with the network information. Portions of CPN database **650** can be published to external databases such as but not limited to DNS databases. The information on the CPN can be received from a control interface **632** in addition to information from one or more external entities **662**. External entities **662** can include elements such as, but not limited to: DHCP servers, admission control servers, global databases (DNS, for example), NAT and monitoring and statistic tools. Using the information on the network, the CPN manager **640** can determine the networks event triggers **636** and networks forwarding rules **634**.

The session managers **620** can determine the session forwarding rules to perform the session traffic optimization. The session managers **620** can receive session event triggers **621** from the control interface **630**. Exemplary event triggers for the session can be: an arrival of a new flow of the session, a change in QoS (quality of service) parameter on the session traffic, etc. In case the session traffic is encapsulated and the TDSPRC cannot handle encapsulated traffic, the session manager **620** can modify the data and transfer the modified session data traffic **613** toward the transmitting device via the control interface **630**, for example. The modification of the data traffic is described in more detail in sections below.

The session manager **620** can receive additional control information from application control servers **660**. The additional control information can arrive in a pre-defined, and/or in-band and/or out-of-band manner. Other sources of information regarding the session optimization plan can be in the CPN database **650** and/or the admission servers and NAT servers. Once the information for the session optimization plan is ready, the session manager **620** can create a session virtualization process, and decides exactly what to do with the session flows. When the optimization plan is completed, the session manager **620** can verify the computed and receive conditions of the plan, and in view of this, the session manager **620** can generate the session's flows forwarding rules.

FIG. **7** illustrates a flowchart with relevant steps of an exemplary network registration process **700**, according to various aspects presented in the present disclosure. Method **700** can be executed by the CPN manager **640** (FIG. **6**) when a new network is discovered, for example. Method **700** can be initialized when a new network is discovered **704** according to many possible protocols such as PPPoE, DHCP, PPP, Mobile IP, L2TP, GTP and others), and networks provisioning or pre-defined information.

At **706**, method **700** can update the estimated networks topology graph with the new network and with the estimated connections to the TDSPRC that transmits the entire traffic for the network. Optionally, the new derived topology can be updated to the CPN DB **650** (FIG. **6**).

Next, the method **700** can start **708** a control schema. To provide a flexible optimization plan for each CPN, the control schema supports in-band and out-of-band control channels in addition to the trivial pre-defined control information. At step **708**, the pre-defined control information on the network is fetched (if it exists) from the network record in the CPN database **650** (FIG. **6**). Next, at step **710**, additional in-band control information (if it exists) is fetched from the received information on the network. At step **714** the CPN manager **640** (FIG. **6**) fetches out-of-band control information on the network. Thus, it opens a communication channel to some entities from the network (such as application server, VLAN switch, admission servers, etc.) and receives information regarding the network traffic optimization. At step **716** the CPN manager **640** (FIG. **6**) can update the network record in the CPN database **650** (FIG. **6**) with the control information.

At step **720**, according to the network context, the discovered network can be combined as a member of the collective virtual network to be used in future operation. For example, it can join a specific VLAN or ask for a temporary IP to be used for the virtualization, in this way the FPOC can either join or

create a new broadcast domain and optimize traffic load, for example. An additional example can be joining a multi-cast group which can be useful in reducing streaming traffic load.

Next, method **700** proceeds to step **724** where it updates counters and statistics collectors that might be internal and/or external. Finally, method **700** creates **726** network event triggers and forwarding rules. The CPN manager **640** (FIG. **6**) can execute step **726** by using the network information to provide the relevant event triggers for this network and/or some forwarding rules for this network traffic to be used by the relevant TDSPRC.

To illustrate this flow, consider the example of CPN, described in the third example **330** (Graph C of FIG. **3**). As mentioned before, we assume that in addition to the networks described in FIG. **2**, N **200** includes two more networks: two Peer to Peer (P2P) networks P**1** and P**2**. User A **210** and C **215** belong to P**1** and user B **211** and D **213** belong to P**2**. As previously mentioned, P**1** and P**2** are CPN under the switch S**1** **220**. The FPOC **600** (FIG. **6**) controls the switch S**1** **220** (FIG. **2**), and, given that the new P2P network P**2** that has now been discovered, of the P**2** network registration process is illustrated in the flow **700** (FIG. **7**).

At step **706** of method **700** (FIG. **7**), the CPN manager **640** (FIG. **6**) updates the estimated networks topology graph and the database with the newly discovered P**2** **334** (FIG. **3**) network and with the estimated connections. At step **708** (FIG. **7**), the pre-defined control information on the network is fetched from the network record (if it exists). Because this is an ad-hoc network, no information on this network is provided in advance. At steps **710** and **714** in-band and out-of-band control information are fetched on the network (if it exists). Depending on the P2P protocols, information, such as the networks members, available resources and so on, can be fetched in these steps. In the Peer to Peer Protocol (P2PP), the Join and Leave messages help in understanding the current network members map, together with Peer-Lookup and Update messages regarding the peers routing or neighbor tables. In addition, Replicate and Insert messages can help in understanding the available objects in the network.

This information is saved in the network record in the CPN database **650** (FIG. **6**) at step **716**. Step **724** deals with updating of counters and statistics possible with the numbers of the members or any other relevant statistics. Non-limiting examples of statistic collections can be: average number of simultaneous sessions, total number of discovered CPN, etc. Finally, at step **726**, the CPN manager **640** (FIG. **6**) uses the network information to provide the relevant event triggers for this network.

Exemplary event triggers can include, but are not limited to: a notification upon the joining of a new member, a network member leaving, a resource request, and so on. An exemplary optimization that can be performed by the FPOC **600** (FIG. **6**) regarding the above example can be: user A **210** (FIG. **2**) from P**1** **332** (FIG. **3**) downloading a file from user B **211** (FIG. **2**) on network P**2** **334** (FIG. **3**).

Exemplary ongoing network operations can include: statistic and counters updates, monitoring additional events triggers that required updating of the network record in the CPN database, and so on.

Exemplary network registration processes in two optimization examples are provided with conjunction with the description of FIG. **11** and FIG. **14** below.

FIG. **8** is an exemplary flowchart depicting relevant steps of an exemplary new session setup process **800**. In one embodiment, the method **800** can be executed by the session manager **620** (FIG. **6**). Process **800** can be initiated **802** when a new session is identified according to one or more event triggers occurring or being detected on the network, for example. A session can be identified using the first flow of the session or using additional or alternate information.

At step **806**, process **800** establishes a session optimization plan by outlining the session optimization requirements to create the session optimization plan, for example. At step **806** method **800** can collect information from different resources. Exemplary resources can be: a network record (the proper context to perform the session virtualization); application control (pre-define, in-band or out-of band); statistics collectors; internal or external counters; and information from admission servers, such as QoS information or bandwidth limits. Additional operations in step **806** can include identification of the session flows, and receiving information on each flow if possible.

Next method **800** verifies **808** that the session optimization plan can be implemented. For example, in one embodiment the session verification may operate to verify the requirements of the QoS, existent of VLAN, etc.

At step **812** method **800** can provide the forwarding rules for each of the discovered session flows. These forwarding rules can be transferred to the control interface block **630** (FIG. **6**) to be translated to the proper syntax.

On-going session operations can include statistic and counters updates and monitoring additional events triggers (such as connection, closing, and/or resetting).

To illustrate the data flow of a new session setup process consider the example of a new Real-Time Streaming Protocol (RTSP) session arrival. The new session is identified **802** using configured event triggers such as RTSP SETUP message, for example. Next a session optimization plan is established **806**. AN exemplary session optimization plan can be setting a specific QoS level to the media stream. Using RTSP relay help, the session flows are identified in both the uplink and downlink direction. At step **808**, the optimization requirements are verified **808**. Exemplary optimization requirements can be: statistics such as estimated maximum jitter, averaged bandwidth, etc. According to the information gathered from the RTSP relay, the session manager **620** (FIG. **6**) can provide **812** the forwarding rules for each of the stream media flows.

Exemplary session virtualization processes in two optimization examples are provided in conjunction with the descriptions of FIG. **11** and FIG. **14** below.

CPN traffic optimization example: P2P traffic over a broadband access network

An exemplary traffic optimization done by FPOC **410** (FIG. **4**) can, as an example, include: reducing the traffic load and the files download times in different types of networks, for example in a P2P network.

In common P2P networks, an acceleration of files download will be a valuable improvement for the peers. The downloading experience of the users will improve due to faster response time (faster file download). The traffic load over the broadband infrastructure will also improve because the traffic load over it will be reduced. An exemplary embodiment of flow path optimizer and creator (FPOC) over P2P network is disclosed below in conjunction with FIG. **9**.

FIG. **9** is a simplified network diagram illustrating an exemplary portion of a common P2P network **900** in which an exemplary embodiment of an optimizer can be used. Exemplary P2P network can be a BitTorrent or an eDonkey, etc, over a broadband access network, such as Digital Subscriber Line (DSL) for example. In a common P2P network **900** if a peer "A" **901** wishes to download a file "X" it relies on a tracker "T" **907** to find other peers and to find out what chunks of the file "X" they have. A few chunks of file "X" can be located in peers nearby "A", such as the peer "B" **903** and the

peer "C" **904** for example. More chunks of file "X" can be located on far peers, such as peer "D" **905** for example.

An exemplary FPOC **410** can control a metro switch **924** in a DSL network, for example. Metro switch **924** can handle the traffic arriving from the Digital Subscriber Line Access Multiplexer **920** and/or **921** (DSLAM) in a DSL network, for example. DSLAM **920** can aggregate the traffic received from users "A" **901** (via a DSL modem **910**, for example) and "B" **903**. The metro switch **924** can be the TDSPRC set of the P2P network **900**. For reasons of simplifying the description of the current embodiment, the controlled metro switch **924** can be capable of frames processing and re-writing frame capabilities, that is, the metro switch is the TDSPRC. In an alternate embodiment, a simple metro switch **924** can be supported by an external device having re-writing capacities for processing and re-writing frames, such as, but not limited to, a NAT (CISCO PIX, for example), or SBC (AcmePacket Net-Net 4000, for example) or DPI (Cisco SCE, Allot NetEnforcer, Sandvine PTS 8210, for example). Thus metro switch **924** and the external device can be referred to as TDSPRC and can rewrite at least one of the original headers of the flow, or remove at least one of the headers of the flow, and by doing so change the path through which the flow will be carried.

Users (such as peer "A" **901**, peer "B" **903**, and so on) can be connected to a Broadband Remote Access Server **930** (BRAS) using a Point-to-Point Protocol over Ethernet (PPPoE) in a DSL network, for example. B-RAS **930** can decapsulate the tunneling headers and send pure IP traffic to an Internet Service Providers **940** (ISP). A broadband operator (not shown in the picture) can provide Internet services or connect end user to other ISPs (not shown in the picture).

The FPOC **410** can receive additional information regarding the broadband operator networks from operator information systems **934**, for example. Exemplary operator information systems **934** can be: a configuration management system, a user profile system, a directory and naming system, and so on. Exemplary additional information can be used for defining CPN, TDSPRC and users that can be used in an optimization plan.

Furthermore, the FPOC **410** can communicate with a global database **454** (FIG. **4**). The FPOC **410** can use such databases to receive information on the P2P network or in the other direction to publish its own information to be used by the trackers and peers, for example.

Tracker **907** can serve as an application control server **462** (FIG. **4**). Tracker **907** can help the FPOC **410** with the optimization plan of P2P sessions, for example. In an alternate embodiment of a P2P network in which there is no tracker, one or more peers can act as an application control server **462** with respect to the FPOC **410**. Tracker **907** can also serve as a P2P network admission control server **464** (as shown in FIG. **4**). In an alternate embodiment an external entity or one or more peer nodes can act as an admission control server **464**.

The FPOC **410** can also assist tracker **907** in retrieving additional information on peers from either the broadband operator databases **934** or from the FPOC's **410** databases (both with the proper admission mechanism), for example. This information can be used in the tracker calculations. Calculations such as, but not limited to: calculation of proximity, calculation of available bandwidth, etc.

The FPOC **410** can also perform operations similar to an iTracker in a P4P (Proactive network Provider Participation for P2P, also known as Provider Portal for P2P) technology. Operations such as, but not limited to providing additional information from an ISP network, on the operators networks, for optimizing traffic before the traffic enters an ISP **940** network. Further, to the known operations detailed above, the exemplary FPOC **410** raises the networks capabilities by changing P2P traffic path decisions using the FPOC's virtualization process. The virtualization process enables the utilization of the CPN carried over different OSI layer than the P2P network. This operates to broaden the number of paths to be calculated in the optimization. In this example, a path over OSI layer 2 (the Ethernet network) is used for serving a P2P network, which is an OSI layer 7 network. The benefits from the virtualization process can be: shorter traffic paths, gaining traffic offload in critical points on the broadband operator network, shorter download times as demonstrated in conjunction with FIG. **10**, and so on.

Reference is now made to FIG. **10** which illustrates the advantages of the exemplary embodiment of the P2P network in comparison to two prior art P2P traffic paths: (a) an exemplary classic common P2P path **1000**; (b) an exemplary optimized P4P path **1100**; and (c) an exemplary optimized virtualized path **1200** that is created by an exemplary embodiment of FPOC **410** and presented in comparison to the common techniques illustrated in (a) and (b). As can be seen in FIG. **10** (c) FPOC **410** can reduce the traffic in some of the operator known bottlenecks such as at BRAS **930**, in a DSL network, for example. Also FPOC **410** can shorten the traffic path immensely compared to the P4P traffic **1100** or other prior art optimized P2P traffic between peer "A" **901** and peer "B" **903**. In the prior art P4P **1100**, the traffic might travel all the way to a first Internet router (ISP network **940**) and only from there be routed to Peer B **903**, for example.

In its traffic optimization plan, the FPOC **410** can use information on the user geographic location and the broadband operator network topology. An exemplary embodiment of shorting a traffic path by FPOC **410** is illustrated in **1200** (FIG. **10**). FPOC **410** can configure the controlled TDSPRC (metro switch **924** FIG. **10**) to copy to FPOC **410** a frame related to an initialization of a PPP session (PPP link establishment phase messages, for example) and/or a P2P Connection establishment messages, for example. For the simplicity of this P2P optimization example, we assume that the metro switch is capable of identifying such messages. Nevertheless, the FPOC can be associated with an external device in order to process the frame and collect this information. An exemplary external device can be a DPI server, for example. In this case, the TDSPRC comprises of both the metro switch and a DPI server. Additional exemplary messages can involve information discovery on P2P networks such as offer-files message in eMule protocol, which may help FPOC **410** with future traffic optimization plans.

FPOC **410** can then wait for a new network message. Exemplary new network message can be: when peer "A" **901** (FIG. **10**) establishes a PPP link with BRAS **930** (FIG. **10**) in a DSL network, for example. Because controlled metro switch **924** (FIG. **10**) is a TDSPRC, it passes all the traffic from user (peer) "A" **901** (FIG. **10**), and since the messages fit the previous configuration rules, then these messages can be copied to FPOC **410**. At this state FPOC **410** can perform a new CPN registration process (described below). At the end of the new CPN registration, FPOC **410** can configure additional new rules, which are relevant to new sessions on the discovered network. For example TCP connection establishment (SYN message), etc.

Next FPOC **410** can wait for either additional new network messages and/or new sessions on existing networks. For example, user "B" **903** (FIG. **9**) establishes a PPP link with BRAS **930** (FIG. **9**) in a DSL network, for example. FPOC **410** can discover this new network, and perform registration of this new discovered transitive CPN and re-configure the

controlled metro switch **924** to copy the relevant messages on this network to the FPOC ports as well.

as an example, suppose user (peer) "A" **901** logs in to the P2P network and user "B" **903** logs in to the P2P network. For purposes of simplifying the description, both of user "A" and "B" perform the registrations at the same server peer (not shown in FIG. **10**). The promiscuous controlled metro switch **924** can be configured to copy such messages to FPOC **410** and a new network registration processes can begin again. At the end of these processes FPOC **410** holds information on three CPN: PPP between user "A" **901** and the BRAS **930**, PPP between user "B" **903** and BRAS **930**, and P2P of the server with user "A" **901** and user "B" **903**. In a DSL network, for example.

The CPN between user "A" **901** and BRAS **930** is carried over OSI layer 3 and 4 (network and transport protocols), while the CPN between the user "A" **901**, the user "B" **903**, and the server peer is carried out over OSI layer 7 (application layer). Consequently, FPOC **410** enables three optional paths that the data from A to B can be transferred through in addition to the one trivial P2P path. If a new message, regarding a new session over a registered network, arrives FPOC **410** can perform a session virtualization process. Meaning create an optimized path for the session, one from the additional new CPN. For example a shorter path can be created for the P2P connection as shown in **1200**. The flow is transferred from user A **901** to user B **903** via the DSLAM **920** and the metro switch **924**. Thus reducing the data traffic to and from B-RAS **930** and ISP **940**. The session virtualization process of the P2P optimization example is described in detailed in conjunction with FIG. **11** below.

When user "A" **901** and user "B" **903** are connected to P2P network, messages such as offer-files message might trigger additional state changes in FPOC **410** and additional information on the CPN can be collected during network update process.

An exemplary embodiment of a network registration process is illustrated at this section. Two types of CPN exist in the P2P example detailed above in conjunction with FIG. **9**: (i) a PPP network between a user and the BRAS in a DSL network, for example (PPP between user "A" and the BRAS, PPP between user "B" and the BRAS **930**) and (ii) P2P of the server peer with user "A" and user "B"; additional node in this network is a tracker **907** (FIG. **9**) which can serve as an application control server and an admission control server of this P2P network.

An exemplary PPP network registration process can be performed as follow: The network discovering is performed using the configured forwarding rules of a controlled metro switch **924** (FIG. **9**). An estimated networks topology graph with the new PPP network and with the controlled metro switch **924** as the TDSPRC that transmits data to and from the three new CPN. Since this is a PPP network with a user known to the DSL operator, there might be some pre-defined information on this network, from the DSL operator information systems. Information such as: user package, user geographic location, for example. If not, some out-of-band information on the user might be fetched from the operator systems. After the FPOC **410** databases are updated, some counters and statistics can be updated by FPOC **410** as well, such as number of active users for example. Some event triggers and forwarding rules can be configured to the controlled metro switch **924**, TCP connection establishment (SYN message), for example.

An exemplary P2P network registration process can be performed as follows:

(a) A network discovering process is performed using configured forwarding rules of a controlled metro switch **924**;

(b) An estimated networks topology graph can be updated with a new P2P network and with the controlled metro switch **924** as the TDSPRC that transmits and receives the network traffic—because this is a P2P network, no pre-defined information on this network exists.

(c) Some in-band information on the network can be collected (step **710**, FIG. **7**).

(d) In addition, out-of-band information can be collected from the tracker, for example (step **714**) information on the peer privileges.

(e) Different databases and statistics can be updated and the proper forwarding rules can be set to the controlled metro switch, including P2P relevant messages, for example, as described below in conjunction with FIG. **11**.

The detailed data flow of the P2P traffic optimization is described in FIG. **11**. FIG. **11** illustrates a time-line diagram having five axes that represent components involved in an exemplary session virtualization process **530** (FIG. **5**): Peer 'A', Tracker 'T', FPOC **410**, TDSPRC (metro switch), and Peer 'B'. To simplify the example, it is assumed that the FPOC **410** publishes, at TO, its communication information using, for example, a global data base, such as DNS (Domain Name Service). In addition, we assume that the TDSPRC (metro switch) is configured to identify event triggers such as connection establishment message with the published FPOC **410** addresses. At T**2** the tracker requests a trust relation with the FPOC **410** using some admission mechanism and the response is sent at T**4**. Once the peer "A" looks for information on a specific file "X" and contacts the tracker "T" at T**6**, the tracker "T" generates an information request on the list of peers that hold some of "X" chunks and sends it on T**8** to the FPOC. Assuming that relevant information exists within the FPOC **410** database or within some other databases that the FPOC can contact, the peers information is sent back T**10** to the tracker. This information might include geographic information, relevant network resources information, etc. The tracker then re-calculates T**12** its functions (efficiency and locality, for example) and sends T**14** the proper response to peer "A". This response can include some information regarding the FPOC **410** operation, for example instructions to use known IP addresses. Note that in fact, with respect to the FPOC, any peer node can replace the tracker role.

Peer "A" uses the information and creates a direct connection with, for example, peer "B" at time T**16**, using the FPOC manageable addresses. Once the connection establishment messages arrive at the TDSPRC, the corresponding notification is sent to the FPOC at time T**18**. Then, optionally, additional admission phase is performed with peer "A" at time T**20**, with the response T**22**. These steps might serve for requesting a specific QoS level, for billing issues and etc. The FPOC **410** identifies the traffic using the known addresses as candidates for optimization (according to user "B" destination address in the IP header, for example). This step corresponds to step **802** in FIG. **8**. Two flows are associated with this P2P session: in one direction a flow from user "A" to user "B" and in the other direction a flow from user "B" to user "A". Note that these two flows are ingress flows to the metro switch **924** (FIG. **9**).

The FPOC identifies the above mentioned two flows associate with the P2P session (for example bi-directional TCP connection) and generates the optimization plan for both flows (step **806** in FIG. **8**). The optimization plan consists of routing the traffic between peer "A" and peer "B" using the shortest path between them, for example. To execute its optimization plan, the exemplary FPOC uses its virtualization

process. this means, the FPOC **410** instructs the metro switch **924**, at T**23**, to re-write the flows frames. (The Ethernet frame re-writing details are described in the paragraphs below) and provides the new session forwarding rules (step **812** in FIG. **8**). Then, the metro switch directs the frames according to the new address to the optimized path and the optimization process is done. Consequently the "heavy data traffic" between "A" and user "B" does not have to pass through the B-RAS **930** and ISP **940** (FIG. **9**), instead it directly passes from "A" to "B" through the metro switch **924**. In this example switching the frames between user A and user B are executed by the metro switch according to OSI layer 2 addresses, in contrary to a common transportation between A and B wherein the routing is executed according to IP address information in layer 3.

Consider the flow in the direction from user "A" to user "B" in a DSL network, for example. The frames in this flow can include an Ethernet header with the values of User "A" MAC address as Source Address (SA) and the BRAS MAC address as the Destination Address (DA). In addition, its PPP tunnel refers to a connection between user "A" and the BRAS. Within the encapsulation (PPPoE encapsulation), the IP addresses are User "A" IP (source) and user "B" IP (destination). In the second flow, from user "B" to user "A", the Ethernet header can include values of user "B" MAC address as Source Address (SA) and the BRAS MAC address as the Destination Address (DA). The PPP tunnel in this flow refers to a connection between the user "B" and the BRAS. Within the encapsulation (PPPoE encapsulation), the IP addresses are user "B" IP (source) and user "A" IP (destination).

According to the present disclosure, the frames re-writing in the flow from user "A" to user "B" in a DSL network, for example include replacing the DA in the Ethernet header from the BRAS MAC address to the user "B" MAC address. In addition, the PPP tunneling is replaced from tunneling between the user "A" and the BRAS with the tunneling between the user "B" and the BRAS. The re-writing in the second direction is done vice versa.

CPN traffic optimization example: HTTP video traffic over a broadband access network

Additional exemplary traffic optimization done by FPOC **410** (FIG. **4**) can be: optimizing video traffic arriving from an HTTP server to a broadband user. In a typical broadband connection over a broadband network an acceleration of video files download will be a valuable improvement for the users. The video experience of the users will improve due to faster response (faster file download). The traffic load over the broadband access network will also improve, since the traffic load over certain segments of the connection will be reduced. An exemplary embodiment of an FPOC **410** in an HTTP video traffic is disclosed below in conjunction with FIG. **12**.

FIG. **12** is a simplified block diagram illustration of an exemplary portion of a common HTTP video traffic **1300** in which an exemplary embodiment of the optimizer can be used. Assume that a user "A" **1301** wishes to view a video file "V", located at a web server "S"**1305**. The video file "V" can be an SWF object for example, which can be a part of a web page "P" which can be located on "S". To view the video, the user "A" **1301** can browse to the page "P" using its browser program. Then, usually, the browser program can generate an HTTP request to each of "P" objects. Since "V" is one of these objects, the file "V" can be downloaded too. Afterward, the browser program can activate a video player program to play the video.

Similar to the previous P2P example, an exemplary FPOC **410** can control the nearest metro switch **1325** handling the traffic from the DSLAM **1320** which aggregates the traffic of user "A" **1301** in a DSL network, for example. The promiscuous metro switch **1325** may have re-write capabilities or may be associated with an external device that has re-write capabilities, therefore metro switch **1325** can be referred as a TDSPRC. Metro switch **1325** can be similar to the TDSPRC **422** of FIG. **4**. Recall that in such a DSL network, the user is connected to the BRAS **1330** using PPPoE and the BRAS **1330** can de-capsulate the tunneling headers and send pure IP traffic to an ISP **1340**. When traffic is not optimized, the BRAS **1330** passes the HTTP traffic to the ISP **1340** and the ISP **1340** routes the traffic to the web server "S".



The FPOC **410** can be connected to a global database **454** of FIG. **4**. The FPOC **410** can use such databases to receive information on the content network of the server "S" or in the other direction to publish its own information to be used by the web servers as the application control server **462** (FIG. **4**).

In this example, a web server **1305** is similar to the application control server **462** of FIG. **4**. The web server **1305** can help the FPOC **410** with the optimization plan of the video traffic. The web server **1305** can also serve as the private network admission control server **464** (FIG. **4**). However, the admission control role can be assigned to an external entity too.

Reference is now made to FIG. **13** that illustrates the benefit of the exemplary embodiment of the FPOC **410** in CPN **1500** compared to a common HTTP video traffic **1400** in a DSL network, for example. The FPOC **410** can contribute by directing the traffic to the short path **1500** using the content network **1360** devices compared to the common prior art long path **1400** through the ISP network **1340** and operator BRAS **1330** as described in FIG. **13***a*. As can be seen, operating the FPOC **410** can reduce the traffic in some of the operator known bottlenecks, such as BRAS **1330**. An additional benefit expected from this traffic manipulation is shorter download times.

The FPOC **410** can be implemented as described in FIG. **5**. In this example, we assume that the server "S" **1305** and the FPOC **410** have a trusted relationship which has been established using some authentication mechanism, and the FPOC CPN database (not shown in figure) is pre-defined with the server "S" **1305** private content network information.

In this example, FPOC **410** can configure the controlled metro switch **1325** (in state **504** of FIG. **5**) to copy the following messages to the FPOC **410** ports: Any frame related to the initialization of a PPP session (PPP link establishment phase messages) and any TCP connection establishment (SYN message) request to the specific IP address of server "S" **1305**. Then, the FPOC **410** FSM **500** (FIG. **5**) can move to state **506** and can wait for a new network message. Assume that user "A" **1301** establishes its PPP link with the BRAS **1330**. Because the controlled metro switch **1325** passes all the traffic from user "A" (and having promiscuous capabilities), and the messages fit the previous configuration rules, these messages are copied to the FPOC **410** and the FSM **500** moves to state **512**. At this state, the FPOC can perform its new CPN registration process. This process can be performed as described in method **700**. At the end of this state, the FPOC **410** can configure additional new rules to the controlled metro switch **1325** that are relevant to new sessions on the discovered network. In this example, the new rules can include any TCP connection establishment (SYN message) having the relevant source and destination IP addresses, for example.

Then, the FSM **500** can move to state **516** (of FIG. **5**) and can wait for either additional new network messages or new sessions on existing networks. User "A" **1301** can now browse to page "P" of server "S" **1305**. The user establishes a TCP connection with the server "S". Because the messages fit

the previous configuration rules of the controlled metro switch, the message is copied to the FPOC **410** and the FPOC FSM can move to state **530**. At state **530**, FSM **500** can perform a session virtualization process **530**. An exemplary description of the session virtualization process **530** of the HTTP video optimization example is given in detailed in FIG. **14** below.

In this example two types of CPN exist: (i) a PPP network between a user and the BRAS **1330** and (ii) A private content network **1360**.

The PPP network registration process is described in the P2P optimization example. The private content network **1360** registration process can be performed as follows. One way can be to pre-define the network information in the FPOC database after the proper authentication process. Additional option (not assumed in this example) can be to discover the network using either in-band or out-of-band control information from the application control at the web server (steps **710** and **714**).

The discovery of a private content network **1360** using in-band control information can be performed in this example via HTTP headers such as specific values in the server cookie header, for example. In this case, the private content network discovery can be more complicated. The FPOC **410** can configure the controlled metro switch **1325** to copy all messages in the proper direction (from the BRAS **1330** to the user **1301**) and process the frames to parse this HTTP header. Once the cookie value matches the specified value, the network registration process can start.

The discovery of a private content network using out-of-band control information can be done in the following manner. The FPOC **410** can publish its addresses in global databases such as DNS, for example. The application control server (the web server, in this example) that wishes to contact the FPOC can generate an admission request and after a positive response (similar to the mechanism of FIG. **14** below) the direct control channel between the application control entity and the FPOC can be established using Session Description Protocol (SDP) format, for example. Using the control channel, the application can instruct the FPOC how to discover any relevant network traffic.

In all the cases, in step **706**, the estimated networks topology graph can be updated with the new private content network **1360** (that can be connected to the metro network via a switch **1327**) and with the controlled metro switch **1325** as the TDSPRC. Again, the database and statistics can be updated and the proper forwarding rules can be set to the controlled metro switch, consisting of TCP connection establishment messages only in this example.

The detailed data flow of the HTTP video traffic optimization is described in FIG. **14** below. FIG. **14** illustrates an exemplary session virtualization process **530** (method **800**). To simplify the example, we assume that the FPOC **410** has published its communication information using, for example, a global database, such as DNS at N**0**. The web server 'S' **1305** can establish a trust relation with the FPOC **410** using some admission mechanism at N**2** and N**4**. Then, the private content network **1360** information can be received by the FPOC (using pre-defined information or out-of-band control as described before). As a result, at this point the FPOC CPN database includes the server "S" private content network **1360** information, such as server IP address, server MAC address, metro switch **1325** as TDSPRC, connecting switch **1327**, VLAN ID and etc. In addition, we assume that the TDSPRC (metro switch) is configured to identify event triggers such as connection establishment message with the server "S" IP address, for example.



Once the user "A" **1301** starts to browse to page "P", the user browser can generate request for TCP connection establishment N**6** with the server "S" **1305**. The proper SYN messages can be copied to the FPOC ports (N**7** in FIG. **14**) according to the configuration rules of the controlled metro switch. For simplicity, we assume that all page objects are located in the same domain with the same server IP. Because the server IP matches the information in the internal database, the FPOC can prepare its optimization plan for this session traffic at N**8**.

In step **802** of FIG. **8**, the session flows are identified. Meaning, for each TCP connection between the user "A" **1301** and the server "S" **1305**, two flows are associated with this HTTP session. One flow in the direction from the user "A" to the server "S" and in the other direction a second flow from the server "S" to the user "A". Note that such two flows are both ingress flows with respect to the metro switch.

The FPOC can identify the two flows associate with each TCP connection of the HTTP session and can generate the optimization plan for both flows (step **806** in FIG. **8**). The optimization plan can consist of routing the traffic between the user "A" and the server "S" using the path between them within the private content network **1360**. To execute its optimization plan, the FPOC **410** can use its session virtualization process. This means that the FPOC can instruct the metro switch **1325** (at N**10**) to re-write the flows original frame headers (The frame re-writing details are described in the paragraphs below) and provide the new session forwarding rules (step **812** in FIG. **8**, steps in FIG. **14**). Note that the FPOC can use additional devices to perform the frame re-writing, as mentioned above. Then, at N**12** the metro switch **1325** can direct the frames according to the new address to the optimized path (to server "S" via metro switch **1327**, for example) and the optimization process is done.

Consider the flow in the direction from the user "A" **1301** to the server "S" **1305**. The frames in this flow can include an Ethernet header with the values of user "A" MAC address as Source Address (SA) and the BRAS **1330** MAC address as the Destination Address (DA). In addition, its PPP tunnel can refer to a connection between user "A" and the BRAS. Within the encapsulation, the IP addresses are user "A" IP (source) and server "S" IP (destination). In the second flow, from the server "S" to the user "A", the Ethernet header includes values of the BRAS MAC address as Source Address (SA) and the user "A" MAC address as the Destination Address (DA). The PPP tunnel refers to a connection between user "A" and the BRAS. Within the encapsulation, the IP addresses can be server "S" IP (source) and user "A" IP (destination).

The frames re-writing in the flow from user "A" to server "S" can include replacing the DA in the Ethernet header from the BRAS MAC address to the server "S" MAC address and replacing the SA in the Ethernet header from the user "A" MAC address to the controlled metro switch MAC address. The result of the SA change is that the responding server traffic can reach the controlled metro switch. The PPP tunneling in this direction should be removed. In addition, any information regarding the private content network, such as VLAN tag can be added to the frames. The re-writing in the second direction is done vice versa. That is, the MAC addresses can be replaced to the original address, the tunneling information can be added and the VLAN information can be removed.

Note that in this example, the FPOC deals with one user only. To deal with traffic from many users, the controlled metro switch must use a distribution mechanism (port address translation (PAT), for example), to distinguish between the different flows from the server to the users. For example,

consider the user "A" **1301** and the user "B" **1302** in FIG. **12**. Both of them can download files from the same HTTP server "S" **1305**. Then, according to the above mentioned frame re-write, the frames from the server "S" arrives at the controlled metro switch (the SA MAC address). The controlled metro switch can use PAT to distinguish between the frames associated with user "A" and frames associated with user "B".

Finally, consider a video multi-cast transmission of RTSP of a streaming server. Such traffic can easily be optimized by the FPOC in a similar way to the HTTP video optimization example. However, additional treatment should be added to replace the Internet Group Management Protocol (IGMP) role at the controlled metro switch and to establish the multicast group memberships. The multi-cast traffic stream arrives to the controlled metro switch, and the FPOC can control the transformation of this single traffic stream into multiple uni-cast streams according to the multi-cast group members list. Meaning, the FPOC can hold a group table with all multi-cast group members' details similar to IGMP.

In the description and claims of the present application, each of the verbs, comprise, include, have, and conjugates thereof, are used to indicate that the object or objects of the verb are not necessarily a complete listing of members, components, elements, or parts of the subject or subjects of the verb.

In this application the words module, unit, and block are used interchangeably. Anything designated as a unit or module may be a stand-alone unit or a specialized module. A unit or a module may be modular or have modular aspects allowing it to be easily removed and replaced with another similar unit or module. Each unit or module may be any one of, or any combination of, software, hardware, and/or firmware. Software of a logical module can be embodied on a computer readable medium such as a read/write hard disc, CDROM, Flash memory, ROM, etc. In order to execute a certain task a software program can be loaded to an appropriate processor as needed.

The present invention has been described using detailed descriptions of embodiments thereof that are provided by way of example and are not intended to limit the scope of the invention. The described embodiments comprise different features, not all of which are required in all embodiments of the invention. Some embodiments of the present invention utilize only some of the features or possible combinations of the features. Many other ramification and variations are possible within the teaching of the embodiments comprising different combinations of features noted in the described embodiments.

It will be appreciated by persons skilled in the art that the present invention is not limited by what has been particularly shown and described herein above. Rather the scope of the invention is defined by the claims that follow.

What is claimed is:

**1**. A method for creating a transitive optimized path for a flow, comprising:

maintaining a topology database of collective virtual networks (CVNs) by collecting topology information related to three or more of different Open System Interconnection (OSI) model layers from a plurality of network devices, wherein a CVN connects devices working in networks that belong to different OSI layers;

identifying a new flow establishment to be carried over a first path;

identifying, based at least in part on information from the CVN database, a Transmitting Device Set with Promiscuous and Re-writing Capabilities (TDSPRC) that transfers the new flow;

defining two or more coupled promiscuity networks (CPN) for carrying the new flow, wherein the traffic over the two or more CPNs passes through the TDSPRC and wherein at least one coupled network within a particular CPN differs from at least one other coupled network within any of the two or more CPN in at least one network characteristic;

planning, based at least in part on information from the CVN database, an optimized path, other than the first path, for the new flow; and

directing the new flow through the planned optimized path by utilizing the TDSPRC to rewrite at least one original header of a frame of the new flow.

**2**. The method of claim **1**, wherein the act of rewriting at least one original header of a frame further comprises deleting at least one encapsulation header from the original header of the frame of the new flow.

**3**. The method of claim **1**, wherein the at least one original header of a frame is a Point-to-Point Protocol over Ethernet (PPPoE) tunneling header.

**4**. The method of claim **1**, wherein the at least one original header of a frame of the new flow is an Open System Interconnection layer 2 header.

**5**. The method of claim **1**, wherein the act of directing the new flow further comprises controlling said one or more TDSPRCs to transfer the new flow according to the optimized path.

**6**. The method of claim **1**, wherein the act of directing the new flow comprises sending control commands to the TDSPRC.

**7**. The method of claim **1**, wherein the TDSPRC is associated with a metro switch.

**8**. The method of claim **7**, wherein the metro switch is associated with a frame-processing device.

**9**. The method of claim **8**, wherein the frame-processing device is a deep packet inspection device.

**10**. The method of claim **1**, wherein the act of planning an optimized path further comprises the act of planning an optimized path based on latency criteria.

**11**. The method of claim **1**, wherein the at least one network characteristic is selected from a group consisting of the OSI application layer and the OSI session layer.

**12**. The method of claim **1**, wherein the new flow establishment is of a Peer-to-Peer session.

**13**. The method of claim **12**, further comprising: changing a layer 2 destination frame address from an address of a Broadband Remote Access Server to a layer 2 address of another peer.

**14**. The method of claim **6**, wherein the act of sending control commands to the TDSPRC further comprises sending a rewrite-header command.

**15**. A system that creates an optimized path for a flow, comprising:

a flow-path-optimizer-and-creator;

a plurality of collective virtual networks (CVNs), wherein a CVN connects devices working in networks that belong to different Open System Interconnection (OSI) model layers; and

one or more Transmitting Device Set with Promiscuous and Re-writing Capabilities (TDSPRCs);

wherein the flow-path-optimizer-and-creator is configured to collect topology information related to three or more different OSI layers from a plurality of network devices working in different OSI layers, define two or more coupled promiscuity networks (CPN) from the plurality of CVNs according to the one or more TDSPRCs, plan, based at least in part on the collected topology informa-

tion related to three or more different OSI layers, an optimized path, instead of a trivial path, for a flow, and instruct the one or more TDSPRCs to rewrite at least one of an original header of a frame as a rewritten header of the flow in order to create and transfer the flow through the optimized path instead of the trivial path; and

wherein the traffic over two or more CPNs passes through the one or more TDSPRCs that transfer the flow according to the rewritten header of the flow.

**16**. The system of claim **15**, wherein at least one CVN differs from another CVN by operating at a different OSI layer selected from a group consisting of the OSI application layer and the OSI session layer.

**17**. The system of claim **15**, wherein one of the one or more TDSPRCs is associated with a frame processor.

**18**. The system of claim **15**, wherein the flow-path-optimizer-and-creator is configured to rewrite at least one of an original header of a frame of the flow by deleting at least one encapsulation header of an original frame of the flow.

**19**. The system of claim **15**, wherein the one or more TDSPRC comprises a metro switch.

**20**. The system of claim **15**, wherein the flow is a peer-to-peer flow.

**21**. A flow-path-creator-and-optimizer, comprising:

an interface controller;

one or more session managers;

a coupled promiscuity networks (CPN) manager; and

a database of topology information;

wherein the interface controller is configured to interface between a plurality of network devices and internal units of the flow-path-creator-and-optimizer;

wherein the CPN manager is configured to collect topology information related to three or more different Open System Interconnection (OSI) model layers from a plurality of network devices working in different OSI layers, store the collected topology information in the database of topology information, and dynamically maintain the database of topology information on collective virtual networks (CVNs), wherein a CVN connects network devices working in networks that belong to different layer OSI layers, and one or more Transmitting Device Set with Promiscuous and Re-writing Capabilities (TDSPRC), perform network registration processes, and update the database of topology information; and

wherein the one or more session managers plans, based at least in part on information from the CVN database, a session optimization path, instead of a trivial path, over two or more coupled promiscuity networks (CPN), based on the database of topology information and accordingly creates a session virtualization process by controlling a selected TDSPRC to rewrite at least one header of an original frame of a flow, generates a session's flows forwarding rules and transfers the session's flows forwarding rules to the selected TDSPRC.



**22**. The flow-path-creator-and-optimizer of claim **21**, wherein the interface controller further comprise a translator that translates data received from the plurality of network devices before transferring them to internal units of the flow-path-creator-and-optimizer.

**23**. The flow-path-creator-and-optimizer of claim **22**, wherein the data comprises forwarding rules transmitted toward the selected TDSPRC.

**24**. The flow-path-creator-and-optimizer of claim **23**, wherein the selected TDSPRC is associated with a frame processor device.

**25**. The flow-path-creator-and-optimizer of claim **21**, wherein the flow-path-creator-and-optimizer publishes in a Domain Name Service (DNS) its optimization addresses.

**26**. A method to optimize information delivery between a first node on a first network and a second node on the same or different network, the delivery being made through a networked system in which one or more paths between the first node and the second node are known and, through a Transmitting Device Set with Promiscuous and Re-writing Capabilities (TDSPRC) that receives and retransmits all frames of the first network and the same or different network, and the method comprising:

collecting topology information related to three or more different Open System Interconnection (OSI) model layers from a plurality of network devices working in networks that belong to different OSI layers;

identifying alternate paths, based at least in part on the collected topology information related to three or more different OSI layers, between the first node and the second node;

creating a collective virtual network (CVN) including the known paths and the alternate paths, for a particular flow, identify an optimal path in the CVN instead of a known path between the first node and the second node; and

modifying the data frames of the particular flow to be compatible with a network technology employed by the identified optimal path, wherein the modification is implemented by the TDSPRC and the TDSPRC is not a member in at least one of the networks.

**27**. The method of claim **26**, wherein the act of identifying alternate paths further comprises: receiving a message; identifying a new network associated with the message; and including the new network in the collective virtual network.

**28**. The method of claim **26**, wherein prior to the act of identifying alternate paths, the method comprises detecting an event that triggers the identifying act.

**29**. The method of claim **27**, wherein the new network differs from at least one other network in the collective virtual network at least in one network characteristic.

**30**. The method of claim **29**, wherein the at least one network characteristic is a layer in a similar Open System Interconnection (OSI) model.

* * * * *

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-2296

**Short Case Caption:** Exafer Ltd v. Microsoft Corporatoin

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 10 words/4 figures number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 01/14/2025

Signature: /s/ Ronald M. Daignault

Name: Ronald M. Daignault

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally spaced typeface and includes 13,895 words, excluding the parts of the brief exempted by the Rules.

Dated: January 14, 2025

*/s/ Ronald M. Daignault*
Ronald M. Daignault

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing document using the Court's CM/ECF filing system on January 14, 2025, which will send notifications to all counsel registered to receive electronic notices.

Dated: January 14, 2025

*/s/ Ronald M. Daignault*
Ronald M. Daignault