No. 24-2296

IN THE
# United States Court of Appeals for the Federal Circuit

EXAFER LTD.,
*Plaintiff-Appellant*,

*v.*

MICROSOFT CORPORATION,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Texas
No. 1:20-cv-00131-ADA, Hon. Alan D Albright

## BRIEF OF CISCO SYSTEMS, INC. AND SAP AMERICA, INC. AS AMICI CURIAE IN SUPPORT OF THE PETITION FOR REHEARING EN BANC

Elizabeth R. Moulton
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Farheena Rasheed
Katherine M. Kopp
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-2296

**Short Case Caption** Exafer Ltd v. Microsoft Corporation

**Filing Party/Entity** Cisco Systems, Inc.; SAP America, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/20/2026

Signature: /s/ Farheena Rasheed

Name: Farheena Rasheed

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Cisco Systems, Inc. | | None |
| SAP America, Inc. | | SAP SE |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ v

INTRODUCTION AND STATEMENT OF INTEREST OF *AMICI CURIAE* ........ 1

ARGUMENT ........ 3

I. The Panel's Decision Is Erroneous and Out of Step With Modern Technology. ........ 3

II. The Panel Opinion Deviates from Established Standards on the Use of Unaccused Products in the Damages Analysis. ........ 7

A. This Court has imposed strict limitations on expansion of the damages base. ........ 7

B. The panel deviated from those strict limitations in this case. ........ 10

CONCLUSION ........ 14

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) .......... 8

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
492 F. Supp. 3d 495 (E.D. Va. 2020) .......... 7

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) .......... 8, 9, 12

*Cyntec Co. v. Chilisin Elecs. Corp.*,
84 F.4th 979 (Fed. Cir. 2023) .......... 12

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
927 F.3d 1292 (Fed. Cir. 2019) .......... 12

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .......... 10, 11

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) .......... 11

*Garretson v. Clark*,
111 U.S. 120 (1884) .......... 8

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) .......... 9

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......... 4, 12

*Micro Chem., Inc. v. Lextron, Inc.*,
317 F.3d 1387 (Fed. Cir. 2003) .......... 9

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) .......... 10

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .......................................................4, 12

**Statutes**

35 U.S.C. § 284 ............................................................. 2, 3, 8, 11, 14

**Other Authorities**

*Cisco Secure Firewall Management Center Data Sheet*, Cisco Systems, Inc. (May 30, 2025), https://tinyurl.com/ycyy729u .............................................................5

William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. 255 (2024) .............................................................7

## INTRODUCTION AND STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The panel opinion embraces a sweeping new damages standard. Patentees may now calculate reasonable royalty damages using a damages base of revenues from unaccused, non-infringing products; the only limitation the panel opinion places on this scheme is that the patentee must articulate some “causal connection” between those unaccused, non-infringing revenues and the asserted claims. Although the patents at issue covered only a narrow aspect of communication between virtualized network devices, the panel approved a damages methodology that placed the entire population of Microsoft’s Azure virtual machines—that admittedly do not practice the asserted claims—into the royalty base. The panel did so on the theory that the accused features made it easier to host more virtual machines, and that this downstream effect supplied the “causal connection” needed to justify their inclusion in the damages base.

---

[1] No party’s counsel authored this brief in whole or in part. No party, party’s counsel, or any person other than amicus or its counsel contributed money intended to fund preparing or submitting this brief. Cisco and SAP have moved for leave to file this brief.

That holding cannot be squared with the language of 35 U.S.C. § 284, longstanding precedent from this Court and the Supreme Court, or with the realities of modern technology. If allowed to stand, the panel's decision will reshape patent damages law in ways that will be felt acutely by every company that builds complex, multicomponent or interconnected products. A creative patentee looking to sweep in the broadest or most lucrative damages base can articulate a "causal connection" between virtually any two features in modern networking and communications systems.

A rule that treats interconnection as sufficient to drag unaccused products and revenue streams into the damages base is a rule that has no stopping point. It allows patentees to circumvent this Court's carefully developed law on apportionment and the entire market value rule, and to recover damages that do not bear the necessary relationship to "the use made of the invention by the infringer" required by the Patent Act. 35 U.S.C. § 284.

Cisco Systems, Inc. and SAP America, Inc. are leading technology innovators that invest billions in developing technologies, products, and services that connect people, businesses, data, and operations. They

own and rely on significant patent portfolios and depend on a strong and balanced intellectual property system to protect their inventions and investments in innovation.

Their commercial success and broad technology footprint also make them frequent targets of patent infringement suits, where they routinely confront nine- to ten-figure damages demands that sweep unaccused hardware, software, and services into the royalty base. The panel's decision will turbocharge those demands. Cisco and SAP have a substantial interest in ensuring that patent damages remain tethered to the value of the patented invention as required by § 284.

En banc review is needed to clarify that a mere "causal connection" between a patent claim and unaccused revenue streams is not sufficient to drag those revenues into the damages base. Amici, therefore, submit this brief in support of Microsoft's Petition for Rehearing En Banc.

## ARGUMENT

### I. The Panel's Decision Is Erroneous and Out of Step With Modern Technology.

The panel's "causal connection" standard is untethered from the reality of modern communications and networking technology. In an

industry defined by interconnection, a "causal connection" standard is no standard at all. It permits a patentee to sweep into the royalty base any unaccused product or revenue stream—whether hardware or software—that bears some incidental relationship to an accused feature. That is the very harm this Court's apportionment and entire-market-value jurisprudence was designed to prevent. *See LaserDynamics, Inc. v. Quanta Comput., Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012) (cautioning against damages theories that "carr[y] a considerable risk that the patentee will be improperly compensated for non-infringing components" of the end product) (quotation omitted); *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1320 (Fed. Cir. 2011) (recognizing "the danger of admitting consideration of the entire market value of the accused [product] where the patented component does not create the basis for customer demand").

Cisco's products are illustrative. A single Cisco Unified Computing System (UCS) server easily exceeds more than 100 distinct hardware and software components. These include processors, memory modules, storage controllers, network interface cards, firmware, system software, and management tools, among others. Those components may

themselves reflect numerous separately developed technologies. And a UCS server does not operate in isolation. It is designed to connect with other UCS servers, with Cisco Nexus switches and routers, and with third-party storage, security, virtualization, and orchestration platforms. Each of those systems has its own multi-layered architecture. And Cisco's software products are no less interconnected. Cisco's network security software, for example, comprises multiple separately licensed modules deployed across hardware appliances, virtual appliances, and cloud services. *Cisco Secure Firewall Management Center Data Sheet*, Cisco Systems, Inc. (May 30, 2025), https://tinyurl.com/ycyy729u.

SAP's products present the same concern in the enterprise software context. SAP's cloud, database, analytics, artificial intelligence, and enterprise application offerings likewise integrate numerous software modules, data models, workflows, interfaces, and third-party systems across customer environments. Treating revenue from those broader systems as attributable to a single patented feature would thus pose the same overreach problem for SAP that it does for Cisco.

The cloud and virtualization platforms of the sort at issue in this case are also made up of thousands of independently developed services across vast data center infrastructure. The overwhelming majority have no relationship to any given asserted patent. A patent directed to one narrow aspect of communication between virtualized network devices is a small contributor to the overall value of such a platform.

When applied to these modern, interconnected products, the panel's rule produces absurd results. Virtually every component in a networking or computing ecosystem could be "causally connected" to every other one. A patent that reduces processor load could be said to "cause" freed up computing space for the running of unaccused workflows. A patent on a security subroutine could be said to "cause" sales of any hardware appliance that runs the software, or to "cause" a user to be more willing to engage in certain secure, revenue-generating activities on that network. A patent on a memory management system could be said to "cause" the sale of every gigabyte of memory on a server—even when the patent offers the public nothing by way of improved memory hardware. Under the panel's reasoning, the more interconnected the accused product, the larger the potential damages

award. And larger potential damages means more opportunistic litigation.

That is not a theoretical concern. As amici's own litigation experience confirms, patentees routinely advance damage theories that sweep entire product lines, ancillary hardware, and unrelated software into the royalty base on precisely this sort of attenuated theory, even though the patent infringement allegations generally target only a handful of subfeatures of the accused products. *See, e.g., Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 492 F. Supp. 3d 495, 596 (E.D. Va. 2020) (example of feature-counting in Cisco products), *rev'd on other grounds*, 38 F.4th 1025 (Fed. Cir. 2022). Under the panel's reasoning, that result is not merely defensible but, for the first time, invited.

## II. The Panel Opinion Deviates from Established Standards on the Use of Unaccused Products in the Damages Analysis.

### A. This Court has imposed strict limitations on expansion of the damages base.

Until the panel decision here, Cisco and SAP relied on this Court's jurisprudence that a royalty base must be tied to the footprint of the claimed invention, not to the footprint of the surrounding product. *See* William F. Lee & Mark A. Lemley, *The Broken Balance: How "Built-In*

*Apportionment" and the Failure to Apply* Daubert *Have Distorted Patent Infringement Damages*, 37 Harv. J.L. & Tech. 255, 305 (2024). Consistent with § 284's requirement that damages "compensate for the infringement," courts have long required the patentee to "in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884).

This apportionment requirement has led courts to impose several limitations on a patentee's recovery in order to strike the balance required by § 284. Until this case, the damages base for running royalty damages was generally limited to some portion of the revenue or profits earned off of the accused product. That limitation follows from the principle that "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement," *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015), and from the related rule that a "reliabl[e] apportion[ment]" generally begins with a "royalty base" that is the "smallest salable patent-practicing"—that is, infringing—"unit," *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir.

2015) ("*CSIRO*"). To be sure, a patentee may rely on the accused end product's entire market value as the royalty base if the patentee proves that the patented invention drives demand for that end product. But that exception to the smallest salable patent-practicing unit rule is necessarily "narrow." *Id.*

These limits are workable in practice because the royalty *rate*, unlike the royalty *base*, affords flexibility to account for related sales. For example, under *Georgia-Pacific* factor 6, a patentee may use evidence of "convoyed" or "derivative" sales to support a higher royalty *rate*, so long as those sales are tied to the patented feature's value. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Courts are generally flexible in allowing qualitative and quantitative adjustments to the royalty rate under this factor. For example, this Court affirmed the trial court's ruling that the patentee "could not include sales of non-patented items in the royalty base but could demonstrate that those sales were relevant in determining a reasonable royalty" under *Georgia-Pacific* factor 6. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003).

The hypothetical negotiation inquiry thus allows the parties to consider how the patented feature increases demand for related products or services and to share in that incremental value through the royalty rate, but "[the] issue of royalty base is not to be confused with the relevance of anticipated collateral sales to the determination of a reasonable royalty rate." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 n.9 (Fed. Cir. 1995) (en banc). *See also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-29 (Fed. Cir. 2014) (requiring fact-tethered apportionment and cautioning against overbroad revenue references). It is thus permissible for evidence of sales "causally connected" to the accused product to influence the royalty rate under *Georgia-Pacific* without relaxing the separate, well-policed constraints that keep the royalty base limited to infringing products or revenues.

### B. The panel deviated from those strict limitations in this case.

The panel's decision does precisely what this Court has repeatedly warned against: it treats the very interconnectedness that defines modern technology as permission to expand liability, rather than as the reason apportionment must be applied with particular rigor. The result is damages bases that grow with the complexity of the surrounding

product, rather than remain tethered to the value attributable to the infringing features. The predictable consequence will be inflated damages demands in cases involving accused features that contribute only marginally to the value of the products at issue, with no meaningful *Daubert* check available to the district courts.

The panel reversed the exclusion of a damages methodology that ties the royalty base to an unaccused, non-infringing product through nothing more than a mere "causal connection" between the accused features and sales of those unaccused, non-infringing products. The methodology accepted by the panel here allows Exafer to recover damages that are not specifically tied to the claimed invention and thus go beyond the damages allowed by § 284. In fact, the methodology is agnostic as to whether the product that makes up the royalty base even uses the accused technology at all. Pet. 4-5. That approach sidesteps both § 284's requirement that damages be "for the use made *of the invention*" and this Court's requirement that damages "reflect the value attributable to the *infringing* features of the product, and no more." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018) (emphasis added) (quoting *Ericsson*, 773 F.3d at 1226)). *See* Pet. 13-16.

The panel's approach is also an end run on the entire market value rule. Pet. 3. It allows a patentee to collect damages based on the value of 100% of multi-component product sales, Op. 6-7, without any accounting of whether those sales are driven by the patented feature. The expert's "conce[ssion]" that "'the entire market value rule does not apply in this case,'" Pet. 3 (quoting Appx3023-24), cannot rescue a methodology that does precisely what that rule forbids. *See CSIRO,* 809 F.3d at 1302; *LaserDynamics*, 694 F.3d at 68.

By contrast, this Court has consistently rejected damages methodologies that inflate the royalty base in this way. *See, e.g.*, *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1302 (Fed. Cir. 2019) (a royalty base that is not "suitably limited" may result in "a prejudicial effect on a jury determination"); *Cyntec Co. v. Chilisin Elecs. Corp.*, 84 F.4th 979, 989 (Fed. Cir. 2023) (requiring "differentiat[ion] between what products would or would not incorporate the accused" technology). Inflated royalty bases create the impression that the defendant is making loads of money and the patentee is asking for only a small portion of the pie. *See Uniloc*, 632 F.3d at 1320.

Yet the panel opinion gives patentees a roadmap to do exactly what this Court's damages precedent forbids: select the most expensive, most profitable products—including *unaccused* and *non-infringing* products—as the damages base, with little regard for whether the patented technology actually drives their value. That is what Exafer did here. Because the accused feature generated little revenue, Exafer pivoted to a far more lucrative base (virtual machines) even though its patent claims no improvement to virtual machines at all.

This expansion of the damages base to any product that is causally connected to the patented technology exposes innovators to an enormous range of potential liability, particularly for companies like Cisco and SAP. As explained above, Cisco's and SAP's products often contain multiple components or features and are designed to integrate across complex customer environments. Patentees should not be permitted to capture in their damages base all revenue causally connected to a single infringing feature embedded within such complex, interconnected products and platforms.

The panel's decision is out of line with this Court's jurisprudence and should be reconsidered.

## CONCLUSION

The patent system's promise of fair value for an invention, without allowing a patentee to capture value attributable to technology the patentee did not invent, depends on disciplined, statutorily grounded limits on the damages base. Those limits are most important—not least—when the accused products are complex, multicomponent systems in which the patented feature represents one contribution among thousands. The panel's "causal connection" standard inverts that principle. It offers patentees a roadmap to circumvent apportionment and the entire-market-value rule whenever they can articulate some downstream effect of the accused feature on an unaccused revenue stream. In an industry defined by interconnection, that approach has no limiting principle. Section 284 promises a reasonable royalty for "the use made of the invention by the infringer,"

not for the use made of everything else. Rehearing en banc is needed to preserve that statutory limit.

May 20, 2026

Respectfully submitted,

*/s/ Farheena Rasheed*

Farheena Rasheed
Katherine M. Kopp
ORRICK, HERRINGTON &
SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

Elizabeth R. Moulton
ORRICK, HERRINGTON &
SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. Cir. R. 40(i)(3), because this brief contains 2,590 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Farheena Rasheed*

Farheena Rasheed
*Counsel for Amici Curiae*